# Exhibit D1

US009116786B2

(12) **United States Patent**　　　　(10) **Patent No.:**　　US 9,116,786 B2
Ricci　　　　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Aug. 25, 2015**

(54) **ON BOARD VEHICLE NETWORKING MODULE**

(71) Applicant: **Flextronics AP, LLC**, San Jose, CA (US)

(72) Inventor: **Christopher P. Ricci**, Saratoga, CA (US)

(73) Assignee: **Flextronics AP, LLC**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/828,513**

(22) Filed: **Mar. 14, 2013**

(65) **Prior Publication Data**

US 2013/0204466 A1　　　Aug. 8, 2013

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 13/679,476, filed on Nov. 16, 2012.

(60) Provisional application No. 61/560,509, filed on Nov. 16, 2011, provisional application No. 61/637,164, filed on Apr. 23, 2012, provisional application No. 61/663,335, filed on Jun. 22, 2012, provisional application No. 61/646,747, filed on May 14, 2012, provisional application No. 61/653,275, filed on May 30, 2012, provisional application No. 61/653,264, filed on May 30, 2012, provisional application No. 61/653,563, filed on May 31, 2012, provisional application No. 61/672,483, filed on Jul. 17, 2012, provisional application No. 61/714,016, filed on Oct. 15, 2012, provisional application No. 61/715,699, filed on Oct. 18, 2012.

(51) **Int. Cl.**
*G05D 1/00*　　　(2006.01)
*G06F 17/00*　　　(2006.01)

*G06F 13/14*　　　(2006.01)
*G06F 3/0484*　　　(2013.01)
*G06F 3/0488*　　　(2013.01)
*G06F 11/00*　　　(2006.01)
*H04L 12/64*　　　(2006.01)
*H04L 12/40*　　　(2006.01)

(52) **U.S. Cl.**
CPC .............. *G06F 17/00* (2013.01); *G06F 3/0484* (2013.01); *G06F 3/0488* (2013.01); *G06F 11/00* (2013.01); *G06F 13/14* (2013.01); *H04L 12/6418* (2013.01); *H04L 2012/40215* (2013.01); *H04L 2012/40273* (2013.01)

(58) **Field of Classification Search**
CPC ....... G06F 17/00; G06F 13/14; G06F 3/0484; G06F 11/00; G06F 3/0488; H04L 2012/40215; H04L 2012/40273
USPC .................... 701/2, 29.1, 29.6; 340/438, 439
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,296,840 A　　　3/1994　Gieffers
5,363,306 A *　11/1994　Kuwahara et al. ............ 701/461
(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 13/462,593, filed May 2, 2012, Ricci et al.
(Continued)

*Primary Examiner* — Gertrude Arthur Jeanglaud
(74) *Attorney, Agent, or Firm* — Sheridan Ross P.C.

(57) **ABSTRACT**

The present disclosure describes a microprocessor executable remote control module operable to receive, via a remote node, a command from a vehicle owner to configure and/or alter and/or determine a state of a selected vehicle component and, when the vehicle owner is authenticated successfully by the remote control module, to configure and/or alter and/or determine a state of the selected vehicle component.

**28 Claims, 31 Drawing Sheets**



100

**US 9,116,786 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,508,689 A | | 4/1996 | Rado et al. |
| 5,648,769 A | * | 7/1997 | Sato et al. ..................... 340/988 |
| 5,710,702 A | * | 1/1998 | Hayashi et al. .................. 701/1 |
| 5,794,164 A | | 8/1998 | Beckert et al. |
| 5,838,251 A | * | 11/1998 | Brinkmeyer et al. ........ 340/5.22 |
| 5,890,080 A | | 3/1999 | Coverdill et al. |
| 6,161,071 A | | 12/2000 | Shuman et al. |
| 6,302,438 B1 | | 10/2001 | Stopper, Jr. et al. |
| 6,484,082 B1 | | 11/2002 | Millsap et al. |
| 6,502,022 B1 | | 12/2002 | Chastain et al. |
| 6,678,747 B2 | | 1/2004 | Goossen et al. |
| 6,681,176 B2 | | 1/2004 | Funk et al. |
| 6,690,940 B1 | | 2/2004 | Brown et al. |
| 6,724,920 B1 | | 4/2004 | Berenz et al. |
| 6,782,240 B1 | | 8/2004 | Tabe |
| 7,019,641 B1 | | 3/2006 | Lakshmanan et al. |
| 7,295,921 B2 | | 11/2007 | Spencer et al. |
| 7,343,148 B1 | | 3/2008 | O'Neil |
| 7,474,264 B2 | | 1/2009 | Bolduc et al. |
| 7,493,140 B2 | | 2/2009 | Michmerhuizen et al. |
| 7,506,375 B2 | | 3/2009 | Kanda et al. |
| 7,548,815 B2 | | 6/2009 | Watkins et al. |
| 7,549,041 B2 | | 6/2009 | Wang |
| 7,606,660 B2 | | 10/2009 | Diaz et al. |
| 7,643,913 B2 | | 1/2010 | Taki et al. |
| 7,734,315 B2 | | 6/2010 | Rathus et al. |
| 7,738,462 B2 | | 6/2010 | Hwang |
| RE41,449 E | | 7/2010 | Krahnstoever et al. |
| 7,891,004 B1 | | 2/2011 | Gelvin et al. |
| 7,899,610 B2 | | 3/2011 | McClellan |
| 8,346,432 B2 | | 1/2013 | Van Wiemeersch et al. |
| 8,432,260 B2 | | 4/2013 | Talty et al. |
| 8,527,143 B2 | | 9/2013 | Tan |
| 8,532,574 B2 | | 9/2013 | Kirsch |
| 8,583,292 B2 | | 11/2013 | Preston et al. |
| 8,644,165 B2 | | 2/2014 | Saarimaki et al. |
| 8,683,496 B2 | | 3/2014 | Reeves et al. |
| 8,706,143 B1 | | 4/2014 | Elias |
| 8,725,311 B1 | | 5/2014 | Breed |
| 8,761,673 B2 | | 6/2014 | Sakata |
| 8,774,842 B2 | | 7/2014 | Jones et al. |
| 8,817,761 B2 | | 8/2014 | Gruberman et al. |
| 8,819,180 B2 | | 8/2014 | Reeves et al. |
| 8,819,705 B2 | | 8/2014 | Reeves et al. |
| 8,838,088 B1 | | 9/2014 | Henn et al. |
| 8,868,899 B2 | | 10/2014 | Galicia et al. |
| 8,933,949 B2 | | 1/2015 | Reeves et al. |
| 8,957,905 B2 | | 2/2015 | Reeves et al. |
| 8,963,939 B2 | | 2/2015 | Yusupov et al. |
| 2002/0023010 A1 | | 2/2002 | Rittmaster et al. |
| 2002/0045484 A1 | | 4/2002 | Eck et al. |
| 2002/0105968 A1 | | 8/2002 | Pruzan et al. |
| 2003/0007227 A1 | | 1/2003 | Ogino |
| 2003/0158638 A1 | | 8/2003 | Yakes et al. |
| 2003/0182435 A1 | | 9/2003 | Redlich et al. |
| 2004/0024502 A1 | | 2/2004 | Squires et al. |
| 2004/0251123 A1 | | 12/2004 | Noyama et al. |
| 2004/0257208 A1 | | 12/2004 | Huang et al. |
| 2005/0031100 A1 | | 2/2005 | Iggulden et al. |
| 2005/0042999 A1 | | 2/2005 | Rappaport |
| 2005/0130744 A1 | | 6/2005 | Eck et al. |
| 2005/0149752 A1 | | 7/2005 | Johnson et al. |
| 2005/0153760 A1 | | 7/2005 | Varley |
| 2006/0042846 A1 | | 3/2006 | Kojori et al. |
| 2006/0047386 A1 | | 3/2006 | Kanevsky et al. |
| 2006/0125631 A1 | | 6/2006 | Sharony |
| 2006/0250272 A1 | | 11/2006 | Puamau |
| 2006/0274829 A1 | | 12/2006 | Siemens et al. |
| 2007/0015485 A1 | | 1/2007 | DeBiasio et al. |
| 2007/0057781 A1 | | 3/2007 | Breed |
| 2007/0103328 A1 | | 5/2007 | Lakshmanan et al. |
| 2007/0115101 A1 | | 5/2007 | Creekbaum et al. |
| 2007/0120697 A1 | | 5/2007 | Ayoub et al. |
| 2007/0156317 A1 | | 7/2007 | Breed |
| 2008/0051957 A1 | | 2/2008 | Breed et al. |
| 2008/0090522 A1 | | 4/2008 | Oyama |
| 2008/0129475 A1 | | 6/2008 | Breed et al. |
| 2008/0140278 A1 | | 6/2008 | Breed |
| 2008/0148374 A1 | | 6/2008 | Spaur et al. |
| 2008/0174451 A1 | | 7/2008 | Harrington et al. |
| 2008/0212215 A1 | | 9/2008 | Schofield et al. |
| 2008/0234919 A1 | | 9/2008 | Ritter et al. |
| 2008/0253613 A1 | | 10/2008 | Jones et al. |
| 2008/0305780 A1 | | 12/2008 | Williams et al. |
| 2009/0082951 A1 | | 3/2009 | Graessley |
| 2009/0180668 A1 | | 7/2009 | Jones et al. |
| 2009/0195370 A1 | | 8/2009 | Huffman et al. |
| 2009/0224931 A1 | | 9/2009 | Dietz et al. |
| 2009/0275321 A1 | | 11/2009 | Crowe |
| 2009/0278750 A1 | | 11/2009 | Man et al. |
| 2009/0278806 A1 | | 11/2009 | Duarte et al. |
| 2009/0279839 A1 | | 11/2009 | Nakamura et al. |
| 2010/0042498 A1 | | 2/2010 | Schalk |
| 2010/0090817 A1 | | 4/2010 | Yamaguchi et al. |
| 2010/0097239 A1 | | 4/2010 | Campbell et al. |
| 2010/0144284 A1 | | 6/2010 | Chutorash et al. |
| 2010/0202346 A1 | | 8/2010 | Sitzes et al. |
| 2010/0222939 A1 | | 9/2010 | Namburu et al. |
| 2010/0228404 A1 | | 9/2010 | Link et al. |
| 2010/0235042 A1 | | 9/2010 | Ying |
| 2010/0253493 A1 | | 10/2010 | Szczerba et al. |
| 2010/0295676 A1 | | 11/2010 | Khachaturov et al. |
| 2011/0021213 A1 | | 1/2011 | Carr |
| 2011/0021234 A1 | | 1/2011 | Tibbitts et al. |
| 2011/0035098 A1 | | 2/2011 | Goto et al. |
| 2011/0053506 A1 | | 3/2011 | Lemke et al. |
| 2011/0092159 A1 | | 4/2011 | Park et al. |
| 2011/0105097 A1 | | 5/2011 | Tadayon et al. |
| 2011/0106375 A1 | | 5/2011 | Sundaram et al. |
| 2011/0112969 A1 | | 5/2011 | Zaid et al. |
| 2011/0117933 A1 | | 5/2011 | Andersson |
| 2011/0137520 A1 | | 6/2011 | Rector et al. |
| 2011/0195699 A1 | | 8/2011 | Tadayon et al. |
| 2011/0267204 A1 | | 11/2011 | Chuang et al. |
| 2012/0006610 A1 | | 1/2012 | Wallace et al. |
| 2012/0071097 A1 | | 3/2012 | Matsushita et al. |
| 2012/0081267 A1 | | 4/2012 | Sirpal et al. |
| 2012/0081311 A1 | | 4/2012 | Sirpal et al. |
| 2012/0084542 A1 | | 4/2012 | Reeves et al. |
| 2012/0084735 A1 | | 4/2012 | Sirpal |
| 2012/0084792 A1 | | 4/2012 | Benedek et al. |
| 2012/0089299 A1 | * | 4/2012 | Breed ............................ 701/36 |
| 2012/0109446 A1 | | 5/2012 | Yousefi et al. |
| 2012/0110356 A1 | | 5/2012 | Yousefi et al. |
| 2012/0115446 A1 | | 5/2012 | Gautama et al. |
| 2012/0116609 A1 | * | 5/2012 | Jung et al. .......................... 701/2 |
| 2012/0116678 A1 | | 5/2012 | Witmer |
| 2012/0173900 A1 | | 7/2012 | Diab et al. |
| 2012/0173905 A1 | | 7/2012 | Diab et al. |
| 2012/0238286 A1 | | 9/2012 | Mallavarapu et al. |
| 2012/0242510 A1 | | 9/2012 | Choi et al. |
| 2012/0259951 A1 | | 10/2012 | Schalk et al. |
| 2012/0274459 A1 | | 11/2012 | Jaisimha et al. |
| 2012/0284292 A1 | | 11/2012 | Rechsteiner et al. |
| 2012/0289217 A1 | | 11/2012 | Riemer et al. |
| 2012/0296567 A1 | | 11/2012 | Breed |
| 2012/0313771 A1 | * | 12/2012 | Wittliff, III ................... 340/441 |
| 2013/0035063 A1 | | 2/2013 | Fisk et al. |
| 2013/0099940 A1 | | 4/2013 | Protopapas |
| 2013/0134730 A1 | | 5/2013 | Ricci |
| 2013/0135118 A1 | | 5/2013 | Ricci |
| 2013/0138591 A1 | | 5/2013 | Ricci |
| 2013/0138714 A1 | | 5/2013 | Ricci |
| 2013/0141247 A1 | | 6/2013 | Ricci |
| 2013/0141252 A1 | | 6/2013 | Ricci |
| 2013/0143495 A1 | | 6/2013 | Ricci |
| 2013/0143546 A1 | | 6/2013 | Ricci |
| 2013/0143601 A1 | | 6/2013 | Ricci |
| 2013/0144459 A1 | | 6/2013 | Ricci |
| 2013/0144460 A1 | | 6/2013 | Ricci |
| 2013/0144461 A1 | | 6/2013 | Ricci |
| 2013/0144462 A1 | | 6/2013 | Ricci |
| 2013/0144463 A1 | | 6/2013 | Ricci et al. |
| 2013/0144469 A1 | | 6/2013 | Ricci |

## US 9,116,786 B2
Page 3

(56)        References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2013/0144470 | A1 | 6/2013 | Ricci |
| 2013/0144474 | A1 | 6/2013 | Ricci |
| 2013/0144486 | A1 | 6/2013 | Ricci |
| 2013/0144520 | A1 | 6/2013 | Ricci |
| 2013/0144657 | A1 | 6/2013 | Ricci |
| 2013/0145065 | A1 | 6/2013 | Ricci |
| 2013/0145279 | A1 | 6/2013 | Ricci |
| 2013/0145297 | A1 | 6/2013 | Ricci et al. |
| 2013/0145360 | A1 | 6/2013 | Ricci |
| 2013/0145401 | A1 | 6/2013 | Ricci |
| 2013/0145482 | A1 | 6/2013 | Ricci et al. |
| 2013/0147638 | A1 | 6/2013 | Ricci |
| 2013/0151031 | A1 | 6/2013 | Ricci |
| 2013/0151065 | A1 | 6/2013 | Ricci |
| 2013/0151088 | A1 | 6/2013 | Ricci |
| 2013/0152003 | A1 | 6/2013 | Ricci et al. |
| 2013/0154298 | A1 | 6/2013 | Ricci |
| 2013/0157640 | A1 | 6/2013 | Aycock |
| 2013/0158821 | A1 | 6/2013 | Ricci |
| 2013/0166097 | A1 | 6/2013 | Ricci |
| 2013/0167159 | A1 | 6/2013 | Ricci et al. |
| 2013/0179689 | A1 | 7/2013 | Matsumoto et al. |
| 2013/0190978 | A1 | 7/2013 | Kato et al. |
| 2013/0198737 | A1 | 8/2013 | Ricci |
| 2013/0198802 | A1 | 8/2013 | Ricci |
| 2013/0200991 | A1 | 8/2013 | Ricci et al. |
| 2013/0203400 | A1 | 8/2013 | Ricci |
| 2013/0204484 | A1 | 8/2013 | Ricci |
| 2013/0204493 | A1 | 8/2013 | Ricci et al. |
| 2013/0204943 | A1 | 8/2013 | Ricci |
| 2013/0205026 | A1 | 8/2013 | Ricci |
| 2013/0205412 | A1 | 8/2013 | Ricci |
| 2013/0212659 | A1 | 8/2013 | Maher et al. |
| 2013/0218412 | A1 | 8/2013 | Ricci |
| 2013/0219039 | A1 | 8/2013 | Ricci |
| 2013/0227648 | A1 | 8/2013 | Ricci |
| 2013/0231800 | A1 | 9/2013 | Ricci |
| 2013/0241720 | A1 | 9/2013 | Ricci et al. |
| 2013/0245882 | A1 | 9/2013 | Ricci |
| 2013/0250933 | A1 | 9/2013 | Yousefi et al. |
| 2013/0288606 | A1 | 10/2013 | Kirsch |
| 2013/0295901 | A1 | 11/2013 | Abramson et al. |
| 2013/0309977 | A1 | 11/2013 | Heines et al. |
| 2014/0032014 | A1 | 1/2014 | DeBiasio et al. |
| 2014/0066014 | A1 | 3/2014 | Nicholson et al. |
| 2014/0088798 | A1 | 3/2014 | Himmelstein |
| 2014/0120829 | A1 | 5/2014 | Bhamidipati et al. |
| 2014/0125802 | A1 | 5/2014 | Beckert et al. |
| 2015/0006035 | A1 | 1/2015 | Ricci |
| 2015/0012152 | A1 | 1/2015 | Ricci |

OTHER PUBLICATIONS

U.S. Appl. No. 13/462,596, filed May 2, 2012, Ricci et al.
U.S. Appl. No. 13/829,605, filed Mar. 14, 2013, Ricci.
U.S. Appl. No. 13/830,066, filed Mar. 14, 2013, Ricci et al.
U.S. Appl. No. 13/840,240, filed Mar. 15, 2013, Ricci.
"Cadillac: 2013 XTS Full-Size Luxury Sedan," Cadillac.com, 4 pages, Jun. 2012 internet archive, found at: (web.archive.org/web/20120606185204/http://www.cadillac.com/xts-luxury-sedan.html).
Lee "Cadillac revamps the instrument panel with CUE," CNET Reviews, Oct. 11, 2011, 5 pages, found at: (reviews.cnet.com/8301-12261_7-20118807-10356022/cadillac-revamps-the-instrument-panel-with-cue/).
Marturano "General Motors Takes a CUE from Customers," InContext, Nov. 8, 2011, 3 pages, found at: (incontextdesign.com/blog/general-motors-takes-a-cue-from-customers/).
International Search Report and Written Opinion for International (PCT) Patent Application No. PCT/US12/65510, mailed May 6, 2013 17 pages.
International Search Report and Written Opinion for International (PCT) Patent Application No. PCT/US12/65613, mailed Feb. 15, 2013 9 pages.

Official Action for U.S. Appl. No. 13/679,441, mailed Sep. 5, 2013 6 pages.
Official Action for U.S. Patent Application No. 6583-315, mailed Jul. 9, 2013 10 pages.
"Time-triggered CAN," CIA, © 2001-2013, 4 pages, found at: (www.can-cia.org/index.php?id+166).
Davis et al. "Controller Area Network (CAN) schedulability analysis: Refuted, revisited and revised," Real-Time Systems, Apr. 2007, vol. 35, No. 3, pp. 239-272.
Di Natale "Controller Area Network," Dec. 2009, 54 pages.
Fonseca et al. "Scheduling for a TTCAN network with a stochastic optimization algorithm," Proceedings 8th Internatioanl CAN Conference, Jan. 2002, 7 pages.
Hartwich et al. "CAN Network with Time Triggered Communication," Robert Bosch GmbH Proceedings 7th International CAN Conference, Jul. 2000, 7 pages.
Idstein et al. "Using the Controller Area Network for Communication Between Prostesis Sensors and Control Systems," Proceedings of the 2011 MyoElectric Controls/Powered Prostetics Symposium Fredericton, New Brunswick, Canada, Aug. 14-19, 2011, 4 pages.
Official Action for U.S. Appl. No. 13/679,476, mailed Oct. 11, 2013 13 pages.
"A8: Technology as standard," Screen-shots from Audi.co.uk, 2014 [retrieved on Apr. 16, 2014], 1 page. Retrieved from: www.audi.co.uk/new-cars/a8/a8/technology-as-standard/mmi-touch.html.
"Audi A8 MMI Touch," Audi of America, Jan. 7, 2011, [retrieved on Apr. 16, 2014], 2 pages. Retrieved from: www.youtube.com/watch?v=O2nZ-WHo9IA.
Diaz, "Audi New MMI Touch Input System Makes Perfect Sense," Gizmodo.com, Dec. 1, 2009 [retrieved on Apr. 16, 2014], 12 pages. Retrieved from: http://gizmodo.com/5416342/audi-new-mmi-touch-input-system-makes-perfect-sense.
Purcher "Apple Invents In-Vehicle Holistic ID for "iOS in the Car"," Patently Apple, Dec. 2013, 8 pages [retrieved on Dec. 12, 2013 from: www.patentlyapple.com/patently-apple/2013/12/apple-invents-in-vehicle-holistic-id-for-ios-in-the-car.html].
International Preliminary Report on Patentability for International (PCT) Patent Application No. PCT/US2012/065510, mailed May 30, 2014 14 pages.
International Preliminary Report on Patentability for International (PCT) Patent Application No. PCT/US2012/065613, mailed May 30, 2014 8 pages.
International Search Report and Written Opinion for International (PCT) Patent Application No. PCT/US14/19209, mailed Apr. 25, 2014.
Official Action for U.S. Appl. No. 13/679,857, mailed Jun. 27, 2014 5 pages.
Official Action for U.S. Appl. No. 13/679,875, mailed Apr. 7, 2014 7 pages Restriction Requirement.
Official Action for U.S. Appl. No. 13/679,441, mailed Jan. 16, 2014 6 pages.
Official Action for U.S. Appl. No. 13/679,441, mailed May 9, 2014 6 pages.
Official Action for U.S. Appl. No. 13/679,476, mailed May 20, 2014 19 pages.
Official Action for U.S. Appl. No. 13/829,718, mailed Apr. 10, 2014 7 pages.
Official Action for U.S. Appl. No. 13/830,003, mailed Apr. 15, 2014 9 pages.
Official Action for U.S. Appl. No. 13/678,773, mailed Dec. 30, 2013 9 pages.
Notice of Allowance for U.S. Appl. No. 13/678,773, mailed Apr. 2, 2014 5 pages.
Official Action for U.S. Appl. No. 13/679,887, mailed Jun. 30, 2014 6 pages.
U.S. Appl. No. 14/657,934, filed Mar. 13, 2015, Ricci.
U.S. Appl. No. 14/657,829, filed Mar. 13, 2015, Ricci.
International Search Report and Written Opinion for International (PCT) Patent Application No. PCT/US2014/019983, mailed Aug. 18, 2014 10 pages.
International Search Report and Written Opinion for International (PCT) Patent Application No. PCT/US14/19216, mailed Jul. 25, 2014 8 pages.

**US 9,116,786 B2**

Page 4

(56)         **References Cited**

OTHER PUBLICATIONS

International Search Report and Written Opinion for International (PCT) Patent Application No. PCT/US14/19201, mailed Jul. 29, 2014 11 pages.
Official Action for U.S. Appl. No. 13/679,459, mailed Oct. 28, 2014 17 pages.
Official Action for U.S. Appl. No. 13/679,459, mailed Mar. 17, 2015 30 pages.
Notice of Allowance for U.S. Appl. No. 13/679,857, mailed Dec. 3, 2014 5 pages.
Official Action for U.S. Appl. No. 13/679,878, mailed Sep. 26, 2014 7 pages.
Notice of Allowance for U.S. Appl. No. 13/679,878, mailed Feb. 2, 2015 5 pages.
Official Action for U.S. Appl. No. 13/679,875, mailed Jul. 17, 2014 13 pages.
Official Action for U.S. Appl. No. 13/679,875, mailed Dec. 26, 2014 14 pages.
Official Action for U.S. Appl. No. 13/679,676, mailed Feb 25, 2015 14 pages.
Notice of Allowance for U.S. Appl. No. 13/679,441, mailed Jul. 22, 2014 5 pages.
Notice of Allowance for U.S. Appl. No. 13/679,441, mailed Oct. 29, 2014 5 pages.
Official Action for U.S. Appl. No. 13/679,864, mailed Nov. 3, 2014 9 pages.
Notice of Allowance for U.S. Appl. No. 13/679,864, mailed Mar. 3, 2015 8 pages.
Official Action for U.S. Appl. No. 13/679,476, mailed Jan. 16, 2015 23 pages.
Official Action for U.S. Appl. No. 13/828,651, mailed Jul. 29, 2014 17 pages.
Notice of Allowance for U.S. Appl. No. 13/828,651, mailed Feb. 2, 2015 10 pages.
Official Action for U.S. Appl. No. 13/828,758, mailed Feb. 12, 2015 10 pages.
Official Action for U.S. Appl. No. 13/828,860, mailed Feb. 27, 2015 16 pages.
Official Action for U.S. Appl. No. 13/828,960, mailed Jan. 5, 2015 15 pages.
Notice of Allowance for U.S. Appl. No. 13/829,157, mailed Jul. 25, 2014 14 pages.
Official Action for U.S. Appl. No. 13/829,505, mailed Jul. 23, 2014 7 pages.
Notice of Allowance for U.S. Appl. No. 13/829,505, mailed Nov. 26, 2014 8 pages.
Official Action for U.S. Appl. No. 13/829,718, mailed Jul. 25, 2014 8 pages.
Notice of Allowance for U.S. Appl. No. 13/829,718, mailed Nov. 21, 2014 5 pages.
Official Action for U.S. Appl. No. 13/830,003, mailed Jul. 25, 2014 9 pages.
Notice of Allowance for U.S. Appl. No. 13/830,003, mailed Nov. 21, 2014 7 pages.
Official Action for U.S. Appl. No. 13/830,133, mailed Jul. 10, 2014 9 pages.
Official Action for U.S. Appl. No. 13/830,133, mailed Oct. 29, 2014 31 pages.
Notice of Allowance for U.S. Appl. No. 13/830,133, mailed Mar. 3, 2015 5 pages.
Notice of Allowance for U.S. Appl. No. 13/679,887, mailed Nov. 13, 2014 5 pages.
Official Action for U.S. Appl. No. 13/679,476, mailed Jun. 4, 2015 25 pages.
Notice of Allowance for U.S. Appl. No. 13/828,960, mailed Jun. 5, 2015 10 pages.
Notice of Allowance for U.S. Appl. No. 14/485,467, mailed Apr. 22, 2015 13 pages.
Official Action for U.S. Appl. No. 13/829,605, mailed Jun. 4, 2015 12 pages.
Official Action for U.S. Appl. No. 13/829,799, mailed Jun. 3, 2015 9 pages.

* cited by examiner



Fig. 1

U.S. Patent

Aug. 25, 2015

Sheet 2 of 31

US 9,116,786 B2



*Fig. 2*



*Fig. 3*

U.S. Patent          Aug. 25, 2015          Sheet 4 of 31          US 9,116,786 B2



410 — PERFORM HEALTH CHECK ON CRITICAL SYSTEMS

411 — PASS TEST?

440 — ACTIVATE HAND-OFF PROCEDURE

No

Yes

420 — PERFORM HEALTH CHECK ON NON-CRITICAL SYSTEMS

421 — SCORE ABOVE THRESHOLD?

450 — ACTIVATE HAND-OFF PROCEDURE

No

Yes

430 — CONTINUE USING PROCESSOR AS ACTIVE PROCESSOR

*Fig. 4*          400



**510** EACH PROCESSING MODULE PERFORMS HEALTH CHECK (FIG. 4) AND REPORTS PASS/FAIL RESULTS AND SCORING INFORMATION TO ARBITRATION MODULE 2000

**514** SELECT NEXT PROCESSING MODULE

**518** PASS TEST ON EACH SET OF CRITICAL TASKS, FUNCTIONS, OPERATIONS? — NO

YES

**524** PASS TEST ON EACH SET OF NON-CRITICAL TASKS, FUNCTIONS, OPERATIONS? — NO

**532** IDENTIFY SELECTED PROCESSING MODULE AS UNHEALTHY AND RETURN TO STEP 514 FOR NEXT PROCESSING MODULE

YES

**528** IDENTIFY SELECTED PROCESSING MODULE AS HEALTHY AND RETURN TO STEP 514 FOR NEXT PROCESSING MODULE

**536** IS HEALTHY PROCESSING MODULE AVAILABLE? — NO

**544** IMPLEMENT EMERGENCY MEASURES/ACTIVATE ALARM INDICATING NO AVAILABLE HEALTHY PROCESSOR/REPORT TO USER AND/OR REMOTE NODE

YES

**540** DESIGNATE HEALTHIEST PROCESSING MODULE AS ACTIVE AND NEXT HEALTHIEST PROCESSING MODULE AS STANDBY AND SUPERVISE TRANSFER OF TOKEN IF REQUIRED

500

*Fig. 5*



**Fig. 6**

600



Fig. 7



**FIG. 8**



*FIG. 9*



**FIG. 10**



FIG. 11

U.S. Patent          Aug. 25, 2015          Sheet 12 of 31          US 9,116,786 B2



*FIG. 12*



**FIG. 13**



*FIG. 14*



*FIG. 15*

U.S. Patent

Aug. 25, 2015

Sheet 16 of 31

US 9,116,786 B2



*FIG. 16*



**FIG. 17**

U.S. Patent          Aug. 25, 2015          Sheet 18 of 31          US 9,116,786 B2



RECEIVE SIGNAL FROM LOCAL OR REMOTE NODE          1800

UNPACKETIZE SIGNAL AND ANALYZE PAYLOAD          1804

SELECT INPUT/OUTPUT SYSTEM(S) TO RECEIVE PACKET PAYLOAD          1808

DETERMINE PERTINENT RULE SET(S)          1812

DETERMINE CURRENT INPUT/OUTPUT SYSTEM CONFIGURATION(S)          1816

GENERATE COMMAND INCORPORATING PAYLOAD          1820

FORWARD COMMAND TO SELECTED INPUT/ OUTPUT SYSTEM(S)          1824

FIG. 18



**FIG. 19**



FIG. 20



**FIG. 21**



**FIG. 22A**



**FIG. 22B**



2300

DETECT STIMULUS

IDENTIFY COMPUTATIONAL MODULES    2304

DETERMINE DUPLICATED COMPUTATIONAL MODULES AND HOST PROCESSING PLATFORM    2308

SELECT A COMPUTATIONAL MODULE AND PLATFORM TO EXECUTE EACH DUPLICATED COMPUTATIONAL MODULE    2312

*FIG. 23*

2316    QUERY OCCUPANT TO UPGRADE?    NO

YES

2320    REQUEST HOST PLATFORM TO UPGRADE COMPUTATIONAL MODULE

2328    SELECT NEXT AVAILABLE PLATFORM

2324    IS SELECTED PLATFORM CURENTLY AVAILABLE?    NO

YES

2332    INITIATE EXECUTION OF COMPUTATIONAL MODULE BY SELECTED PLATFORM



**FIG. 24**



**FIG. 25**



**FIG. 26**



**FIG. 27**



**FIG. 28**



**FIG. 29**



**FIG. 30**



*FIG. 31*

US 9,116,786 B2

**1**

## ON BOARD VEHICLE NETWORKING MODULE

### CROSS REFERENCE TO RELATED APPLICATION

The present application is a continuation-in-part of U.S. patent application Ser. No. 13/679,476, filed Nov. 16, 2012, entitled "Vehicle Middleware", which claims the benefits of U.S. Provisional Application Ser. Nos. 61/560,509, filed Nov. 16, 2011; 61/637,164, filed Apr. 23, 2012; and 61/663,335, filed Jun. 22, 2012, all entitled "Complete Vehicle Ecosystem"; 61/646,747, filed on May 14, 2012, entitled "Branding of Electrically Propelled Vehicles Via the Generation of Specific Operating Sounds"; 61/653,275, filed on May 30, 2012, entitled "Vehicle Application Store for Console"; 61/653,264, filed on May 30, 2012, entitled "Control of Device Features Based on Vehicle State"; 61/653,563, filed on May 31, 2012, entitled "Complete Vehicle Ecosystem"; 61/672,483, filed on Jul. 17, 2012, entitled "Vehicle Climate Control"; 61/714,016, filed on Oct. 15, 2012, entitled "Vehicle Middleware"; and 61/715,699, filed Oct. 18, 2012, entitled "Vehicle Middleware"; each of which is incorporated herein by this reference in its entirety.

Cross reference is made to U.S. patent application Ser. No. 13/420,236, filed on Mar. 14, 2012, entitled, "Configurable Vehicle Console"; Ser. No. 13/420,240, filed on Mar. 14, 2012, entitled "Removable, Configurable Vehicle Console"; Ser. No. 13/462,593, filed on May 2, 2012, entitled "Configurable Dash Display"; Ser. No. 13/679,459, filed on Nov. 16, 2012, entitled "Vehicle Comprising Multi-Operating System"; Ser. No. 13/679,234, filed on Nov. 16, 2012, entitled "Gesture Recognition for On-Board Display"; Ser. No. 13/679,412, filed on Nov. 16, 2012, entitled "Vehicle Application Store for Console"; Ser. No. 13/679,857, filed on Nov. 16, 2012, entitled "Sharing Applications/Media Between Car and Phone (Hydroid)"; Ser. No. 13/679,878, filed on Nov. 16, 2012, entitled "In-Cloud Connection for Car Multimedia"; Ser. No. 13/679,875, filed on Nov. 16, 2012, entitled "Music Streaming"; Ser. No. 13/679,676, filed on Nov. 16, 2012, entitled "Control of Device Features Based on Vehicle State"; Ser. No. 13/678,673, filed on Nov. 16, 2012, entitled "Insurance Tracking"; Ser. No. 13/678,691, filed on Nov. 16, 2012, entitled "Law Breaking/Behavior Sensor"; Ser. No. 13/678,699, filed on Nov. 16, 2012, entitled "Etiquette Suggestion"; Ser. No. 13/678,710, filed on Nov. 16, 2012, entitled "Parking Space Finder Based on Parking Meter Data"; Ser. No. 13/678,722, filed on Nov. 16, 2012, entitled "Parking Meter Expired Alert"; Ser. No. 13/678,726, filed on Nov. 16, 2012, entitled "Object Sensing (Pedestrian Avoidance/Accident Avoidance)"; Ser. No. 13/678,735, filed on Nov. 16, 2012, entitled "Proximity Warning Relative to Other Cars"; Ser. No. 13/678,745, filed on Nov. 16, 2012, entitled "Street Side Sensors"; Ser. No. 13/678,753, filed on Nov. 16, 2012, entitled "Car Location"; Ser. No. 13/679,441, filed on Nov. 16, 2012, entitled "Universal Bus in the Car"; Ser. No. 13/679,864, filed on Nov. 16, 2012, entitled "Mobile Hot Spot/Router/Application Share Site or Network"; Ser. No. 13/679,815, filed on Nov. 16, 2012, entitled "Universal Console Chassis for the Car"; Ser. No. 13/679,476, filed on Nov. 16, 2012, entitled "Vehicle Middleware"; Ser. No. 13/679,306, filed on Nov. 16, 2012, entitled "Method and System for Vehicle Data Collection Regarding Traffic"; Ser. No. 13/679,369, filed on Nov. 16, 2012, entitled "Method and System for Vehicle Data Collection"; Ser. No. 13/679,680, filed on Nov. 16, 2012, entitled "Communications Based on Vehicle Diagnostics and Indications"; Ser. No. 13/679,443, filed on Nov.

**2**

16, 2012, entitled "Method and System for Maintaining and Reporting Vehicle Occupant Information"; Ser. No. 13/678,762, filed on Nov. 16, 2012, entitled "Behavioral Tracking and Vehicle Applications"; Ser. No. 13/679,292, filed Nov. 16, 2012, entitled "Branding of Electrically Propelled Vehicles Via the Generation of Specific Operating Output"; Ser. No. 13/679,400, filed Nov. 16, 2012, entitled "Vehicle Climate Control"; Ser. No. 13/840,240, filed on Mar. 15, 2013, entitled "Controller Area Network Bus"; Ser. No. 13/678,773, filed on Nov. 16, 2012, entitled "Location Information Exchange Between Vehicle and Device"; Ser. No. 13/679,887, filed on Nov. 16, 2012, entitled "In Car Communication Between Devices"; Ser. No. 13/679,842, filed on Nov. 16, 2012, entitled "Configurable Hardware Unit for Car Systems"; Ser. No. 13/679,204, filed on Nov. 16, 2012, entitled "Feature Recognition for Configuring a Vehicle Console and Associated Devices"; Ser. No. 13/679,350, filed on Nov. 16, 2012, entitled "Configurable Vehicle Console"; Ser. No. 13/679,358, filed on Nov. 16, 2012, entitled "Configurable Dash Display"; Ser. No. 13/679,363, filed on Nov. 16, 2012, entitled "Configurable Heads-Up Dash Display"; and Ser. No. 13/679,368, filed on Nov. 16, 2012, entitled "Removable, Configurable Vehicle Console". The entire disclosures of the applications listed above are hereby incorporated by reference, in their entirety, for all that they teach and for all purposes.

### FIELD

The disclosure relates generally to vehicle middleware systems and particularly to vehicle middleware systems for drivers and third-parties.

### BACKGROUND

Modern vehicles use a number of communication systems and/or networks. Each of these communication systems and/or networks may have a bus structure that is open or proprietary. Each of these buses may also be specifically designed to work in a vehicle or may be available as a general communication protocol. These communication systems and/or networks connect the various individual components of the vehicles through their respective buses. Examples of proprietary vehicle bus architecture include Controller Area Network (CAN) Bus, Local Interconnect Network (LIN) Bus, and the various Original Equipment manufacturer (OEM) Bus among others. Examples of open and general bus architecture include wired or wireless Ethernet and Low-Voltage Differential Signaling (LVDS) among others.

Taking the CAN bus for example, the CAN bus is a serial network developed primarily for use with automotive applications. CAN bus allows devices and microcontrollers in a vehicle to communicate with each other without a host computer.

The CAN protocol allows various devices and microcontrollers to be connected to a single CAN bus. According to the protocol, communication along the CAN bus is message-based to allow messages and data to be sent from one connected device to another.

To facilitate communication on the CAN bus without the need of a host computer, CAN features an arbitration-free transmission mechanism. A CAN transmission includes an arbitration field (message ID) representing the priority of the message being transmitted. A dominant bit ('0') indicates a higher priority than a recessive bit ('1'). For example, in a hypothetical two-bit ID CAN network, a device sending a '10' ID will have priority over a device sending a '11' ID on

US 9,116,786 B2

**3**

the CAN bus. In this example, both devices have a recessive bit in the first bit; however, the first device has a dominant second bit which could be used to arbitrate against a recessive second bit in the second device. The second device will back-off from transmitting over the bus upon this determination in favor of the second device and will attempt to retransmit a few clock cycles after the first device has finished transmitting. It is recognized that each message ID transmitted must be unique over the CAN bus for this arbitration-free transmission mechanism. According to the CAN specification, standard CAN (version 2.0A) uses 11-bit IDs, and extended CAN (version 2.0B) uses 29-bit IDs.

The CAN specification (ISO 11898) further described two types of CAN buses, the high-speed CAN bus (ISO 11898-2) (such as for engine, suspension, and transmission controllers and safety equipment) and the low-speed CAN bus (ISO 11898-3) (such as for less critical components including non-safety sensors). The high-speed CAN bus is designed to carry data at high speed (up to 1 Mbit/s in some implementation). The low-speed CAN bus is designed to carry data at a lower speed (up to 125 Kbit/s in some implementation) but is more fault tolerant than the high-speed CAN bus. Further, the low-speed CAN bus can serves as a back-up for the high-speed CAN bus in case there is a failure to the high-speed CAN bus.

As usage of the CAN standard evolves, many vehicles and systems implementing CAN are using both a high-speed and a low-speed CAN bus in parallel. The high-speed CAN bus carries information that is vital for vehicle operation or safety and is delivered to various part of the vehicle or system in substantially real time. For example, the high-speed CAN bus would be used in a situation where an airbag deploys. When sensors in the bumper or at the front of the vehicle indicate that the vehicle has been involved in a frontal collision, the sensors can send priority information via the high-speed CAN bus to the airbag deployment unit to deploy the airbag. The low-speed CAN bus would be used for other less critical applications.

A number of extensions have been proposed and used to extend the capabilities of the various bus architectures. For example, On-Board Diagnostics (OBD) adds support for requesting data from vehicle components for diagnostics purposes using Parameter Identifiers (PIDs). While OBD is designed to work with CAN bus, OBD can be implemented to work with other general and/or OEM specific buses. Further, specific vehicle components such as the Engine Control Unit (ECU), Transmission Control Unit (TCU), Anti-lock Braking System (ABS), and generally Body Control Modules (BCMs) can have specific protocol extensions to work with the various bus architectures. Further, extensions to the bus architectures are needed to support carrying information regarding various environmental type issues such as emissions information to comply with various government regulation mandates.

Vehicles, particularly passenger vehicles, are evolving rapidly with emerging safety, entertainment, and communication technologies. Existing vehicle bus protocols, which are largely designed for safety, are generally unsuitable for other non-safety communications, due to low bus bandwidth and transmission speed. There are therefore various needs in the art including improving information flow between vehicle components, leveraging the various communication systems and/or networks in the art to enhance vehicle safety, data security, and/or data processing, and providing remote authorized third party (i.e., peace officers, vehicle manufacturers, vehicle security services, and owners) access to a vehicle's functions and state information while maintaining security against unauthorized parties and components.

**4**

SUMMARY

These and other needs are addressed by the various aspects, embodiments, and/or configurations of the present disclosure. The present disclosure is directed to a vehicle having a variety of networking and other capabilities.

The vehicle, in accordance with this disclosure, can include a microprocessor executable remote control module operable to receive, via a remote node, a command from a vehicle owner to configure and/or alter and/or determine a state of a selected vehicle component and, when the vehicle owner is authenticated successfully by the remote control module, to configure and/or alter and/or determine a state of the selected vehicle component.

A method, in accordance with this disclosure, can include the steps of:

(a) a microprocessor executable remote control module receiving, via a remote node, a command from a vehicle owner to configure and/or alter and/or determine a state of a selected vehicle component, and

(b) the remote control module, when the vehicle owner is authenticated successfully, configuring and/or altering and/or determining a state of the selected vehicle component.

A non-transient, tangible computer readable medium, in accordance with this disclosure, can include microprocessor executable remote control module on board a selected vehicle that, when executed, receives, via a remote node, a command from a vehicle owner to configure and/or alter and/or determine a state of a selected vehicle component and, when the vehicle owner is authenticated successfully, configuring and/or or altering and/or determining a state of the selected vehicle component.

The selected vehicle component can be an on board input/output system, and the configuration and/or alteration can be one or more of moving a graphical object to another location, removing a graphical object from the input/output system, adding a graphical object to the input/output system, adding wall paper to the input/output system, and altering a setting of the input/output system.

The selected vehicle component can be a programmable hard button, and the configuration and/or alteration can be to assign, to the hard button, a different function.

The command can be to download content from the Internet and save the downloaded content in on board memory of the vehicle.

The command can be to change a vehicle performance mode from a first performance configuration to a second performance configuration and/or alter a setting of a vehicle component associated with a power unit and/or drive train of the vehicle.

The command can be to determine a state of the selected vehicle component.

When a vehicle occupant is identified, the remote control module can automatically configure the selected vehicle component as desired by the identified occupant.

The vehicle described in the present disclosure can provide a number of advantages. For example, the vehicle can provide for improved control of data stream management and integration to accommodate the ever-increasing sophistication of each data segment and enable data sharing amongst all segments. It can enable interoperability amongst diverse systems. It can provide an open architecture, thereby obviating existing constraints on design changes due to locked-in technology. It can enable drivers freely and conveniently to integrate his or her digital lifestyle into a vehicle while enabling voice and fingertip activation. It can implement a dynamic software environment and on board vehicle network that does

US 9,116,786 B2

**5**

not need to change over technology generations. Car manufacturers can have the freedom to specify any type of processor, memory or storage technology and to make appropriate changes at any time. The architecture can integrate presentation functions, sensor/control functions and infotainment functions in a highly modular extensible way ensuring that the system design can scale up or down easily and evolve over many model years without battling technological obsolescence. For example, the architecture can allow the vehicle owner and/or manufacturer to upgrade and/or add application engines, upgrade the in-vehicle networking capabilities, upgrade Internet connectivity, upgrade display capabilities, and migrate to high availability capabilities, all without radical changes to the software environment and/or for inter- and intra-model line differentiation. The vehicle can support multiple processing and expansion modules that anchor specific functions to a selected processor. It can support a variety of embedded Electronic Control Unit ("ECU") data sources, such as those provided by LIN, CAN, and FlexRay, and IPv6 connectivity that enables seamless migration to Ethernet-based sensor technology and new bus architectures supported by the AutoStar initiative. It can employ a single data management hub, providing improved vehicle safety in the face of security threats posed by connectivity to the Ethernet. It can enable vehicle manufacturers to manage multiple display subsystems that are unique to the subsystem location in the vehicle and deliver vehicle occupants a personalized experience. The subsystems can include, for example, a console display (providing information and input/output control), a configurable dashboard display, a configurable heads-up display, and passenger display units. Configurable displays allow drivers to add/change gauges for non-vehicle operation information that is displayed on the dashboard and heads-up display to suit user preferences and needs. Direct video can be delivered through display controllers and/or an interactive touch screen, optionally equipped with proximity sensors, all implemented with Ethernet-based intelligent display subsystems. Handheld devices, such as personal digital assistants, cellular phones, and tablet and laptop computers, can interface wirelessly, via one or more tethered networks, with the vehicle's processing module(s) and be integrated into the processing resources available to perform vehicle-related tasks, operations, and functions. Assignment of an IPv6 address or other electronic address on a network to the vehicle can provide an address to locate the vehicle on the Internet (or other network), simplify implementing cyber security, enable applications that support safety and data collection for predictive analytics, enable voice-over-IP calls from the vehicle, and furnish reliable presence information to a presence service or server.

These and other advantages will be apparent from the disclosure.

The phrases "at least one", "one or more", and "and/or" are open-ended expressions that are both conjunctive and disjunctive in operation. For example, each of the expressions "at least one of A, B and C", "at least one of A, B, or C", "one or more of A, B, and C", "one or more of A, B, or C" and "A, B, and/or C" means A alone, B alone, C alone, A and B together, A and C together, B and C together, or A, B and C together.

The term "a" or "an" entity refers to one or more of that entity. As such, the terms "a" (or "an"), "one or more" and "at least one" can be used interchangeably herein. It is also to be noted that the terms "comprising", "including", and "having" can be used interchangeably.

The term "automatic" and variations thereof, as used herein, refers to any process or operation done without mate-

**6**

rial human input when the process or operation is performed. However, a process or operation can be automatic, even though performance of the process or operation uses material or immaterial human input, if the input is received before performance of the process or operation. Human input is deemed to be material if such input influences how the process or operation will be performed. Human input that consents to the performance of the process or operation is not deemed to be "material".

The term "automotive navigation system" is a satellite navigation system designed for use in automobiles. It typically uses a GPS navigation device to acquire position data to locate the user on a road in the unit's map database. Using the road database, the unit can give directions to other locations along roads also in its database. Dead reckoning using distance data from sensors attached to the drivetrain, a gyroscope and an accelerometer can be used for greater reliability, as GPS signal loss and/or multipath can occur due to urban canyons or tunnels.

The term "bus" and variations thereof, as used herein, refers to a subsystem that transfers information and/or data between various components. A bus generally refers to the collection communication hardware interface, interconnects, bus architecture, and/or protocol defining the communication scheme for a communication system and/or communication network. A bus may also be specifically refer to a part of a communication hardware that interfaces the communication hardware with the interconnects that connect to other components of the corresponding communication network. The bus may be for a wired network, such as a physical bus, or wireless network, such as part of an antenna or hardware that couples the communication hardware with the antenna. A bus architecture supports a defined format in which information and/or data is arranged when sent and received through a communication network. A protocol may define the format and rules of communication of a bus architecture.

A "communication channel" refers to an analog and/or digital physical transmission medium such as cable (twisted-pair wire, cable, and fiber-optic cable) and/or other wireline transmission medium, and/or a logical and/or virtual connection over a multiplexed medium, such microwave, satellite, radio, infrared, or other wireless transmission medium. A channel is used to convey an information signal, for example a digital bit stream, from one or several senders (or transmitters) to one or several receivers. A channel has a certain capacity for transmitting information, often measured by its bandwidth in Hz or its data rate in bits per second. Channel performance measures that can be employed in determining a quality or grade of service of a selected channel include spectral bandwidth in Hertz, symbol rate in baud, pulses/s or symbols/s, digital bandwidth bit/s measures (e.g., gross bit rate (signaling rate), net bit rate (information rate), channel capacity, and maximum throughput), channel utilization, link spectral efficiency, signal-to-noise ratio measures (e.g., signal-to-interference ratio, $E_b/N_0$, and carrier-to-interference ratio in decibel), bit-error rate (BER), packet-error rate (PER), latency in seconds, propagation time, transmission time, and delay jitter.

The terms "communication device," "smartphone," and "mobile device," and variations thereof, as used herein, are used interchangeably and include any type of device capable of communicating with one or more of another device and/or across a communications network, via a communications protocol, and the like. Exemplary communication devices may include but are not limited to smartphones, handheld computers, laptops, netbooks, notebook computers, subnotebooks, tablet computers, scanners, portable gaming devices,

US 9,116,786 B2

7

phones, pagers, GPS modules, portable music players, and other Internet-enabled and/or network-connected devices.

A "communication modality" refers to a protocol- or standard defined or specific communication session or interaction, such as Voice-Over-Internet-Protocol ("VoIP), cellular communications (e.g., IS-95, 1G, 2G, 3G, 3.5G, 4G, 4G/IMT-Advanced standards, 3GPP, WIMAX™, GSM, CDMA, CDMA2000, EDGE, 1xEVDO, iDEN, GPRS, HSPDA, TDMA, UMA, UMTS, ITU-R, and 5G), Bluetooth™, text or instant messaging (e.g., AIM, Blauk, eBuddy, Gadu-Gadu, IBM Lotus Sametime, ICQ, iMessage, IMVU, Lync, MXit, Paltalk, Skype, Tencent QQ, Windows Live Messenger™ or MSN Messenger™, Wireclub, Xfire, and Yahoo! Messenger™), email, Twitter (e.g., tweeting), Digital Service Protocol (DSP), and the like.

The term "communication system" or "communication network" and variations thereof, as used herein, refers to a collection of communication components capable of one or more of transmission, relay, interconnect, control, or otherwise manipulate information or data from at least one transmitter to at least one receiver. As such, the communication may include a range of systems supporting point-to-point to broadcasting of the information or data. A communication system may refer to the collection individual communication hardware as well as the interconnects associated with and connecting the individual communication hardware. Communication hardware may refer to dedicated communication hardware or may refer a processor coupled with a communication means (i.e., an antenna) and running software capable of using the communication means to send a signal within the communication system. Interconnect refers some type of wired or wireless communication link that connects various components, such as communication hardware, within a communication system. A communication network may refer to a specific setup of a communication system with the collection of individual communication hardware and interconnects having some definable network topography. A communication network may include wired and/or wireless network having a pre-set to an ad hoc network structure.

The term "computer-readable medium" as used herein refers to any tangible storage and/or transmission medium that participate in providing instructions to a processor for execution. Such a medium may take many forms, including but not limited to, non-volatile media, volatile media, and transmission media. Non-volatile media includes, for example, NVRAM, or magnetic or optical disks. Volatile media includes dynamic memory, such as main memory. Common forms of computer-readable media include, for example, a floppy disk, a flexible disk, hard disk, magnetic tape, or any other magnetic medium, magneto-optical medium, a CD-ROM, any other optical medium, punch cards, paper tape, any other physical medium with patterns of holes, a RAM, a PROM, and EPROM, a FLASH-EPROM, a solid state medium like a memory card, any other memory chip or cartridge, a carrier wave as described hereinafter, or any other medium from which a computer can read. A digital file attachment to e-mail or other self-contained information archive or set of archives is considered a distribution medium equivalent to a tangible storage medium. When the computer-readable media is configured as a database, it is to be understood that the database may be any type of database, such as relational, hierarchical, object-oriented, and/or the like. Accordingly, the disclosure is considered to include a tangible storage medium or distribution medium and prior art-recognized equivalents and successor media, in which the software implementations of the present disclosure are stored.

8

The terms "dash" and "dashboard" and variations thereof, as used herein, are used interchangeably and include any panel and/or area of a vehicle disposed adjacent to an operator, user, and/or passenger. Typical dashboards may include but are not limited to one or more control panel, instrument housing, head unit, indicator, gauge, meter, light, audio equipment, computer, screen, display, HUD unit, and graphical user interface.

The terms "determine", "calculate" and "compute," and variations thereof, as used herein, are used interchangeably and include any type of methodology, process, mathematical operation or technique.

The term "display" refers to a portion of a screen used to display the output of a computer to a user.

The term "displayed image" or "displayed object" refers to an image produced on the display. A typical displayed image is a window or desktop or portion thereof, such as an icon. The displayed image may occupy all or a portion of the display.

The term "electronic address" refers to any contactable address, including a telephone number, instant message handle, e-mail address, Universal Resource Locator ("URL"), Universal Resource Identifier ("URI"), Address of Record ("AOR"), electronic alias in a database, like addresses, and combinations thereof.

The term "means" as used herein shall be given its broadest possible interpretation in accordance with 35 U.S.C., Section 112, Paragraph 6. Accordingly, a claim incorporating the term "means" shall cover all structures, materials, or acts set forth herein, and all of the equivalents thereof. Further, the structures, materials or acts and the equivalents thereof shall include all those described in the summary of the invention, brief description of the drawings, detailed description, abstract, and claims themselves.

The term "module" as used herein refers to any known or later developed hardware, software, firmware, artificial intelligence, fuzzy logic, or combination of hardware and software that is capable of performing the functionality associated with that element. Also, while the disclosure is presented in terms of exemplary embodiments, it should be appreciated that individual aspects of the disclosure can be separately claimed.

The terms "online community", "e-community", or "virtual community" mean a group of people that primarily interact via a computer network, rather than face to face, for social, professional, educational or other purposes. The interaction can use a variety of media formats, including wikis, blogs, chat rooms, Internet forums, instant messaging, email, and other forms of electronic media. Many media formats are used in social software separately or in combination, including text-based chat rooms and forums that use voice, video text or avatars.

The term "presence" is a status indicator that conveys ability and willingness of a potential communication partner—for example a user—to communicate. A user's client provides presence information (presence state) via a network connection to a presence service, which is stored in what constitutes his personal availability record (called a presentity) and can be made available for distribution to other users (called watchers) to convey his availability for communication. Presence information has wide application in many communication services and is one of the innovations driving the popularity of instant messaging or recent implementations of voice over IP clients. A user client may publish a presence state to indicate its current communication status. This published state informs others that wish to contact the user of his availability and willingness to communicate. The most common use of presence today is to display an indicator

US 9,116,786 B2

9

icon on instant messaging clients, typically from a choice of graphic symbols with easy-to-convey meanings, and a list of corresponding text descriptions of each of the states. Even when technically not the same, the "on-hook" or "off-hook" state of called telephone is an analogy, as long as the caller receives a distinctive tone indicating unavailability or availability.

The term "satellite positioning system receiver" refers to a wireless receiver or transceiver to receive and/or send location signals from and/or to a satellite positioning system, such as the Global Positioning System ("GPS") (US), GLONASS (Russia), Galileo positioning system (EU), Compass navigation system (China), and Regional Navigational Satellite System (India).

The term "social network service" is a service provider that builds online communities of people, who share interests and/or activities, or who are interested in exploring the interests and activities of others. Most social network services are web-based and provide a variety of ways for users to interact, such as e-mail and instant messaging services.

The term "social network" refers to a web-based social network.

The term "screen," "touch screen," or "touchscreen" refers to a physical structure that enables the user to interact with the computer by touching areas on the screen and provides information to a user through a display. The touch screen may sense user contact in a number of different ways, such as by a change in an electrical parameter (e.g., resistance or capacitance), acoustic wave variations, infrared radiation proximity detection, light variation detection, and the like. In a resistive touch screen, for example, normally separated conductive and resistive metallic layers in the screen pass an electrical current. When a user touches the screen, the two layers make contact in the contacted location, whereby a change in electrical field is noted and the coordinates of the contacted location calculated. In a capacitive touch screen, a capacitive layer stores electrical charge, which is discharged to the user upon contact with the touch screen, causing a decrease in the charge of the capacitive layer. The decrease is measured, and the contacted location coordinates determined. In a surface acoustic wave touch screen, an acoustic wave is transmitted through the screen, and the acoustic wave is disturbed by user contact. A receiving transducer detects the user contact instance and determines the contacted location coordinates. The touch screen may or may not include a proximity sensor to sense a nearness of object, such as a user digit, to the screen.

The term "vehicle" refers to a device or structure for transporting animate and/or inanimate or tangible objects (e.g., persons and/or things), such as a self-propelled conveyance. The term "vehicle" as used herein includes any conveyance, or model of a conveyance, where the conveyance was originally designed for the purpose of moving one or more tangible objects, such as people, animals, cargo, and the like. The term "vehicle" does not require that a conveyance moves or is capable of movement. Typical vehicles may include but are in no way limited to cars, trucks, motorcycles, busses, automobiles, trains, railed conveyances, boats, ships, marine conveyances, submarine conveyances, aircraft, space craft, flying machines, human-powered conveyances, and the like.

The preceding is a simplified summary of the disclosure to provide an understanding of some aspects of the disclosure. This summary is neither an extensive nor exhaustive overview of the disclosure and its various aspects, embodiments, and/or configurations. It is intended neither to identify key or critical elements of the disclosure nor to delineate the scope of the disclosure but to present selected concepts of the disclosure in a simplified form as an introduction to the more

10

detailed description presented below. As will be appreciated, other aspects, embodiments, and/or configurations of the disclosure are possible utilizing, alone or in combination, one or more of the features set forth above or described in detail below.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts a vehicle configured in accordance with an embodiment;

FIG. 2 is a block diagram of a processing module according to an embodiment;

FIG. 3 depicts a vehicle implementing processing modules configured in according with an embodiment;

FIG. 4 depicts a flow diagram of a health-check method according to an embodiment;

FIG. 5 depicts a flow diagram of a hand-off procedure method according to an embodiment;

FIG. 6 depicts a flow diagram of a system stand-by method according to an embodiment;

FIG. 7 depicts a flow diagram of a processor off-load method according to an embodiment;

FIG. 8 depicts a flow diagram according to an embodiment;

FIG. 9 depicts a flow diagram according to an embodiment;

FIG. 10 depicts a flow diagram according to an embodiment;

FIG. 11 depicts a flow diagram according to an embodiment;

FIG. 12 depicts a flow diagram according to an embodiment;

FIG. 13 depicts a flow diagram according to an embodiment;

FIG. 14 depicts a flow diagram according to an embodiment;

FIG. 15 is a block diagram of a computational system according to an embodiment;

FIG. 16 is a block diagram of an input/output system according to an embodiment;

FIG. 17 depicts a flow diagram according to an embodiment;

FIG. 18 depicts a flow diagram according to an embodiment;

FIG. 19 depicts a flow diagram according to an embodiment;

FIG. 20 is a block diagram of a vehicle computational system according to an embodiment;

FIG. 21 depicts a flow diagram according to an embodiment;

FIGS. 22A-B depict configurations of input/output systems according to an embodiment;

FIG. 23 depicts a flow diagram according to an embodiment;

FIG. 24 depicts a flow diagram according to an embodiment;

FIG. 25 depicts a flow diagram according to an embodiment;

FIG. 26 depicts a flow diagram according to an embodiment;

FIG. 27 depicts a communication system according to an embodiment;

FIG. 28 depicts a flow diagram according to an embodiment;

FIG. 29 depicts a flow diagram according to an embodiment;

US 9,116,786 B2

**11**

FIG. **30** depicts a flow diagram according to an embodiment; and

FIG. **31** depicts a flow diagram according to an embodiment.

DETAILED DESCRIPTION

Overview

The present disclosure describes a vehicle implementing one or more processing modules. These modules are configured to connect and interface with the various buses in the vehicle, where the various buses are connected with the various components of the vehicle to facilitate information transfer among the vehicle components. Each processing module is further modularized with the ability to add and replace other functional modules now or in the future. These functional modules can themselves act as distinct vehicle components. Each processing module may hand-off processing to other modules depending on its health, processing load, or by third-party control. Thus, the plurality of processing modules help to implement a middleware point of control to the vehicle with redundancy in processing and safety and security awareness in their applications.

Exemplary processing modules include one or more of:

(a) an active-active or active-standby duplicated processing module configurations in fully or partially wirelessly networked vehicles;

(b) an arbitration module to handle hand-off conflicts in duplicated processing module configurations;

(c) a health check module which checks critical and non-critical tasks, functions, and operations of each processing module to determine which to designate as the active or primary processing module;

(d) a displayed object movement module to move displayed objects from a source input/output system to a target or destination input/output system;

(e) a media filter which filters and/or processes (e.g., formats, configures, changes a presentation mode of, and/or otherwise causes at least part of the signal to be altered from the signal as received) third party sourced signal, particularly multimedia signals, in a manner consistent with a vehicle universal or occupant-specific whitelist, blacklist, or other user preference, sensed occupant context, and/or a governing federal, state, provincial, and/or local law or regulation;

(f) in a vehicle equipped with an internal wireless network and optionally bus-type network, a network selector which selects a network for signal transmission based on network/node status, signal/noise ratio, type of signal, available and/or unavailable bandwidth, network performance parameter(s) (e.g., availability, packet drop or loss, jitter, latency, buffer capacity, throughput, and the like) quality of service, and/or other parameters and configures the signal for transmission over the selected network;

(g) a diagnostic module handles warning/error signals in a predetermined manner;

(h) a remote control module which receives a request from a remote source or third party to command a vehicle function (which function may be identified by a suitable function-specific code), authenticates the requestor, and if successfully authenticated and if privileged to request the performance of the vehicle function, executes the request notwithstanding a contrary command from the vehicle operator;

(i) a media controller, which receives a media stream from a remote node, identifies which input/output systems are disabled (and/or restricted) due to operator command and/or as a

**12**

result of governing law, and provides the media stream to an input/output system associated with the associated occupant;

(j) an installation supervisor which, for a newly installed software and/or hardware and/or other device (such as an on-board sensor, processing module or component thereof, software application, circuit board, expansion module or component thereof (which expansion module may be hardware, software, or a combination thereof), critical or non-critical device (such as those discussed above with respect to the critical or non-critical system controller(s)), cellular upgrade module (e.g., 2G, 3G, 4G, 5G, LTE, or other cellular standard upgrade or Subscriber Identity Module ("SIM") card, board, or other upgrade module, and the like), determines whether the newly installed component satisfies defined functional and/or source or reuse requirements and/or restrictions for the component, license restrictions, and other criteria, and, if satisfied, creates data structures in the component (if it has a resident memory) and the vehicle memory to bind the component to the current vehicle;

(k) a computational module selector to perform processing load balancing over multiple processing modules;

(l) network security which isolates a component encountering a security breach event and/or isolates the primary processing module from other components in the local network if the former is not possible;

(m) a "cone of silence" capability by the media controller for external computational devices;

(n) an automated caching, potentially by individual input/output systems, by the media controller of media based on various factors;

(o) a presence reporting module considering local laws in determining whether an individual is present (e.g., for unified communications) and, if so, by what communication channel(s) and/or modalities; and

(p) a networking module to enable processing modules of different vehicles to wirelessly connect for to exchange vehicle information.

The Vehicle

FIGS. **1**, **3**, and **15** collectively illustrate a vehicle **100** incorporating various features.

Referring to FIG. **1**, the vehicle **100** includes, among many components common to vehicles, wheels **104**, a power source **108** (such as an engine, motor, or energy storage system (e.g., battery or capacitive energy storage system)), a manual or automatic transmission **112**, a manual or automatic transmission gear controller **116**, a power controller **120** (such as a throttle), a braking system **136**, a steering wheel **140**, a display panel **144** (e.g., a dashboard displaying information regarding components in vehicle **100**), and an occupant seating system **148**.

Other components in vehicle **100** include communication components such as a wireless signal receiver **152** to receive wireless signals from signal sources such as roadside beacons and other electronic roadside devices, and a satellite positioning system receiver **156** (e.g., a Global Positioning System ("GPS") (US), GLONASS (Russia), Galileo positioning system (EU), Compass navigation system (China), and Regional Navigational Satellite System (India) receiver).

The vehicle **100** also includes a number of control units and sensors for the various components of vehicle **100**. Exemplary control units and sensors therefore include wheel state sensor **160** to sense one or more of vehicle speed, acceleration, deceleration, wheel rotation, wheel speed (e.g., wheel revolutions-per-minute), wheel slip, and the like. Power source controller and energy output sensor **164** controls the power source and to senses a power output of the power source **108**. Example aspects of power source controller and

US 9,116,786 B2

**13**

energy output sensor **165** include balancing the mixture of fuel (e.g. gasoline, natural gas, or other sources of fuel) and other elements (e.g. air for combustion) and measuring one or more of current engine speed (e.g., revolutions-per-minute), energy input and/or output (e.g., voltage, current, fuel consumption, and torque), and the like. Switch state control unit **168** activates or deactivates the power source (e.g. the ignition). Transmission control unit ("TCU") **170** sets the current state the transmission (e.g., gear selection or setting) based on the state of gear controller **116**. Power control unit **174** sets the throttle for power source **108** given the state of power controller **120**. Brake control unit **176** operates the current state (braking or non-braking) of braking system **136** based on the state of the brake controller (which could be linked to power controller **120**).

Vehicle **100** also includes other control units and sensors for safety purposes. An airbag deployment system includes an airbag deployment control unit **133** and a collision sensor **132**. When a collision is detected by collision sensor **132**, data is sent to airbag release control unit **133** which determines whether to deploy the airbag based on the data received (e.g., the speed of the collision and the area of impact to determine whether an airbag deployment can promote safety). Other safety components include seat belt control unit and sensors for setting the seat belt (e.g. engaging or disengaging the seat belt during hard breaking), head light control unit and sensors for headlight **128** and other lights (e.g. emergency light, brake light, parking light, fog light, interior or passenger compartment light, and/or tail light state (on or off)), door settings (locking and unlocking), window settings (opening or closing), one or cameras or other imaging sensors (which commonly convert an optical image into an electronic signal but may include other devices for detection objects such as an electromagnetic radiation emitter/receiver that emits electromagnetic radiation and receives electromagnetic waves reflected by the object) to sense objects, such as other vehicles and pedestrians and optionally determine the distance, trajectory and speed of such objects, in the vicinity or path of the vehicle, and other components and sensors as known in the art.

Vehicle **100** further includes components for the convenience and enjoyment of the occupants or operators. Seating system controller and sensor **178** sets the position and other settings of a seat and measure various attributes of an occupant of the seat (e.g., the current weight of seated occupant) in a selected seat of the seating system **148**. Entertainment system **190**, preferably located in the head unit of the passenger compartment, provides entertainment options such as music or video for occupants of vehicle **100**.

Examples of other vehicle components include one or more cameras or other imaging sensors (which commonly convert an optical image into an electronic signal but may include other devices for detection objects such as an electromagnetic radiation emitter/receiver that emits electromagnetic radiation and receives electromagnetic waves reflected by the object) to sense objects, such as other vehicles and pedestrians and optionally determine the distance, trajectory and speed of such objects, in the vicinity or path of the vehicle, odometer reading sensor, trip mileage reading sensor, wind speed sensor, radar transmitter/receiver output, brake wear sensor, steering/torque sensor, oxygen sensor, ambient lighting sensor, vision system sensor, ranging sensor, parking sensor, heating, venting, and air conditioning (HVAC) sensor, water sensor, air-fuel ratio meter, blind spot monitor, hall effect sensor, microphone, radio frequency (RF) sensor, infrared (IR) sensor, vehicle control system sensors,

**14**

wireless network sensor (e.g., Wi-Fi and/or Bluetooth sensor), cellular data sensor, and other sensors known to those of skill in the vehicle art.

Vehicle **100** includes one or more vehicle buses **180** for connecting the various components and systems of vehicle **100** as described above. In modern vehicles, subsystems such as an anti-lock braking system (ABS), which may be used by brake control unit **176** and braking system **136**, engine control unit (ECU), which may be used by power source control unit **164**, transmission control unit (TCU), which may be used by transmission control unit **170** and gear controller **116**, and supplemental restraint system (SRS), such as airbag deployment control unit **133** and collision sensor **132** and seating system controller and sensor **178**, are frequently interconnected using a standardized bus. Standardized buses for use in vehicles include Controller Area Network (CAN), and Local Interconnect Network (LIN) and others, as are known in the art. In particular, these components and subsystems may use the high-speed CAN bus for real-time information. Other components with lower priorities may use the low-speed CAN bus to transmit information. Vehicle bus **180** (which is optional) is illustrated as one bus in FIG. **1**. However, vehicle **100** may include one or more of these standardized buses, such as a combination of the high-speed and low-speed CAN, LIN, and/or other buses. Also, vehicle bus **180** may further include and support extensions to standardized buses, such as the FlexCAN extension to the CAN bus. Further, vehicle bus **180** may include standardized communication networks that can be implemented vehicle **100**. Well known networks include Ethernet, Wi-Fi, USB, I²C, RS232, RS485 and FireWire.

Vehicle **100** also includes processing module **124**. Preferably, processing module **124** is placed in the trunk, hood (not shown), behind the head unit (not shown), and/or other accessible but unseen locations. Processing module **124** is coupled to vehicle bus **180** and provides processing for data related to vehicle bus **180** and other vehicle components.

Processing modules, for example, can perform, monitor, and/or control critical and non-critical tasks, functions, and operations, such as interaction with and/or monitoring and/or control of critical and non-critical on board sensors and vehicle operations (e.g., engine, transmission, throttle, brake power assist/brake lock-up, electronic suspension, traction and stability control, parallel parking assistance, occupant protection systems, power steering assistance, self-diagnostics, event data recorders, steer-by-wire and/or brake-by-wire operations, vehicle-to-vehicle interactions, vehicle-to-infrastructure interactions, partial and/or full automation, telematics, navigation/SPS, multimedia systems, audio systems, rear seat entertainment systems, game consoles, tuners (SDR), heads-up display, night vision, lane departure warning, adaptive cruise control, adaptive headlights, collision warning, blind spot sensors, park/reverse assistance, tire pressure monitoring, traffic signal recognition, vehicle tracking (e.g., LoJack™), dashboard/instrument cluster, lights, seats, climate control, voice recognition, remote keyless entry, security alarm systems, and wiper/window control). Processing modules can be enclosed in an advanced EMI-shielded enclosure containing multiple expansion modules. Processing modules can have a "black box" or flight data recorder technology, containing an event (or driving history) recorder (containing operational information collected from vehicle on board sensors and provided by nearby or roadside signal transmitters), a crash survivable memory unit, an integrated controller and circuitry board, and network interfaces. Processing module **124** is further disclosed with reference to FIG. **2**.

15

As set forth below and as shown in FIG. **3**, multiple processing modules **124***a-c* may be located at various locations in a common vehicle. The disparate, spaced apart locations of the processing modules **124***a-c* provide redundancy in the event of a collision or other catastrophic event. For example, a collision with the rear of the vehicle **100** may damage the processing module **124***c* but not the processing modules **124***a,b.*

As will be appreciated, the multiple processing modules **124***a-c* may be configured to operate in an active/active and/ or active/standby mode. These operating modes describe the manner in which first and second (redundant) devices operate under normal conditions. In active/standby implementations, only the primary device in a pair processes information and issues commands. The standby device sits idle, ready to assume the active role should the primary device fail. The standby device may receive, from the primary device, processing, command, and primary device state information to facilitate stateful failover, but it does not itself commonly perform meaningful work until the primary device fails. In active/active implementations, both devices are online and collaboratively process information and issue commands under normal conditions. When one device fails, all processing is handled by the remaining device.

A user can be an occupant of a vehicle **100** that implements the system of FIG. **1**. A user can further be an assembler, technician, or mechanic working on the vehicle to configure the system of FIG. **1** for use by an end-user of the vehicle.

FIG. **2** illustrates an exemplary block diagram for a primary and/or secondary) processing module **124***a-c.*

Processing module **124** may include processor **210**, memory **220**, storage **230**, and interfaces for one or more buses **240-270**. Among the interfaces **240-270** include high-speed CAN bus **240**, low-speed CAN bus **250**, LIN bus **260**, network interface **270**, and/or wireless interface **280**. One skilled in the art will recognize that processing module **124** may take other configurations and with other buses as known in the art, and interfaces **240-290** may be implemented with more or fewer buses than those shown.

The operations of processing module **124** will now be described with respect to the high-speed CAN bus interface **240** and low-speed CAN bus interface **250** as an exemplary configuration in one embodiment of the invention. In one implementation, processing module **124** receives data transmitted over vehicle bus **180** through high-speed CAN bus interface **240** and/or low-speed CAN bus interface **250**. Data transmitted over the high-speed CAN bus includes priority data from subsystems such as anti-lock braking system (ABS), which may be used by brake control unit **176** and braking system **136**, engine control unit (ECU), which may be used by power source control **164**, transmission control unit (TCU), which may be used by transmission control unit **170** and gear controller **116**, and supplemental restraint system (SRS), such as airbag deployment control unit **133** and collision sensor **132** and seating system controller and sensor **178**, as described above. Data transmitted over the low-speed CAN bus includes other noncritical data, such as engine temperature and oil pressure sensor readings.

Wireless interface **280**, by contrast, can be a transceiver for one or more long, intermediate, or short range wireless networks, such as a radio (e.g., cellular such as CDMA, GSM, or IS-95 network), 802.X, a WiFi™ network, a Bluetooth™ network, and the like, sending and receiving a wide variety of information, including lower priority information, such as data for the convenience and enjoyment of the occupants in entertainment system **190** or seating system **148**. The wireless interface **280** can access information over one or more wire-

16

less networks using an appropriate protocol, such as the Wireless Application Protocol, Wireless Internet Protocol, Wireless Session Protocol, Bluetooth Wireless Protocol, Wireless Datagram Protocol, Wireless HART Protocol, Wired Equivalent Privacy (WEP), MiWi and MiWi P2P, RuBee (IEEE standard 1902.1), Wireless USB, Wireless Transport Layer Security (WTLS), and the like. In one vehicle configuration, the wireless interface **280** connects, via a short distance protocol such as Bluetooth™ or WiFi™, to an external computational device, such as a cell phone, personal digital assistant, laptop, personal computer, or tablet computer, for access to remote nodes over the Internet.

Local network interface **270** is a transceiver for signals exchanged with other on board components of the vehicle (including the components discussed above with respect to FIG. **1**). The signals may be sent over a wired or wireless (or combination thereof) network. In one configuration, the local network interface is a wireless access point. Any suitable local area network protocol may be used, with the Ethernet protocol and the short-range protocols mentioned above being examples.

The processor **210** may comprise a general purpose programmable (micro) processor or controller for executing application programming or instructions. In accordance with at least some embodiments, the processor **210** may include multiple processor cores, and/or implement multiple virtual processors. In accordance with still other embodiments, the processor **210** may include multiple physical processors. As a particular example, the processor **304** may comprise a specially configured application specific integrated circuit (ASIC) or other integrated circuit, a digital signal processor, a controller, a hardwired electronic or logic circuit, a programmable logic device or gate array, a special purpose computer, or the like. The processor **210** generally functions to run programming code or instructions implementing various functions of the device **200**.

Memory **220** for use in connection with the execution of application programming or instructions by the processor **210**, and for the temporary or long term storage of program instructions and/or data. As examples, the memory **220** may comprise RAM, DRAM, SDRAM, or other solid state memory. Alternatively or in addition, data storage **230** may be provided. Like the memory **220**, the data storage **230** may comprise a solid state memory device or devices. Alternatively or in addition, the data storage **230** may comprise a hard disk drive or other random access memory.

FIG. **3** depicts a vehicle **300** with multiple processing modules according to an embodiment. Vehicle **300** includes bus **180**, vehicle component **310**, and processing modules **124**A-C.

Vehicle component **310** is an exemplary vehicle component for illustration purposes that is connected to bus **380**. Vehicle component **310** may represent any of the vehicle components discussed in connection with vehicle **100** (FIG. **1**).

Each of the processing modules **124**A-C is coupled to bus **180**. Processing module **124**A is located in the engine compartment of vehicle **300**; processing module **124**B is located in the passenger compartment of vehicle **300**; and processing module **124**C is located in the trunk of vehicle **300**.

In one configuration, some of the processing modules **124**A-C may have limited processing functions as compared to the others. For example, processing module **124**A may act as the default processing module for vehicle **300** normally because of its location being close to most critical vehicle components in the engine compartment (i.e., ECU, TCU). If the other processing modules **124**B-C are only needed for

**17**

redundancy, they may be implemented to only have limited capabilities (i.e., these processing modules would not require to have processing all critical and non-critical functions). This implementation has the advantage of reduced costs and/or space as compared to fitting processing module will full capabilities. The processing modules **124**A-C may also have cascading levels of capabilities. For example, processing module **124**B is fitted in the passenger compartment and is deemed to most likely survive a collision; it may be required to have capabilities critical to vehicle operation but no other capabilities to save space in the passenger compartment. Processing module **124**C may have additional capabilities such as a cellular module so that emergency calls may be automatically placed if the default processing module **124**A fails.

In another configuration, each of the processing modules **124**A-C may have different capabilities. For example, processing module **124**A may have capabilities only for critical vehicle functions; processing module **124**C may have capabilities only for non-critical vehicle functions; and processing module **124**B may be reserved for back-up processing of both critical and non-critical vehicle functions. In one implementation, processing may be off-loaded to another processing module if one module becomes overloaded. This configuration has the advantage of a further reduction in costs and space because processing power is not wasted due to redundancy. In the case where one processing module malfunctions, the other processing modules may pick up processing duties via a processor off-load procedure. If there is not enough processing power for all wanted functionalities, the processing modules may work together to prioritize critical vehicle functions ahead of non-critical functions.

FIG. **20** depicts computational modules and data structures in memory **220** according to an embodiment.

An arbitration module **2000** selects a processing module to currently possess or own token **2004** (which is used to designate the processing module **124**, in an active-standby configuration, being the active or standby processing module or, in an active-active configuration, having the responsibility for certain tasks, functions, or operations, such as critical tasks, operations, or functions, while the other processing module has responsibility for other different tasks, operations, or functions, such as non-critical tasks, operations, or functions.

A heath check module **2008** performs checks or tests, in response to internally generated interrupts or requests from the other processing module, its ability to perform both critical and non-critical tasks, functions, and operations. Individual scores and composite or cumulative scores for the tasks, functions, and operations can be determined and compared to thresholds to determine an absolute state of health and/or to the individual and/or cumulative scores of the other processing module to determine a relative state of health.

Critical system controller(s) control, monitor, and/or operate critical systems.

Critical systems can include one or more of (depending on the particular vehicle) monitoring, controlling, and/or operating the ECU, TCU, door settings, window settings, and/or blind spot monitor, monitoring, controlling, and/or operating the safety equipment (e.g., airbag deployment control unit **133**, collision sensor **132**, nearby object sensing system, seat belt control unit, sensors for setting the seat belt, etc.), monitoring and/or controlling certain critical sensors such as the power source controller and energy output sensor **164**, engine temperature, oil pressure sensing, hydraulic pressure sensors, sensors for headlight **128** and other lights (e.g., emergency light, brake light, parking light, fog light, interior or passenger compartment light, and/or tail light state (on or off)), vehicle

**18**

control system sensors, wireless network sensor (e.g., Wi-Fi and/or Bluetooth sensor), cellular data sensor, and/or steering/torque sensor, controlling the operation of the engine (e.g., ignition), head light control unit, power steering, display panel, switch state control unit **168**, power control unit **174**, and/or brake control unit **176**, and/or issuing alerts to a user and/or remote monitoring entity of potential problems with a vehicle operation.

Non-critical system controller(s) **2016** control, monitor, and/or operate non-critical systems. Non-critical systems can include one or more of (depending on the particular vehicle) monitoring, controlling, and/or operating a non-critical system, emissions control, seating system controller and sensor **178**, entertainment system **190**, monitoring certain non-critical sensors such as ambient (outdoor) weather readings (e.g., temperature, precipitation, wind speed, and the like), odometer reading sensor, trip mileage reading sensor, road condition sensors (e.g., wet, icy, etc.), radar transmitter/receiver output, brake wear sensor, oxygen sensor, ambient lighting sensor, vision system sensor, ranging sensor, parking sensor, heating, venting, and air conditioning (HVAC) system and sensor, water sensor, air-fuel ratio meter, hall effect sensor, microphone, radio frequency (RF) sensor, and/or infrared (IR) sensor.

On board sensor monitor(s) **2020** include interfaces to receive signals from and transmit signals to a corresponding on-board sensor, including the on-board sensors discussed above, and the logic to monitor sensor operation and readings.

The displayed object movement module **2024** monitors display input received from occupants for commands to move a displayed object from a first display to a different second display in the vehicle for viewing by, for instance, a different occupant. The display input may include, for example, a sensed gesture, an icon selection, or other input indicative to a desire or request to move a displayed object from the first display to the second display. The moved object may or may not be retained for view on the first display after movement.

The diagnostic module **2028** handles warning/error signals in a predetermined manner. The signals, for instance, can be presented to a third party and/or occupant and/or cause the performance of on board diagnostics.

The media filter **2032** filters third party sourced signals, particularly multimedia signals, in a manner consistent with a vehicle universal or occupant-specific whitelist, blacklist, or other user preference, sensed occupant context, and/or a governing federal, state, provincial, or local law or regulation.

The network selector **2036** selects a network for signal transmission based on network/node status, signal/noise ratio, type of signal, available and/or unavailable bandwidth, network performance parameter(s) (e.g., availability, packet drop or loss, jitter, latency, buffer capacity, throughput, and the like) quality of service, and/or other parameters and configures the signal for transmission over the selected network.

The remote control module **2040** receives a request from a remote source or third party to command a vehicle function (which function may be identified by a suitable function-specific code), authenticates the requestor, and if successfully authenticated and if privileged to request the performance of the vehicle function, executes the request notwithstanding a contrary command from the vehicle operator. The requestor can, for example, be a vehicle owner, a law enforcement authority, a vehicle manufacturer, a lender having a loan collateralized by the vehicle, and the like.

The installation supervisor **2044**, for a newly installed software and/or hardware and/or other device (such as an on-board sensor, processing module **124** or component thereof, software application, circuit board, expansion module **290** or

US 9,116,786 B2

19

component thereof (which expansion module **290** may be hardware, software, or a combination thereof), critical or non-critical device (such as those discussed above with respect to the critical or non-critical system controller(s) **2012** and **2016**), cellular upgrade module (e.g., 2G, 3G, 4G, 5G, LTE, or other cellular standard upgrade or Subscriber Identity Module ("SIM") card, board, or other upgrade module, and the like), determines whether the newly installed component satisfies defined functional and/or source or reuse requirements and/or restrictions for the component, license restrictions, and other criteria, and, if satisfied, creates data structures in the component (if it has a resident memory) and the vehicle memory **220** to bind the component to the current vehicle.

The media controller **1524** receives a media stream from a remote node, identifies which input/output systems are disabled due to operator command and/or as a result of governing law, and provides the media stream to an input/output system associated with the associated occupant.

The computational module selector **2052** identifies the computational modules, particularly software applications, currently available within the local area network of the vehicle, the identification including not only the type (e.g., game, multimedia, music, utility, and the like), source or vendor (e.g., Apple, Microsoft, and the like), capabilities and requirements (e.g., operating system, processing, memory, display, and other requirements) but also the version of the computational module, and records this information in memory **220**. The selector **2052** can select not only, for duplicated computational modules, a most current version of the duplicated module to execute and a computational platform (e.g., first, second, . . . processing module or external computational device **1532**) for the execution.

The presence reporting module **2056** considers local laws, individual (contactee) context, and other factors in determining whether an individual (contactee) is present (e.g., for unified communications) and, if so, by what communication channel(s).

The social networking module **2070** creates, manages, and/or maintains a social networking session with one or more other vehicles. The social networking module **2070** can identify operational vehicles having an occupant in a social networking relationship with an occupant of the selected vehicle, notify one or both occupants of the capability of instantiating a social networking session, and effectuate and maintain such a session.

In one application, processing module **124** is configured to process information sent over the CAN buses. As priority data is received by processing module **124** from high-speed CAN bus interface **240** and/or low-speed CAN bus **250**, processing module **124** may determine the nature of the received data and independently do further processing on the received data. In a preferred embodiment, processor **210** executes instructions stored in memory **220** to perform these functions. Further, memory **220** serves as stores and retrieves for data by processor **210**.

In one configuration, processing module **124** only receives data over high-speed CAN bus **240** and may send the data back over low-speed CAN bus **250**. As the CAN bus provides arbitration-free transmission, processing module **124** may passively listen to information traffic, which includes priority data from the various components as discussed, sent over high-speed CAN bus **240**. Processing module **124** then determines if a piece of received information may need further processing and should be sent to devices via low-speed CAN bus **250**.

20

For example, collision sensor **132** may have detected a frontal collision. In one data path, collision sensor **132** may send a signal with details to the collision (i.e., areas of impact and/or force and/or velocity of impact) over high-speed CAN bus **240** with specific target to airbag release control unit **133** to potentially deploy the airbags once airbag release control unit **133** determines that it is suitable to do so upon the receipt of the sent data. Since the CAN bus is arbitration-free, processing module **124** also receives the collision information from collision sensor **132**. Processing module **124** then processes the information received to determine to relay the information to an information display (i.e., display console of entertainment system **190**) via the low speed CAN bus **250**.

It is noted that the data rate is limited in the current implementations of the CAN bus. However, future implementations may allow for higher speeds such that the CAN bus may support data rate suitable for multimedia application. In these implementations, processing module **200** may be configured to leverage the CAN bus for multimedia use. For example, real-time multimedia information (i.e., analog/digital radio or television signal) may be received by an antenna and transmitted through a CAN bus via processing unit **200** to entertainment system **190**. At some point in time, one component of vehicle **100** may have suffered a malfunction that requires information the driver. In the default implementation of the CAN bus, the higher priority signal from the malfunctioning component will have priority over the multimedia information. With the leveraged CAN bus by processing module **200**, the high priority signal from the malfunctioning component can be further processed by processor **210**. If processor **210** determines that the malfunction is minor, processor **210** may relay the malfunction information to the low speed CAN bus **250** but being mixed in with the multimedia information such that there is little disruption to playing backing the multimedia information. Further, processor **210** may also consider if the malfunction requires further processing such as notification to a repair facility or emergency services.

In another configuration, processing module **200** may leverage other buses such as the network interface **270** and/or wireless interface **280** that have more bandwidth for the data. For example, while the present implementation of the CAN bus would not support multimedia information with any substantial bit rate, the network interface **270** may be leveraged such that while CAN bus information is received via the high speed CAN bus **240**, multimedia information is relayed separately via the network interface **270**. This enables the processing module **200** to implement the previous example discussed involving relaying information regarding malfunctioning component without waiting for a future implementation of the CAN bus.

In another application, a processing module **124** may add further expansion modules **290**A-N for further capabilities. For example, expansion modules **290**A-N may contain a cellular telephony module. The cellular telephony module can comprise a GSM, CDMA, FDMA, or other digital cellular telephony transceiver and/or analog cellular telephony transceiver capable of supporting voice, multimedia and/or data transfers over a cellular network. Additionally, expansion modules **290**A-N can include other cellular telephony modules from different providers or modes for other wireless communications protocols. As examples, the modules for other wireless communications protocols can include a Wi-Fi, BLUETOOTH™, WiMax, infrared, or other wireless communications link. The cellular telephony module and the other wireless communications module can each be associated with a shared or a dedicated antenna. Further, expansion modules **290**A-N may also include other wired bus modules

US 9,116,786 B2

21

that may connect to additional essential and nonessential vehicle components that may be installed or upgraded in the future. Processing modules **290**A-N may contain functions critical to the operation of the vehicle such as engine control (ECU), transmission control (TCU), airbag control, various sensors, or other operational or safety related components. Further, processing modules **290** may take on more processing duties from a vehicle component **310** connected to bus **380**. Thus, processing modules **124**A-C benefits from redundancy in the case that one of modules malfunctions. Further, in a vehicle collision, it is expected that at least some of the processing modules may totally malfunction. In these cases, the remaining processing modules may take over limited or full processing duties of the malfunctioning vehicle components **310** or processing modules **390**A-C.

In one configuration, processor **210**, memory **220**, storage **230**, and the bus interfaces **240-280** may also be expansion modules similar to **290**A-N. For example, processor **210** may be initially implemented as an OMAP 4 processor. In the future, OMAP 5 processors may be developed and processor **210** may be upgraded as a modular component.

In another application, processing module **124** is able to support additional vehicle hardware and/or software components that are added to the vehicle and is connected to processing module **124** via a bus. For example, vehicle **100** may have installed an additional entertainment system. In one configuration, processing module **124** can treat the additional component that is connected to processing module **200** via a bus as an expansion module **290**A-N.

In another configuration, the additional hardware and/or software component may require further processing for it to work with processing module **124**. For example, the bus protocol may need to be modified to support communicating with the additional component because the additional component has capabilities beyond the existing protocol (i.e., an extension to an existing bus architecture). In one implementation, processing module **124** must first check to ensure that the additional component complies with OEM defined standards such that rogue components not recognized for a particular vehicle would not be supported.

FIG. **15** depicts the vehicle **100** in communication, via first, second, . . . networks **1504** *a, b*, . . . , with a remote node **1500**, such as a computational device, e.g., a server, mobile phone, tablet computer, laptop computer, personal computer, and the like, of the vehicle owner, law enforcement authority, insurance company, vehicle or parts manufacturer/vendor (e.g., to provide vehicle diagnostics, maintenance alerts, vehicle or part recall notifications, and/or predictive analytics), a service provider (e.g., a convenience service provider such as a service to connect the vehicle operator with a dealer, a service to locate the vehicle, a service to provide vehicle information and/or feature assistance, an automotive navigation system service and a service to start a vehicle (OnStar™ being an example), a location-based service provider (e.g., traffic and/or weather reporting and/or adviser on gas, accommodations, navigation, parking assistance, and/or food), Internet content provider, software vendor, concierge service provider, a processing module of another vehicle, a roadside monitor, sign, beacon, and the like, to name a few.

The first, second, . . . networks **1504***a,b*, . . . can be any wireless network, such as a radio or cellular network (e.g., CDMA, CDMA2000, AMPS, D-AMPS, TACS, ETACS, CSK, CDMAOne, GSM, EDGE, GPRS, HSCSD, UMTS, WCDMA, HSPA, WIMAX, WIMAX ADVANCED, LTE ADVANCED, or FDMA in accordance with the 1G, 2G, 2G

22

transitional, 3G, 3G transitional, 4G or 5G cellular network standards), a Wi Fi network, a Bluetooth network, and the like.

The vehicle **100** includes a transceiver **1508** to send and receive signals over a selected one of the first, second, . . . networks **1504** *a, b*, . . . , a gateway/firewall **1512** to provide secure connectivity between the various components of the vehicle **100** and the first, second, . . . networks **1504***a, b*, . . . , primary and secondary processing modules **124***a* and *b*, memory/storage **220** or **230**, on board sensors **1516** (discussed above with reference to FIG. **1**), input/output system(s) **1520** and associated media controller (discussed below) to manage and control the output presented by the input/output system(s) to the user, network controller **1528** to supervise local networks and nodes thereof and identify and, if possible, isolate malfunctioning networks and/or nodes to avoid detrimental impact on other networks and/or nodes of the vehicle **100**, and external computational device(s) **1532** of occupants, such as wireless capable mobile phones, personal digital assistants, tablet computers, laptop computers, and the like. As will be appreciated, the logic for the gateway/firewall **1512**, media controller **1524** and network controller **1528** can be contained within memory/storage **220**, **330**. The various components are connected by a bus, wireless network, or combination thereof (denoted by reference **1536**).

The gateway/firewall can be any suitable module that can maintain secure connectivity. The need for the gateway/firewall is necessitated by the assignment of a wireless data network address, such as defined by IPv6 (Internet Protocol version 6), with the corresponding processing module **124**. As will be appreciated, IPv6 addresses, as commonly displayed to users, consist of eight groups of four hexadecimal digits separated by colons, for example 2001:0db8:85a3: 0042:0000:8a2e:0370:7334.

Each processing module **124** can have an independent network address or use a common network address. The gateway can be any module equipped for interfacing with another network that uses one or more different communication protocols. The firewall can use any technique to maintain security, including network address translation, network layer or packet filtration, application-layer firewall, and the like.

FIG. **16** depicts an exemplary input/output architecture for the vehicle **100**. The architecture includes first, second, . . . nth input/output systems **1600***a-n*, the media controller **1524**, display controller(s) **1604** to receive user input via the input/output system(s) and configure the output presented by the input/output system(s) to the user, audio controller(s) **1608** to control audio output to the user, and rule sets **1612** (stored in memory/storage **220**, **230**) to regulate corresponding features/functions of the vehicle **100**, particularly the information and/or other output provided to each occupant by a respective input/output system. Generally, each of the multiple occupants has a separate and corresponding input/output system **1600**. For example, each seat **148** can have a corresponding input/output system **1600**.

As can be appreciated, the functionality disclosed herein may be affected by the geographical location and/or movement of a vehicle. A vehicle may cross a jurisdictional line where different laws exist that concern behavior in or about vehicles. These laws may be stored, as one or more rule set(s) **1612**, in a database on-board and/or remotely accessible by the vehicle. A vehicle may use its location-based features to determine the appropriate applicable laws and enable or disable certain features to a user. For example, in the event that an individual crosses a state line where the local laws prohibit texting while driving, the vehicle may disable texting for the vehicle operator. This blocking would not prevent others in a

US 9,116,786 B2

23

vehicle from texting, and if allowed may provide for the operator to continue to send voice-activated texts, etc. Movement and location of the vehicle may be determined using location-based features as described herein. Moreover, to prevent false blocking of features, a specific user device position may be determined by sensors on the device, sensors in the vehicle, and/or combinations thereof. Although described with reference to blocking the texting ability of a specific user, it can be appreciated that the ability to surf the Internet, view photos, access streaming content, and other predetermined distractions may also be disabled.

For an additional external computational device **1532** that connects to processing module **124** via wireless interface **280**, a secured connection protocol is needed. Unlike a wired bus connection, which is generally electronically confined to vehicle **100**, a wireless connection via wireless interface **280** may be broadcast to other communication systems within the vicinity of vehicle **100**. Thus, other wireless communication hardware, systems, and networks might be able to communicate with the communication system of the vehicle **100**. This ability is potentially a security hazard.

To resolve this issue, wireless security rules should be used to ensure that only trusted devices, such as the external computational device **1532**, communicate wirelessly, via the wireless interface **280**, with the on board vehicle components through the wireless interface **280**. Such security is provided by the gateway/firewall **1512** applying known security algorithms. In one implementation, wireless security may be implemented by the gateway/firewall **1512** using the current security setup in the 802.11 standard such as Wired Equivalent Privacy (WEP) or Wi-Fi Protected Access (WPA) or other security systems as known in the art. OEMs may also choose to implement security by using a propriety security system and/or wireless protocol to work with the in-vehicle wireless communication network.

Upgrading the vehicle **100** using different processing modules and/or other on board components, such as on board sensors **1516**, can be done securely and seamlessly. A limit may be imposed on the place and manner in which an additional component communicating via the in-vehicle wireless network may be added to the vehicle **100**. For example, installation of the additional component may only be available at an automobile shop or may even more limited to only in OEM approved shops or dealership to ensure that the newly installed component is fully tested to communicate only with vehicle **100** and not with other adjacent vehicles.

To facilitate this process, a handshake procedure may be used during the initial installation of the component. In one implementation, an OEM approved shop may have codes that will allow the new component to accept a link with vehicle **100**. During this handshake procedure, vehicle **100** and its relevant components, such as processing module **200**, may negotiate a protocol and/or security settings to communicate with the new component. For example, a symmetric or asymmetric code or key pair may be developed for encrypting communications. Alternatively, codes for WEP, WPA, or other security systems as known in the art may be developed for secured communication. After this initial handshake procedure, the new component and vehicle **100** will not have to do any further security setup in the future to prevent leaking the secured codes. In a further implementation, the new component is considered married or bound to vehicle **100** and may not communicate with any other vehicles unless unmarried or unbound when the component is removed at an approved shop. The dedication of the component to the vehicle may be done by using a unique code, such as a serial number of the component or vehicle, to enable a type of routine licensing

24

compliance check when the car is activated. This can be done, for example, by comparing a unique code received by the installed component from another vehicle component or by the other vehicle component from the installed component. The licensing check is successful when the received code matches a code stored in memory of the receiving device.

In another configuration, the additional, or installed, component may also communicate wirelessly with other vehicle components of vehicle **100** without needed processing module **200** to relay any communication. This may be done by sharing a vehicle encryption scheme and code for the wireless use. This may be useful for emergency purposes (i.e., the police may have a need to control certain components in a vehicle).

Operation of Arbitration and Health Check Modules **2000** and **2008**

The processing modules **124** can use any of a variety of techniques to determine relative status and/or processing role of each. For example, under one technique a token is passed to signify the active or passive processing module or the processing module performing a specified set of processing operations. The processing module in possession of the token at any one time has the status and/or is responsible for the set of processing operations associated with the token. Rules may be used to arbitrate between the processing modules when each asserts ownership and/or non-ownership of the token.

By way of illustration, the processing modules **124** can determine which module is active and which is standby by employing the following rules. Upon detection of a selected stimulus (e.g., at vehicle start-up, processing module power-up, and/or periodically during vehicle or processing module operation), the health check module **2008** in each processing module **124** runs self-tests or queries the health check module **2008** other processing module **124** to perform selected computational tasks and provide the result. The processing modules **124** thus exchange messages with each other. Based on the results of its self-test (or queried tests), each processing module **124** decides whether it can become active. If so, the processing module **124** asserts an available signal to an arbitration module **2000**, which propagates the signal to the other processing module **124**. The arbitration module **2000**, applying rules, chooses the active processing module **124** and forwards the token to the selected processing module **124**, along with an interrupt. Rules may include a default selection, an ordered, random or pseudorandom periodic change in which processing module **124** is active and which is standby, which processing module **124** is healthier (or has a higher state of health score, the relative capabilities of the processing modules **124** (with the more capable processing module being active), and the like. The arbitration module **2000** propagates a token non-ownership signal to the other processing module **124**, along with an interrupt. Each processing module **124**, in response, sets its status in memory to "primary" or "standby". If the active processing module **124** is removed, powered down, or voluntarily de-asserts ownership or possession of the token, the standby processing module immediately receives the available token **2004**, along with an interrupt. It then assumes, and records in memory, the primary state.

In one variation, arbitration is performed by the arbitration module **2000** using a health check procedure **400** shown in FIG. **4**.

Health check procedure **400** by the health check module **2008** is one way in which each processing modules **124**A-C may self-check to determine a respective state of health (e.g., if the processing modules remains fully functional or is only

US 9,116,786 B2

25

partially functional). Health check procedure **400** may be activated by each processing module **124** or one of the other processing modules **124** at a certain time interval or may be manually activated by user (i.e., a user directly activating the module or whenever the ignition is started). Health check procedure **400** may also be continuously running while the vehicle **300** is running to ensure the fastest response time in case a collision occurs resulting in an immediate loss of processing functions.

In step **410**, the health check module **2008** in each processing module **124** performs a health check on its critical tasks, functions or operations of which losing one would result in a potentially critical loss to vehicle operation. As discussed previously, the critical tasks, functions or operations may include, for example (depending on the particular vehicle), monitoring, controlling, and/or operating a critical system. Health check **410** may involve procedures such as testing or monitoring that each critical function or operation is operating within predetermined or selected operating parameters and/or causing each critical component (safety equipment, selected sensors, engine, power steering, and/or brakes) to operate within selected operating parameters. In some configurations, a critical system, such as the ECU, may include both critical (i.e., engine failure) and non-critical tasks or functions (i.e., minor oil leak). Health check **410** may be configured to check only the critical tasks or functions.

In pass test check **411**, if any malfunction to a critical task, function or operation is detected, the procedure activates hand-off procedure in step **440**, which will be discussed with reference to FIG. **5**. In one variation, a cumulative score is computed for all critical tasks, functions, and operations. The individual scores of the tasks, functions, and operations and cumulative score for the processing module is provided to the arbitration module **2000**, which compares both sets of scores for the two processing modules **124** and selects and designates the healthier of the two processing modules **124** as the primary or active processing module **124**.

If the processing module **124** passes test check **411**, health check on non-critical tasks, functions or operations **420** is performed. Non-critical tasks, functions or operations may include, for example (depending on the particular vehicle) monitoring, controlling, and/or operating a non-critical system. In step **420**, health check is done on various functions of the non-critical system, with each function having a score for passing the health check. The score may be adjusted according to the level non-criticality of the system. For example, an emissions control unit, while it may be non-critical to vehicle operation, may nonetheless be fairly important so as to comply with environmental regulations; therefore an emissions control unit could be weighted a comparatively high score for passing. In contrast, an entertainment system's failure may not be deemed to be important (except for operator/occupant inconvenience) and may be weighted with a relatively low score for passing.

In step **421**, the score is tabulated for all non-critical systems and compared to see if it is above a certain threshold. If the score is below the threshold, a hand-off procedure is activated in step **450**. For example, if emissions control by the processing module **124** is detected to be failing, causing or potentially causing harmful gas emissions to rise significantly above the legal limit, health check **421** may give a very low score to this non-critical system. Therefore, even if the entertainment system is working perfectly, health check may still give a score that is below the threshold and hand-off procedure will be activated.

In one configuration, the score weight for each non-critical system may be defined dynamically according to the location

26

of the vehicle or other factors. For example, vehicle-use laws may affect how a non-critical system should be weighted (i.e., the stringency of emissions law, noise control law, or other laws in one area). Thus, vehicle-use laws may be provided by an organization, governmental entity, group, individual, and/ or combinations thereof. The laws may be stored locally or retrieved from a remotely located storage. The vehicle-in-use laws may be statutes and/or regulations that are enforced by a government entity, such as a city, municipality, county, province, state, country, and the like. These laws may define vehicle, traffic, transportation, and/or safety rules associated with a given geographical region. An exemplary vehicle-in-use law governs texting, cellular phone use, and video availability to the operator when the car is in motion and the like. The laws may be updated from time to time, among other things, account for changes in the laws. Thus, a first task, operation, or function may be critical in a first geographic location but noncritical in a different second geographic location. Likewise, a first task, operation, or function may be non-critical and have a first score (if operating properly) in a first geographic location but be non-critical and have a lower second score (if operating properly) in a second geographic location.

In step **430**, if the score for non-critical systems is above the threshold, the active processing module **124** may be continued to be used as the active processor. In one variation, a cumulative score is computed for all non-critical tasks, functions, and operations. The individual scores of the tasks, functions, and operations and cumulative score for the processing module is provided to the arbitration module, which compares both sets of scores for the two processing modules and selects and designates the healthier of the two processing modules as the primary or active processing module.

The operation of a an arbitration module **2000** procedure **500** for a processing module will now be discussed with reference to FIG. **5**.

The arbitration module **2000** can activate a token arbitration procedure **500** by steps **440** and **450** (FIG. **4**) where either (a) the one or more critical tasks, functions, and operations has failed health check or (b) where one or more non-critical tasks, functions, and operations has not tabulated enough score to represent that the selected processing module is healthy enough for processing. Arbitration may be based on an absolute and/or relative state-of-health.

In step **510**, a health check is performed, by a respective health check module **2008**, on each processing module **124** and the pass/fail results and scoring information reported to the other processing modules **124** and/or the arbitration module **2000**.

In step **514**, the arbitration module **2000** selects a next processing module **124** (until all are considered) and proceeds to decision diamond **518**.

In decision diamond **518**, the arbitration module **2000** determines whether the selected processing module **124** passes the health test on set of critical tasks, functions, and operations. If so, the arbitration module **2000** proceeds to decision diamond **524**.

In decision diamond **524**, the arbitration module **2000** determines whether the selected processing module **124** passes the health test on set of non-critical tasks, functions, and operations. If so, the arbitration module **2000** proceeds to step **528**.

In step **528**, the arbitration module **2000** creates or updates data structures indicating that the selected processing module **124** is healthy and recording the selected processing module's respective scoring information. Optionally, the arbitra-

US 9,116,786 B2

27

tion module **2000** can determine and record the relative state-of-health of the selected processing module **124** relative to other processing modules.

When the selected processing module **124** fails to pass one or more sets of critical tasks, functions, and operations (decision diamond **518**) or non-critical tasks, functions, and operations (decision diamond **524**), the arbitration module **2000** proceeds to step **532** and creates or updates data structures indicating that the selected processing module **124** is unhealthy and recording the selected processing module's respective scoring information. Optionally, the arbitration module **2000** can determine and record the relative state-of-health of the selected processing module **124** relative to other processing modules.

After performing steps **528** or **532**, as appropriate, and when no processing module **124** remains to be analyzed, the arbitration module **2000** proceeds to decision diamond **536**. In decision diamond **536**, the arbitration module **2000** determines whether a healthy processing module **124** is available and, when available, designates, in step **540**, the healthiest (based on absolute or relative state-of-health or both) processing module **124** as the active processing module **124** (or, in an active-active configuration, as being primarily responsible for handling critical tasks, functions, and operations).

When no healthy processing module **124** is available, the arbitration module **2000** implements emergency measures, activates an alarm indicating that there is currently no available healthy processing module **124**, and reports the alarm to the user and/or a remote node **1500**, such as the vendor, manufacturer, servicing entity, roadside service, and the like.

The emergency measures implemented can vary by application. In one application, the emergency measure is to identify which processing module **124** is healthy to perform each set of critical and optionally non-critical tasks, functions and operations. If a healthy processing module exists for each set of critical and optionally non-critical tasks, functions and operations, the arbitration module **2000** assigns each set of critical and optionally non-critical tasks, functions, and operations to a processing module **124** having a sufficiently high health score (e.g., above a selected threshold) to perform the selected set of critical and non-critical tasks, functions and operations. Where multiple processing modules are healthy enough to perform the selected set of critical and optionally non-critical tasks, functions and operations, the arbitration module **2000** can select the processing module **124** having the highest health score for the selected set of critical and optionally non-critical tasks, functions and operations and/or having the highest available or unused processing units or resources to perform the selected set of critical and optionally non-critical tasks, functions and operations. Where no processing module **124** is healthy to perform a selected set of critical and optionally non-critical tasks, functions and operations, the selected set of critical and optionally non-critical tasks, functions and operations can be performed by a remote node, via first, second, . . . network **1504**$a$, $b$, . . . . The remote node **1500** can be, for example, the vendor, manufacturer, servicing entity, roadside service, and the like. In one application, the critical and optionally non-critical tasks, functions, and operations are performed by a remote node **1500**, via first, second, . . . network **1504**$a$, $b$, . . . ., rather than by a local or on board processing module **124**.

An important aspect of an active-standby configuration can be how to maintain synchronicity between the active and standby processing modules to enable "hot" hand-offs, which can be particularly important for automotive applications, without loss of memory as to the current operational state of the vehicle and its component tasks, functions, and opera-

28

tions. One technique is to have the standby processing module **124** perform "shadow" processing in which it receives all input received by the active processing module **124** and performs the same processing tasks, functions, and operations as the active processing module **124**. The assumption is that the two processing modules **124** have identical processing rates and therefore, at any one time, precisely duplicate the other as to processing state of completion as to any task, function, and/or operation. Due to varying processing loads on the processing modules, delays in signal transmissions, and other factors, this assumption may or may not be true. Another technique is to have the standby processing module **124** receive, and store in memory **220**, time-stamped processing state information from the active processing module **124**. The time-stamped processing state information relates to any processing task, function or operation currently being performed by the active processing module **124** and the results thereof. A potential issue with this approach is latency between the current and reported states of the active processing module **124**. Another technique is a combination of the foregoing techniques. In this technique, the standby processing module **124** performs "shadow processing" but periodically checks its processing state information against the time-stamped processing state information received from the active processing module **124** and resets, alters, or updates its state information to reflect the received processing state information. Where a processing string is being performed correctly, it does not typically need to be revised to reflect a potentially earlier point reflected in the received and time stamped state information (which may be delayed). A reset to an earlier point in the processing string may be appropriate where the standby processing module **124** is too far ahead of the active processing module **124**. The primary purpose of this combined approach is to confirm processing accuracy by the standby processing module **124** and to keep the standby processing module **124** from getting too far in advance of the active processing module **124** in processing information.

Operation of Remote Control Module **2040**

FIG. **27** depicts a particular configuration of a remote node **1500**. The remote node **1500**, configured as a central repository for vehicle information, includes a server **2700** and associated database **2704**. The remote node **1500** is in wireless communication, via network **1504**, with first, second, . . . nth vehicles **100**$a$-$n$. Currently, car drivers have the option to sign up for a service like General Motors OnStar® to remotely unlock cars, and provide other features such as remote start, tracking vehicles, and/or locking cars, etc.

In some embodiments, the present disclosure is directed to a central repository **2704** that can be used in conjunction with an individual vehicle. The central repository may be stored remotely (as shown) or on-board the vehicle. In the event that the central repository is stored remotely, it may be supervised by a law enforcement agency, or secure administrative agency. It is anticipated that strong security procedures may be employed to avoid hacker attacks, especially if stored at a remote central repository like the Department of Motor Vehicles (DMV), or other security-approved location. In the event that a vehicle is stolen, the true owner of a vehicle may prove ownership to the central repository and locate, lock, shutdown, etc. the vehicle.

Commonly, the requested vehicle function is one or more of accelerate, decelerate, activate, deactivate, provide current vehicle location, broadcast audible and/or visual message to vehicle operator, brake, set a maximum, vehicle velocity, and lock doors. The requested vehicle function can be identified by a function-specific code. The remote control module can map the function-specific code in a look up table indexing

**29**

function-specific codes with corresponding vehicle functions to determine the requested vehicle function to be performed.

In another embodiment, a police device may communicate to another vehicle to slowly reduce that vehicle's speed, shut-down the engine, cut power, etc. The communication can be securely effected using unique codes or other cryptographic techniques. Moreover, the communication may be through a server associated with a central repository. It is anticipated that the module controlling these functions is securely guarded and designed to prevent hacking attempts.

The operation of a system stand-by procedure **600** implemented by a remote control module **2040** and/or other component of a processing module **124** will now be discussed with reference to FIG. **6**. Stand-by procedure **600** may be activated when the selected processing module **124** transitions from active to standby or standby to active or in response to a command from the operator or the remote node **1500**. In one configuration, stand-by procedure **600** may also be activated manually by the driver of the vehicle or by another third party. For example, the driver or another third party may wish to disable certain aspects of vehicle **300** (i.e., the driver may wish to disable certain functions, either critical or non-critical, of the vehicle to prevent another user of the vehicle, such as a valet, from accessing them, a third party, which may be the police or a theft prevention service such as On-Star, may wish to disable a stolen vehicle or a vehicle which is otherwise in violation of the law).

Manual activation of stand-by procedure **600** may be done locally or remotely. For local activation, an additional component in the form of a switch may be added and connected to the processing module via a bus or as a expansion module **290**A-N. The driver may then manually activate the switch as needed.

Most likely, manual activation of stand-by procedure **600** is done remotely (i.e., by the police, theft prevention service, or the owner of the vehicle at a remote location). As such, in one implementation, the corresponding processing module may be accessed via a non-physical bus such as by wireless interface **280**. However, this is not the preferred method. As discussed previously, vehicle components communicating with a processing module wirelessly should only work with a secured scheme. The in-vehicle wireless network should not be accessible to third parties for further security purposes. A direct access to the in-vehicle wireless bus would defeat these principles. The wireless interface **280** may have a limited range such that connection and control can only be effected within the vicinity of the vehicle. Nevertheless, this implementation may be useful in cases where there is an emergency that is within the vicinity of the vehicle (i.e., emergency road closure) that requires a third party such as the police to disable passing vehicles for safety reasons. In such cases, the authorized third party may activates codes that bypasses securities of the in-vehicle wireless network that is normally off-limit and directly access the processing module.

In another implementation, the vehicle may have a cellular or satellite communication component that has the capability of accessing an outside cellular or other communication network. Alternatively, this communication component may be installed as an additional expansion module **290**A-N as discussed previously. Access to processing module is granted through a valid security verification within this component. Therefore, access to the processing module using this implementation does not require open access to the in-vehicle wireless bus.

In another configuration, stand-by procedure **600** may also be activated by a control system within the vehicle when some automated condition is met. For example, a leased or rental

**30**

car company may wish to limit the geographical location where the vehicle can be driven. The vehicle may be automatically disabled if it is detected that the vehicle has left the allowed zone of operation (i.e., detected via a GPS).

In step **601**, the method confirms if any critical subsystem would be unavailable. As discussed above, a critical subsystem may be unavailable because it did not pass the health check, because it was disabled by the driver or a third party, or because some automated condition has been met.

If critical subsystems are unavailable, step **610** performs general vehicle stand-by. In one configuration, general vehicle stand-by disables all components of the vehicle rendering the vehicle unusable. However, this may lead to safety issues where a sudden shut-down of the vehicle while operating on the road may be hazardous to both the driver of the vehicle and other vehicle on the road. In another configuration, general vehicle stand-by performs a shut-down of non-critical systems while placing a limit on critical system designed to bring the vehicle to stop. For example, a speed limiter may limit the speed of the vehicle to a minimal speed so that the vehicle can be bought to a safe stop subsequently but cannot operate effectively. After the vehicle is brought to a stop, general shut-down that disables all components of the vehicle may be performed.

In step **620**, an alarm is activated to inform about the status of a general stand-by. Here, similar to step **540**, an alarm is normally sent to at least components like display **144** or entertainment system **190** of vehicle **100** via a reliable bus such as the high speed CAN bus to inform the driver of the generally stand-by. In one implementation, an alarm may also be sent to a remote node **1500**, such as a service or maintenance provider, e.g., a nearby or a default car repair facility with possible system diagnosis information, emergency services if it is detected that a emergency affecting road safety has occurred, and/or to car manufacturers for data collection and other purposes.

If critical subsystems are not unavailable in step **601**, the method further confirms if any non-critical subsystem is unavailable **602**. If any of the non-critical subsystem is indeed unavailable, the method performs specific stand-by on the specific subsystem **630**.

Specific stand-by **630** involves performing stand-by only for a specific non-critical subsystem. For example, if entertainment system **190** malfunctions, entertainment system **190** can be safely turned off without affecting the operation of the vehicle. However, some non-critical functions may be affected such as an alarm function announcing certain information that is pre-disposed to be announced by entertainment system **190**. In this case, specific stand-by **630** may include rerouting the information to display **144**, perhaps with the information to be presented in abbreviated form to ensure the information will be presentable on display **144**. Specific stand-by **630** for entertainment system **190** may also involve rerouting information to other perceptible methods such as by light or sound.

In step **640**, the method activates an alarm to information driver and third-party services of specific subsystem stand-by similar to step **620**.

FIG. **9** depicts a method of operation of the remote control module **2040**. There are a number of examples of operation by a remote control module **2040**.

In one example, a police officer or other law enforcement authority and/or rule trap sensor can "ping" an automobile for information relating to its speed and driving conditions. By comparing this received data from the automobile to known data relating to stop signs, speed limits, and the like, a decision can be made on whether the law has been broken. For

**31**

example, the sensor itself may not necessarily determine the speed of a vehicle. The sensor asks the vehicle to respond to the sensor with the vehicle's speed and possibly other information. Therefore, the speed detection is achieved through responding to a sensor's question and the vehicle's answer. It is anticipated that a specific sensor may use alternate detection methods to verify the accuracy of a received signal. For instance, if a vehicle is asked to respond with a current speed value, and does so, the sensor may send a radar signal to verify the response. If the response does not match the verification signal, a note is made of the anomaly and the data is recorded. This data may be used by law enforcement to later identify vehicles that are malfunctioning and/or have been compromised. The identity of the car, including serial number, owner identity (e.g., name, home address, and contact information), driver's license number, insurance information (e.g., name and address of insurance company, owner's insurance policy identification, and coverage limits), and the like, and/or licensing information (e.g., license plate number) can be provided by the vehicle to the requestor.

In another example, a law enforcement authority, owner, or other privileged entity may request a critical or non-critical task, function or operation to be disabled or behave in a selected manner. For instance, a law enforcement officer can cause the vehicle to decelerate in a high speed pursuit or, for a high speed pursuit or stolen car, can disable the engine.

In another example, a remote node **1500**, such as a law enforcement authority, an insurance company, an intelligent sign or traffic signal, a roadside monitor, or the owner himself or herself requests historic or current vehicle operating information, such as speed, and/or information received by the vehicle from an external source, such as a stop light, speed limit sign, yield or stop sign, and the like. This information can be compared to identify poor driving practices and/or breaking of the law. It can also be used in accident reconstruction to determine who is at fault in an automobile accident where vehicle operators frequently dishonestly represent who is at fault. Currently, responsible drivers pay inflated insurance premiums because the insurance industry cannot guaranty a particular driver's adherence to the law or general driving behavior. To address this concern, current insurance companies may allow a driver to install a device in a vehicle to randomly monitor behavior. This device can only monitor certain functions and requires the installation of a device separate from the vehicle's ecosystem. The present disclosure is directed to using various data compiled by the system to analyze factors contributing to an individual's driving behavior and/or habits. In the event that an individual wishes to receive better insurance rates for responsible driving, a lower quantity of driving, or other good driving indicators, the driver may agree to provide insurance tracking information. The insurance tracking system may consider GPS and other location-based information (to compare actual speed with speed limit data), g-force sensors (to detect rapid acceleration, hard turns, etc.), perimeter sensors (to detect close-calls, inattention while changing lanes, etc), in order to determine conformance with the good-driving terms established by an insurance company. Because the device may be integrated, and/or associated, with the vehicle's ecosystem total behavioral data may be recorded and sent in real-time to a receiving module. Moreover, the system may detect the user and provide accurate information for each user of a vehicle.

Referring to FIG. **9**, the remote control module **2040**, in step **900**, receives a request to command a vehicle task, function and/or operation and/or to transmit specified information to the requestor.

**32**

In step **904**, the remote control module **2040** attempts to authenticate the requestor. User authentication is a way of identifying a user and verifying that the user is allowed to access some restricted service. Authentication can be performed by, for example, by encrypted symmetric or asymmetric key exchange, public and private key cryptography, a secure remote password, multi-factor authentication (e.g., three major factors include verification by something a user knows (such as a password or PIN), something the user has (such as a smart card, ATM card, or a security token), and something the user is (such as the use of biometrics, such as a fingerprint or retina scan)), time-based authentication, a unique digital identity, closed-loop authentication, access control service, and the like.

Control then passes to decision diamond **908** where the remote control module determines whether authentication was successful. When authentication is successful, the remote control module, in decision diamond **912**, determines whether the requestor is privileged to make the request. In other words, a first requestor is entitled to a first set of privileges with respect to access to vehicle information and/or control of vehicle tasks, functions, and operations while a second requestor is entitled to a different second set of privileges with respect to access to vehicle information and/or control of vehicle tasks, functions, and operations. A law enforcement entity or vehicle owner, for example, will generally have a highest level of privilege (enabling broad access to vehicle information and/or control of vehicle tasks, functions, and operations) while an insurance company or servicing entity will not have the highest level of privilege.

When the requestor is entitled to make the request, the remote control module, in step **916**, executes or causes execution of the request in accordance with rules governing what the privilege accorded the requestor, which may override operator and/or other occupant commands.

When the requestor is not entitled to make the request, the remote control module, in step **920**, ignores the request and logs in memory **220** the information surrounding the request, e.g., the identity of the requestor, the time stamp of the request, and the request itself.

The remote control module **2040** can perform other functions at the request of the vehicle owner and/or a vehicle family member. The remote control module **2040** can receive vehicle configuration commands from a remote node **1500** that cause the remote control module **2040** to implement the configuration commands. The configuration commands respect the configuration of any vehicle component, including on board input/output system display appearance and/or content and/or icon configuration, programmable hard button function mapping, on board cached media selection, alteration of vehicle performance parameters, and vehicle status.

A number of examples will be described to illustrate these remote control module functions. In a first example, a vehicle owner or family member, via a remote node **1500**, such as a home computer, tablet or laptop computer, smart phone, and the like, can customize his or her input/output system display settings, appearance, sounds, wall paper, icon selection and location, and the like. Manufacturer or after market defined templates may be provided to assist the user in configuring the input/output system. The user, for instance, could move graphical objects, such as icons, around to where he or she wants them to be. He or she could put in or remove graphics. He or she could add a digital tachometer or navigation application, such as one downloaded from an application store over the Internet. He or she could rearrange preferences. For instance, he or she may cause the default configuration on the infotainment or entertainment system to be the radio presets

US 9,116,786 B2

33

or the navigation. Because the vehicle is web-based, the user can download third party displays from a commercial entity, such as an on line application store, or even trade with friends. He or she could configure programmable hard buttons, such as stereo or radio buttons, so that a selected button that currently causes the radio to scan can be made to trigger the on board navigation application. Users can apply software-based skins, such as wall paper, that are decorative ways to add personal style to the vehicle. Users can add functionality to the vehicle. For example, he or she can download, over the Internet, media, such as digital movies from an on line rental service, such as Netflix, and digital games to the vehicle memory. He or she can customize vehicle performance, such as by tuning the vehicle through the remote connection. For instance, if the user moves the vehicle to a sport mode, shifting points would be altered and, if the user moves the vehicle into economy mode, cylinders could be disabled at different speeds. He or she can connect to obtain and/or run diagnostics of a selected vehicle component. He or she could use the diagnostics to obtain quotes for and/or schedule repair or maintenance operations by selected service personnel. He or she could check states of selected vehicle operations, including whether cabin lights are on or off, whether headlights are on or off, whether windows are up or down, whether the on board alarm is on or off, whether the on board alarm has been triggered, and whether the sun roof is open or closed. The remote node **1500** could then be used to reset the state as desired, e.g., turn cabin lights off, turn headlights off, close windows and/or sunroof, activate alarm, and the like. The user could also set up communication paths and/or modalities for vehicle-generated alarms. Exemplary communication paths and/or modalities, including phone call, instant messaging, emails, and the like.

A hard reset could be performed to reset all vehicle components to factory default settings.

This operation of the remote control module **2040** will be discussed with reference to FIG. **31**.

Referring to FIG. **31**, the remote control module **2040**, in step **3100**, receives a request, via a remote node **1500** and from an owner or family member of the owner, to configure a selected component of the vehicle, such as an on board input/ output system, and/or to access vehicle state information.

In step **3104**, the remote control module **2040** attempts to authenticate the requestor. User authentication is a way of identifying a user and verifying that the user is allowed to access some restricted service. Authentication can be performed by, for example, by encrypted symmetric or asymmetric key exchange, public and private key cryptography, a secure remote password, multi-factor authentication (e.g., three major factors include verification by something a user knows (such as a password or PIN), something the user has (such as a smart card, ATM card, or a security token), and something the user is (such as the use of biometrics, such as a fingerprint or retina scan)), time-based authentication, a unique digital identity, closed-loop authentication, access control service, and the like.

Control then passes to decision diamond **3108** where the remote control module determines whether authentication was successful. When authentication is successful, the remote control module, in decision diamond **3112**, determines whether the requestor is privileged to make the request. In other words, a first requestor is entitled to a first set of privileges with respect to access to vehicle information and/or control of vehicle tasks, functions, and operations while a second requestor is entitled to a different second set of privileges with respect to access to vehicle information and/or control of vehicle tasks, functions, and operations.

34

When the requestor is entitled to make the request, the remote control module, in step **3116**, executes or causes execution of the request in accordance with rules governing what the privilege accorded the requestor, which may override operator and/or other occupant commands.

When the requestor is not entitled to make the request, the remote control module, in step **1320**, ignores the request and logs in memory **220** the information surrounding the request, e.g., the identity of the requestor, the time stamp of the request, and the request itself.

This functionality can enable a vehicle to have multiple configurations for a selected vehicle component, such as an input/output system, that is indexed or associated with a specific occupant. Techniques can be used to determine where each occupant is seated in the vehicle, map the identified occupant to the set of data structures correlating each occupant with selected vehicle component configuration and configuring the respective input/output system accordingly. Thus, the vehicle can have plural differently configured input/ output systems at any one time. When the selected component is a component other than an input/output system, the particular configuration of the selected component to be employed is dependent on who the identified operator of the vehicle is.

In addition to the techniques described elsewhere for identifying a vehicle occupant, other techniques that may be employed include ignition keys that are identified uniquely to an occupant, user input such as selection of one or more keys, entry of an identification code or other identity, or biometric data, such as a fingerprint or retinal scan, and login. When the occupant is identified and associated with a particular seating position, the selected component will auto configure.

Operation of Computational Module Selector **2052**

The operation of a processor off-load procedure **700** by computational module selector **2052** one or more processing module(s) will now be discussed with reference to FIG. **7**. This operation is particularly beneficial in an active-active configuration but may be used in an active-standby configuration. As discussed with respect to vehicle **300** of FIG. **3**, some configurations of expansion modules **290**A-C may require processor off-load to share processing functions of tasks among a number of expansion modules in a common host processing module **124** or across different processing modules **124**. For example, a first expansion module **290**A and/or host processing module **124** may be specialized for critical functions while a different second expansion module **290**B and/or host processing module **124** is specialized for non-critical functions. In an event where the first expansion module **290**A and/or its host processing module **124** loses some processing power, the first expansion module **290**A and/or its host processing module **124** may be able to off-load some critical function to second expansion module **290**B and/or its host processing module **124**.

In step **701**, the method continuously checks if a next processing module, expansion module, and/or external computational device(s) **1532** (in wireless communication with the network controller **1528** via the gateway/firewall **1512**) is available with excess processing power. If a next processing module, expansion module, and/or external computational device(s) **1532** is not available, the method will check at some time interval later to see if a new processing module, expansion module, and/or external computational device(s) **1532** would have a change in a number of available and/or unavailable processing power units and/or bandwidth. Other stimuli for this step **701** include a user request to initiate execution of an application, notification of a processing resource having unused bandwidth below a selected threshold, notification of

US 9,116,786 B2

35                                                            36

a processing resource having used bandwidth above a selected threshold, a power level of a processing resource falling below a selected threshold, notification of a processing resource having an operational error, malfunction, or outage, and the like.

If a next processing module, expansion module, and/or external computational device(s) **1532** is available, the method confirms with the next processing module, expansion module, and/or external computational device(s) **1532** on its available processing power units and/or bandwidth for a task **710**. Other factors considered in determining whether a selected processing module, expansion module, and/or external computational device is available include not only the processing resources available but also the application and operating system requirements as compared to the capabilities of the selected processing module, expansion module, and/or external computational device and power level in the selected processing module, expansion module, and/or external computational device.

In one configuration, processing module, expansion module, and/or external computational device(s) **1532** may be distinguished depending on the type of processing needed. For example, a critical function might not be suitable for a processing module that deals only with non-critical functions and vice versa due to safety, security, or other concerns. In other configurations, a critical function might look for a processing module that is tasked with a disproportionally high non-critical function load to balance the processing load.

If the selected processing module, expansion module, and/or external computational device(s) **1532** is available to process a given task, function or operation **710**, the task is offloaded to the selected processing module, expansion module, and/or external computational device(s) **1532**.

If the selected processing module, expansion module, and/or external computational device(s) **1532** is not available to process a given task, function or operation **710**, the procedure continues to check if any other processing module, expansion module, and/or external computational device(s) **1532** is available **702**. If there is a different processing module, expansion module, and/or external computational device(s) **1532** available, the method returns to step **701**.

If there is no other processing module, expansion module, and/or external computational device(s) **1532** available, the method informs the active processing module, expansion module, and/or external computational device(s) **1532** of no available offload capacity **730**. In one configuration, the active processing module may decide to drop the task that it is unable to handle. The active processing module, expansion module, and/or external computational device(s) **1532** may also decide to return to step **701** to continue to check for a next available processing module, expansion module, and/or external computational device(s) **1532**.

A further set of operations for the computational module selector **2052** will now be discussed with reference to FIG. **23**. This set of operations identifies, for a selected computational module, such as an expansion module, software application, or other computational module, which processing modules or external computational device(s) **1532** contain the selected computational module for purposes of computational module selection. While the prior flow chart depicts a method to balance a processing load amongst plural processing devices, the present flow chart selects which duplicative computational module should perform a request by a user.

In step **2300**, the computational module selector **2052** detects a stimulus. Exemplary stimuli include a user or operator request to initiate a computational module and/or perform a selected task, function, or operation, an interrupt based on a

passage of a predetermined time, installation of a computational module, a request by a different user to use a platform currently executing the computational module, notification of a processing resource having unused bandwidth below a selected threshold, notification of a processing resource having used bandwidth above a selected threshold, a power level of a processing resource falling below a selected threshold, notification of a processing resource having an operational error, malfunction, or outage, and the like.

In step **2304**, the computational module selector **2052**, in step **2308**, determines duplicated computational modules and the host processing platform(s) therefore. Host processing platforms can include a processing module, expansion module, and/or external computational device(s) **1532**. Duplication may be for a specific computational device (e.g., from a common vendor and commonly named) or for a common type of computational device. For example, duplication may be determined for the differing versions of automotive navigation system applications GPS Drive™ by MotionX™, Garmin GPS™, Magellan GPS™, Tomtom GPS™, and other SPS systems or for all navigation applications generally regardless of vendor, application identity, or version.

In step **2312**, the computational module selector **2052** selects a computational module and platform to execute each duplicated computational module. For example, if an occupant requests, by an input/output system of the vehicle, a game or multimedia application and if different versions of the game or multimedia application are on a processing module **124** and external computational device(s) **1532**, the computational module selector **2052** can select the most recent version of the game or multimedia application and host platform containing same, regardless of whether the host platform is a processing module or external computational device **1532** currently in communication with a processing module and by what device, whether an input/output system or user interface of the external computational device **1532** receiving the request. If the request were to be received by an input/output system **1600** to initiate a game and the most recent version of the game were located on a processing module, the processing module would be selected to execute the game and output would be provided to an occupant by the corresponding input/output system **1600**. If the request were to be received by an input/output system **1600** to initiate a game and the most recent version of the game were located on an external computational device **1532**, the external computational device **1532** would be selected to execute the game and output would be provided to processing module for presentation to an occupant by the occupant's input/output system **1600**. If the request were to be received by an external computational device **1532** to initiate a game and the most recent version of the game were located on a processing module, the processing module would be selected to execute the game and output would be provided to an occupant by the external computational device **1532**. If the request were to be received by external computational device **1532** to initiate a game and the most recent version of the game were located on the external computational device **1532**, the external computational device **1532** would be selected to execute the game and output would be provided to processing module for presentation to an occupant by the external computational device **1532**.

In decision diamond **2316**, the processing module, or external computational device **1532**, by the user interface receiving the stimulus, whether an input/output system or the user interface of the external computational device **1532**, queries the user whether or not the older versions of the computa-

US 9,116,786 B2

37

tional module should be updated to the newer locally available or newest remotely available version.

If no or a negative response is received, the computational module selector **2352** proceeds to decision diamond **2324**.

If a positive response is received, the computational module selector **2052**, in step **2320**, requests the host platform to upgrade the computational module.

In decision diamond **2324**, the computational module selector **2052** determines whether the selected platform is currently available to execute the computational module. The selected platform may currently be executing other computational modules and have insufficient available processing resources for execution. The computational module selector **2052**, in that event, would attempt to off load some of the processing to another platform to free up sufficient processing resources for execution. In other words, the computational module selector **2052** would perform processing load balancing to more optimally use processing resources. A user may currently be using the selected platform, such as engaged in a call if the selected platform is a cellular phone or watching multimedia content. The computational module selector **2052** would determine if the platform can request the user for permission to use the platform for processing the computational module. When the user is on a call, such a request cannot be made. If a request can be made, the user is requested. The platform is only deemed to be available when the user provides input indicating availability.

When the platform is not available, the computational module selector **2052** in step **2328** selects a next available platform even though the platform may contain an older version of the computational module.

When the selected module is currently available or when the computational module selector **2052** selects a different platform in step **2328**, the computational module selector in step **2328**, initiates execution, by the selected platform, of the computational module.

Operation of Network Controller **1528**

FIG. **24** depicts another operation of the network controller **1528**. As noted, security for cyber attacks is important for an Internet-enabled vehicle. Drivers are accessing data from Internet service providers via smart phone, tablet computer, and/or on board or embedded technologies as well as utilizing hands-free communication technology to send and receive phone calls and text messages. Automotive manufacturers are sending and receiving data based on electronic sensor readings and event data recording. Due to the potentially dire consequences of a security breach event on on-board processing module operation, rigorous security measures should be deployed. While the vehicular network can employ passive techniques, such as configuration of access restrictions in access points (such as encryption, checks on MAC addresses, disabling ESSID broadcasting, isolation of the vehicular network by the firewall and gateway, hiding the SSID (Service Set Identifier), MAC ID filtering (allowing access from know, pre-approved MAC addresses, static IP addressing, IEEE 802.11, 802.11i, and/or 802.1x security, use of the wired equivalent privacy encryption, TKIP, EAP, LEAP, PEAP, WPAv 1, and/or WPAv2 protocols, end-to-end encryption (in one or more of 2, 3, and/or application layer), and RF shielding substantially surrounding the interior of the vehicle (to attenuate signals and prevent wireless signals from propagating outside the vehicle), active techniques may also be employed. Communications with external computational devices **1532** can be channeled through the gateway/firewall **1512**.

One active technique is depicted in FIG. **24**.

In step **2400**, the network controller **1528** detects a stimulus, such as an instance of a virus, malware, unauthorized access, misuse, modification, denial-of-service attack, spoof-

38

ing, man-in-the-middle attack, ARP poisoning, smurf attack, buffer overflow, heap overflow, format string attack, SQL injection, identity theft (or MAC spoofing), network injection, caffe latte attack, or denial of a computer network and/or network-accessible resource. The stimulus may be a warning signal received by the network controller **1528** from the gateway/firewall **1512**, a honeypot (which is a decoy network-assistant resource to provide network surveillance and early-warning tool, a network node, mapping a template corresponding to a specific attack type to received signals, a network probe, and the like.

In step **2404**, the network controller **1528** attempts to confirm the instance of potential security breach event. This can be done by reviewing historical behavior, such as shown by communication logs (containing signal description (e.g., type, source, destination, protocol, and payload type) and signal receipt timestamps) not only for the current node but also for other nodes and comparing the behavior to templates characteristic of differing types of attacks and/or applying rules to the historical behavior. The security breach event details, signal description (e.g., type, source, destination, protocol, and payload type) and signal receipt timestamps), are recorded in memory **220** and firewall settings, including whitelists and blacklists, are updated.

In decision diamond **2408**, the network controller **1528** determines whether or not the computational devices impacted or potentially impacted by the security breach event can be isolated from other vehicular network components or whether the active processing module can be isolated from other non-critical computational components. This can depend, for example, on whether the affected computational component is physically and/or logically within or internal and/or external to a Dimilitarized Zone ("DMZ") or perimeter network. As will be appreciated, a DMZ is a physical or logical subnetwork, within the vehicular wireless network, that contains and exposes the network's external-facing services to a larger untrusted network, usually the Internet. The purpose of a DMZ is to add an additional layer of security to the vehicular wireless network; that is, an external attacker only has access to equipment in the DMZ, rather than any other part of the network. The DMZ typically includes services, such as Web servers, mail servers, FTP servers, and voice mail servers. For an external computational device **1532** (outside the DMZ), such as a tablet computer, smart phone, laptop computer, personal digital assistant, and the like, and/or device within the DMZ isolation is possible simply by denying vehicular wireless network access or access, by a component of the vehicular wireless network, to the external computational device **1532**. For components in the vehicular wireless network, communications to and from the affected components, which normally do not pass through the gateway/firewall, can be redirected through and filtered by the gateway/firewall or, depending on the criticality of the affected component(s), such communications can be blocked. For the active processing module **124**, non-critical communications to and from other non-critical computational components, which normally do not pass through the gateway/firewall, can be redirected through and filtered by the gateway/firewall before being provided to the active processing module or, depending on the criticality of the communication(s), such communications can be blocked. Critical communications, or communications with critical components, typically cannot be delayed by firewall processing. In one variation, a critical communication security mechanism is activated for the components physically and/or logically within the vehicular wireless network and internal to the DMZ when a security breach event is detected. The security

US 9,116,786 B2

**39**

mechanism can include, for example, one or more of encrypting access restrictions in critical components and the active processing module (such as encryption, checks on MAC addresses, disabling ESSID broadcasting, hiding the SSID (Service Set Identifier), MAC ID filtering (allowing access from known pre-approved MAC addresses, static IP addressing, IEEE 802.11, 802.11i, and/or 802.1x security, use of wired equivalent privacy encryption, TKIP, EAP, LEAP, PEAP, WPAv 1, and/or WPAv2 protocols, and end-to-end encryption (in one or more of 2, 3, and/or application layer(s))).

When isolation is possible, the network controller **1528**, in step **2412**, isolates the affected computational device(s) from further communications with or filters communications with the active processing module **124** or the active processing module from further communications with the affected computational component(s) and alerts the user

and/or a remote node **1500** of the security breach event and details regarding it. When isolation is not possible, the network controller **1528** alerts the user and/or a remote node **1500** of the security breach event and details regarding it. The critical security mechanism may be activated to protect the critical components and active processing module.

Operation of Network Selector **2036**

The operation of the network selector **2036**, a subcomponent of the network controller **1528**, will now be discussed with reference to FIGS. **8** and **10-11**.

Referring to FIG. **8**, an active processing module **124**, in step **800**, receives a signal to transmit to a separate vehicle component. The signal can be, for example, from any on board computational component, including an on board sensor **1516** (including those discussed above), a critical or non-critical system controller **2012** or **2016**, an on board sensor monitor **2020**, the displayed object movement module **2024**, the diagnostic module **2028**, the media filter **2032**, the remote control module **2040**, the installation supervisor **2044**, the multimedia control module **2048**, the computational module selector **2052**, the media controller **1524**, the gateway/firewall **1512**, another processing module **124**, the transceiver **1508**, an input/output system **1520**, a network controller **1528**, and/or an external computational device **1532**.

The network selector **2036**, in step **804**, selects a network compatible with the type and/or required format of the signal, such as one or more of a local wired network **808**, local wireless network **812**, and/or the internet **816**, to deliver the signal to a selected local or remote endpoint, including those set forth in the prior paragraph. The selection is based on one or more factors, including a type, urgency, importance and/or requirements of the signal (e.g., whether the signal contains an urgent flag or other urgency indicator, a source of the signal (such as from an on-board sensor or sensor monitor, a critical component, a non-critical component, and the like), a type of signal payload (such as whether the signal contains multimedia), transmission and/or bandwidth requirements for the signal (e.g., requisite maximum latency, packet loss, jitter, and/or transmission rate, transport protocol, quality of service, and the like)), an operational status (e.g., operational or nonoperational) of each of the compatible networks, an operational status of an intermediate node on the compatible networks, a signal/noise ratio over each of the compatible networks, available and/or unavailable bandwidth for each of the compatible networks, current compatible network performance parameters (e.g., packet drop, latency, jitter, throughput, quality of service, availability, bandwidth utilization, error rate, delay, and the like), and other factors influencing signal quality, reliability, and/or transmission speed.

**40**

Network and node performance parameters and characteristics can be collected by any number of techniques. One technique uses the Simple Network Management Protocol (SNMP), which is a protocol for sending and transmitting network performance information. Network performance monitoring tools vary from simple one device applications to a complex hierarchical system. These systems employ a variety of monitoring techniques. Some systems use passive monitoring to gather information about network traffic while others actively poll network devices to gather network performance data. Exemplary network performance monitoring tools include packet sniffers, flow monitors, and application monitors. Flow monitoring aggregates network traffic based on individual connections, users, protocols, or applications. The network selector can obtain information regarding network and node performance by accessing a node's management information base (MIB). A MIB is a database used to store management information in networks. MIBs are used by network management systems to identify network data objects that are stored, retrieved and set by the system. A MIB uses a hierarchical tree structure to store an extensible collection of data. A subset of Abstract Syntax Notation One (ASN.1) is used to specify an object. The network selector can be configured as a network management system, which includes a centralized network management station and management agents running on network devices. Using a management protocol, the management station polls agents distributed throughout the network, such as in network nodes, for information about the network devices. Agents return requested information ranging from bandwidth usage to CPU load. Using this information, the network management system provides performance and error reporting information.

Generally, the network selector **2036** determines the type, urgency, importance and/or requirements of the signal and one or more of the above parameters for each of the compatible networks, compares the signal parameters with the compatible network parameters and selects the compatible network able to currently best satisfy the requisite signal parameters. For example, a signal from a critical component generally is transmitted by a local wired network **808**, such as a bus, due to the high signal quality, reliability and/or transmission speed required for the signal. A multimedia signal would generally not be transmitted by a local wired network as it is not commonly incompatible with the signal payload. Such a signal would more typically be transmitted by a local wireless network **812** (e.g., by Bluetooth™ or WiFi™ or a "hot spot") or, if the signal recipient (whether or not an on board component or remote node) has a corresponding IP address, by the internet **816**.

In one configuration, the network selector **2036** determines, for each of the plural communication networks, a corresponding one or more of a network status, a node status, a signal/noise ratio, an available and/or unavailable bandwidth, a current performance parameter(s), and a quality of service and selects the selected network based on one or more relative values associated with the corresponding value(s). The network selector can, for example, determine a composite value for each of the plural networks. The composite value is based on one or more of the corresponding one or more of a network status, a node status, a signal/noise ratio, an available and/or unavailable bandwidth, a current performance parameter(s), and a quality of service. The composite value computational algorithm can weight (or hierarchically rank) some of the individual values of network status, node status, signal/noise ratio, available and/or unavailable bandwidth, current performance parameter(s), and quality of service

US 9,116,786 B2

41

more or higher than others. The composite is used, rather than multiple values, in selecting the selected network.

By way of example, a signal relating to a critical task, function, and/or operation is deemed to have a higher level of importance than a signal relating to a non-critical task, function, and/or operation. The former signal may be transmitted by a low error-rate and low latency network, such as a bustype network, while the latter signal may be transmitted over a wireless network or even the Internet.

Once the compatible network is selected for signal transmission, the network selector **2036**, in step **820**, configures or causes to be configured the signal in accordance with the selected network's transmission protocol. For example, when the signal is to be transmitted over a local wireless network **812**, the signal payload and/or signal itself would generally be packaged (such as by a protocol stack) in a header and trailer in accordance with an appropriate one of the WiFi™ or Bluetooth™ protocols. By way of further example, when the signal is to be transmitted over the Internet **816**, the signal payload and/or signal itself would generally be packaged (such as by a protocol stack) in a header and trailer in accordance with TCP/IP suite of protocols.

The properly configured or formatted signal is then transmitted over the selected compatible network.

A further operation of the network selector **2036** will now be discussed with reference to FIG. **10**. In this operation, the network selector **2036** receives a media stream from a remote node **1500**, such as a radio or television station or other Web site, and selects an intermediate local network to carry the media stream to an input/output system for presentation to an occupant of the vehicle.

In step **1000**, a processing module **124** receives the media stream from the remote node **1500**. The media stream packets contain information associating the media stream with one or more input/output systems of the vehicle.

In step **1004**, the network selector **2036** determines the transmission mode and/or network based on various parameters, including network status, intermediate node status, signal/nose ratio of the network, type and/or source of media, available and/or unavailable bandwidth, network performance parameters (e.g., availability, packet drop, latency, jitter, throughput, etc.), quality of service, and the like. The network selector **2036** selects which of the local on board wireless network **812** (e.g., generated by a on board or portable component within the vehicle), local wired network **808**, and nearby independent wireless network **1008** (e.g., generated by a component external to the vehicle) is to carry the media to the destination input/output system(s) of the vehicle.

In step **1012**, the media is provided, over the selected network, to the destination input/output system(s).

Operation of Media Controller **1524**

A further operation of the network selector **2036** and operations of the media controller **1524** will now be discussed with reference to FIG. **11**. In this operation, the network selector **2036** receives a signal, which typically includes a media payload, from a local or remote node and selects an intermediate local compatible network to carry the media stream to an input/output system for presentation to an occupant of the vehicle. Depending on an input/output system mode, the signal is directed by the media controller **1524** only to a subset or to all of the input/output systems. In a dependent mode, common content is provided synchronously to each of the input/output systems while in an independent mode different content is provided to different ones of the input/output systems. While each occupant controls his or her input/output system in independent mode, the operator controls all input/

42

output systems in the dependent mode. This is particularly beneficial for young children as occupants. The operator typically selects which of the modes is in effect in the vehicle at any one time.

In step **1100**, the processing module **124** receives a signal for graphical presentation to one or more occupants. The signal typically comprises media as a payload.

In step **1104**, the network selector **2036** determines the transmission mode and/or compatible network based on various parameters, including network status, intermediate node status, signal/nose ratio of the network, type and/or source of media, available and/or unavailable bandwidth, network performance parameters (e.g., availability, packet drop, latency, jitter, throughput, etc.), quality of service, and the like. The network selector **2036** selects which of the local on board wireless network **812** (e.g., generated by a on board or portable component within the vehicle), local wired network **808**, and Internet **818** is to carry the media to the destination input/output system(s) of the vehicle.

In step **1108**, the media controller **1524** determines which of the input/output systems are to receive the media. There are a number of factors that can influence this decision. The first is whether the input/output systems are in dependent or independent mode. The second is whether an applicable law, whether federal, state, provincial, or local, limits the operation of one or more of the input/output systems. The satellite positioning system receiver on board the vehicle can provide, at any time, the precise vehicle position to a processing module. The processing module can use the position coordinates to determine a set of applicable laws and, from the set of applicable laws, determine one or more restrictions on input/output systems of vehicles within that jurisdiction. Restrictions may also be configured by the operator of the vehicle. These legal and operator restrictions are collectively referred to as rule set(s) **1612**. For example, exemplary restrictions, or rule sets **1612**, include not providing videos to the operator when the vehicle is in gear or moving, banning texting in the vehicle when the vehicle is in gear or moving, and banning cellular calls when the vehicle is in gear or moving. Restrictions may, alternatively, require the media to be presented to the operator and/or occupant in a specific manner. For example, the audio channel of a video may be permitted to be played in the absence of the video channel of the video. A cellular call may be permitted using a hands-free mode but not using a handheld phone.

In step **1112**, the media controller **1524** configures and transmits the signal in accordance with the selected network and the restrictions, if any, determined in step **1108**. Configuration refers not only to formatting and including the addresses of the input/output systems to receive the signal but also to changing the media payload, such as, for instance, removing video content while leaving audio content.

Upon receipt, the signal is processed by the display and/or audio controllers **1604** and **1608** and presented, by the recipient input/output system and over the corresponding input/output system to the occupant.

FIG. **17** depicts another operation of the media controller **1524**.

In step **1700**, the media controller **1524** detects a stimulus, such as an occupant request to change the operational mode of an input/output system.

In step **1704**, the media controller **1524** determines a current operational mode of the input/output system associated with each of the occupants (e.g., independent or dependent operation) and whether the occupant has authority or is privileged to request the change. The mode is changed only when the occupant is authorized or privileged to make the change.

US 9,116,786 B2

43

44

In step **1708**, the media controller **1524** determines when the requestor is authorized or privileged to request the operational mode change, the input/output system preferences of each of the occupant user(s) including the requestor.

In step **1712**, the media controller **1524** determines when the requestor is authorized or privileged to request the operational mode change, the pertinent rule set(s) **1612**. As noted, the rule set(s) **1612** include rules set by the owner or operator of the vehicle, manufacturer of the vehicle, and as a matter of applicable law.

In step **1716**, the media controller **1524** determines, when the requestor is authorized or privileged to request the operational mode change, a current state of each of the input/output system(s). The current state includes not only the on/off status and settings but also the content being displayed and operations currently being performed by the occupant for each of the input/output systems.

In step **1720**, the media controller **1524** determines when the requestor is authorized or privileged to request the operational mode change, a current display configuration of each of the input/output systems.

In step **1724** and when the requestor is authorized or privileged to request the operational mode change, the media controller **1524** configures or reconfigures each of the input/output systems and the corresponding displays as required by the new operational mode. For example, when the current operational mode is independent and the new operational mode is dependent, the media controller **1524** blocks content currently being provided to each of the subservient input/output displays in favor of providing to each of the subservient input/output displays the content provided to the master input/output display controlled by the requestor or to display content selected by the requestor. When the current operational mode is dependent and the new operational mode is independent, the media controller **1524** continues to provide the content formerly provided to all of the input/output systems to the requestor's input/output system but returns each of the other input/output systems to a default display. From the default display, the respective user can select customized content, which may be the same as or different from the content being provided to the requestor's input/output system.

FIG. **18** depicts another operation of the media controller **1524**.

In step **1800**, the media controller **1524** receives a signal from a local or remote node **1500**. The signal includes, for example, media from a web site or server or communication from a third party.

In optional step **1804**, the media controller **1524** unpacketizes the signal and analyzes the payload. This is done, for example, when the destination for the signal and/or type of payload is not clear from the packet header and/or trailer.

In step **1808**, the media controller **1524** selects an input/output system to receive the packet payload. This can be based, for example, on the destination information in the header and/or results of the analysis of optional step **1804**.

In step **1812**, the media controller **1524** determines the applicable rule set **1612** (or set of restrictions), if any, governing the destination input/output system and/or payload type or content.

In step **1816**, the media controller **1524** determines a current input/output system configuration(s). The current configuration includes not only settings and capabilities but also whether the input/output system is in the dependent or independent operational mode.

Based on the above information, the media controller **1524** determines whether the payload can be provided to each of the destination input/output systems and, if so, generates a command incorporating the payload and including commands to the input/output system on how to render and display the content. As noted, the payload cannot be provided to a subservient input/output system when in the dependent operational mode and the content differs from that provided to the master input/output system. It cannot be provided when an applicable rule set **1612** prohibits such presentation. It may need to be filtered to remove some of the payload to comply with the applicable rule set **1612**.

In step **1824**, the command is forwarded to each of the destination input/output systems.

FIG. **19** depicts another operation of the media controller **1524**.

In step **1900**, the media controller **1524** determines a location of each external computational device **1532** by a suitable technique. In one example, a signal receiver or transceiver or other connectivity access point, such as a wireless access point, WiFi™ antenna, and the like is placed at each input/output system and/or near each occupant seating location and/or at the operator's seat. The network interface on the network controller can force external computational devices to connect via a specified communication protocol, such as by Bluetooth™ or WiFi™.

In step **1904**, the media controller **1524** determines a spatial location of each of the external computational devices relative to one or more selected connectivity access points. Continuing the example of the prior paragraph, the media controller **1524** measures, at each connectivity access point, a signal strength for each detected external computational device and, using the measured signal strengths and a suitable algorithm such as triangulation, determines a spatial location of each external computational device and, in step **1908** for each located external computational device, a nearest input/output system and/or occupant seat.

In step **1912**, the media controller **1524** determines a pertinent rule set **1612** for the determined location of each external computational device.

In decision diamond **1916**, the media controller **1524**, based on the pertinent rule set **1612**, determines whether or not to accept connectivity access by each of the external computational devices or what limitations to place on such access. In the latter case, specific tasks, functions, and/or operations may be permitted by the pertinent rule set but not others. For example, a cellular phone may be forced into hands free calling mode or prevented from texting or using an instant messaging application or protocol when located at the operator's seat. The rule set **1612** may be configured as a table listing, by vehicle location, an applicable set of legal restrictions and/or permissions and the restrictions or permissions on specific tasks, functions, and/or operations.

When unlimited or limited access is permitted by the rule set **1612**, such access is provided by the media controller.

In decision diamond **1920**, the media controller **1524** monitors each of the external computational devices for a change in spatial location. In other words, the media controller detects movement of any external computational device from a first connectivity access point or input/output system or seat governed by a first rule set to a second different connectivity access point or input/output system or seat governed by a different rule set. This is so because each connectivity access point or input/output system or seat has a corresponding rule set. When no change detected, decision diamond **1920** is repeated by the media controller substantially continuously or periodically.

US 9,116,786 B2

45

When limited or unlimited access is not accepted (decision diamond **1916**) or a location change is detected (decision diamond **1920**), the media controller returns to step **1904**.

FIG. **25** depicts a further operation of the media controller **1524**. Currently, a particular vehicle radio may have access to XM, AM, FM, and in some cases "streaming audio" capabilities through separate sources (remote node(s) **1500**). However, it is necessary to change the input on a console to receive the information and music from a specific source.

It is an aspect of the present disclosure to provide a console capable of compiling and playing music and multimedia information (such as a streaming video) by a general and/or specific category. It is anticipated that the console may adaptively select the source providing the content according to specific rules, such as music type. For example, the console may select the strongest signal, or highest quality of channel. Furthermore the data is collected regardless of the source and represented by icons (independent of source) on the console. These icons may be selected by the user to access content. In one configuration, the icon corresponds to a type of music. The music is band and/or communication mode independent. For example, a "classical music" icon indexes and/or links to all classical music channels, whether AM, FM, streaming, XM, etc.

In some cases, a user may be listening to one station/source while media information is being received and cached from another station/source. In the event that the first signal is lost, the cached media signal or stream may play. Additionally, the system may adaptively "signal surf," for a given category, to determine the best channel to receive the highest or best quality signal (e.g., S/N ratio, stream or radio wave). Moreover, the system may be able to determine that a reception limit is being neared (by pilot signal back or satellite positioning system receiver location) and may push delayed broadcast media information or other content to a vehicle computer to be cached and listened to after coverage is lost.

In step **2500**, the media controller **1524** detects a stimulus indicating that caching of media content is to be performed. This may be a request by a user, a media signal falling below a specified signal-noise ratio, the vehicle nearing an estimated broadcast limit or range of the media source (or remote node **1500**), a request by a remote node **1500** (or signal source) to forward content to the vehicle for caching for later presentation to the user, a user action requiring the media not to be presented by the vehicle (e.g., the vehicle operation moves from being "parked" to being in gear (or in "drive" or "reverse"), and the like. As will be appreciated, many jurisdictions' laws prohibit displaying media to a driver while a vehicle is in operation.

In decision diamond **2504**, the media controller **1524** determines whether or not to cache media. Depending on the stimulus, rules configured by the user or default rules, may cause the stimulus to be ignored. For example, when the request is from a remote node **1500** the media controller **1524** may have a rule denying such SPAM-like requests, may determine that insufficient memory resources are available to cache the content, may determine that the media content or remote node **1500** constitutes a potential security breach event, or may have the remote node **1500** address, identity, or other identifier on a blacklist. When the media is a video, the video may be cached for one input/output system, namely that of the driver, but not for another input/output system, namely that of a passenger.

In step **2508**, when caching is to be performed the media controller **1524** commences caching the streaming media for

46

delayed presentation to the user. As will be appreciated, the media controller **1524** can continue normal buffering of streaming media packets.

In step **2512**, when caching is not to be performed, the media controller **1524** can continue normal buffering of streaming media packets but does not perform media caching.

FIG. **26** depicts a further operation of the media controller **1524**. The operation involves conforming media presentation, by input/output system, in a manner comply with a pertinent rule set **1612**. For example, instant messages, RSS feeds, Twitter messages, can, in response to a vehicle moving from a parked (non-operational) to an operational (in motion) state, cease displaying this content to the driver and, instead, audibly present the content and message source identifier to the driver, such as reading the source name or address and RSS feeds or Twitter or instant messages or enabling the audio channel for streaming multimedia while disabling the video channel.

In step **2600**, the media controller **1524** detects a stimulus indicating that media presentation is to be altered for one or more input/output systems. This may be a request by a user or a change in vehicle state from operational to non-operational or from non-operational to operational (e.g., a user action requiring the media not to be presented by the vehicle (e.g., the vehicle operation moves from being "parked" or a non-operational state to being in gear (or in "drive" or "reverse" or in motion), or an operational state). As will be appreciated, many jurisdictions' laws prohibit displaying media to a driver while a vehicle is in operation.

In decision diamond **2604**, the media controller **1524** determines whether or not to alter the media presentation for a selected input/output system. When, for example, the vehicle moves from an operational to a non-operational state, the media presentation for the selected input/output system can revert automatically to a more functional format. For instance, multimedia can have all channels, both audio and video, enabled for presentation, by the selected input/output system to the user. An RSS feed or Twitter or instant message, among others, can revert to text presentation, with automated reading being disabled.

In step **2608**, the media presentation is altered, as determined, for one or more selected input/output systems.

In step **2612**, media continues to be presented, in an unchanged format, on the selected input/output system.

Operation of Installation Supervisor **2044**

An operation of the installation supervisor **2044** will now be discussed with reference to FIG. **12**. The operation can provide a plug-and-play functionality for automotive components, whether device, hardware and/or software.

In step **1200**, the installation supervisor **2044** detects an attempt to install a new computational component in the vehicle. The attempt can be detected by receipt of an installation notification or request from a user or the computational component itself. The computational component can be software, hardware, or a combination thereof. Exemplary computational components include an on board sensor **1516**, a media controller **1524**, a gateway/firewall **1512**, a processing module **124**, a network controller **1528**, an input/output system **1520**, a display and/or audio controller **1604** and/or **1608**, an arbitration module **2000**, a health check module **2008**, a critical system controller **2012**, a non-critical system controller **2016**, an on board sensor monitor **2020**, a displayed object movement module **2024**, a diagnostic module **2028**, a media filter **2032**, a network selector **2036**, a remote control module **2040**, a computational module selector **2052**, an expansion module **290**, an application, a plug-in module, and the like.

US 9,116,786 B2

47

In step **1204**, the installation supervisor **2044** determines the characteristics of the computational component. Exemplary characteristics include manufacturer, model number, serial number, date of manufacturer, and capabilities.

In decision diamond **1208**, the installation supervisor **2044** determines whether the component is already linked to another vehicle. This can be done by accessing the memory of the installation component itself to check for a prior installation or accessing the records of the manufacturer via remote node **1500**.

When the component has not yet been linked to another vehicle, the installation supervisor **2044**, in decision diamond **1212**, determines whether the installation is in compliance with licensing restrictions on the use of the computational component. Licensing conditions and/or restrictions can include payment of funds to vendor, use restrictions (e.g., user-based license restrictions (e.g., authorized user, concurrent user, floating user, and user value unit restrictions), capacity-based license restrictions (e.g., install, processor value unit, server and virtual server restrictions), territorial restrictions (e.g., use permitted only in certain countries, states, provinces, and the like), and other license restrictions (e.g., client device (or host vehicle-based restrictions) and resource value unit restrictions)), and other conditions and/or restrictions.

When the component installation is in compliance with applicable license restrictions, the installation supervisor **2044**, in decision diamond **1216**, determines whether the computational component is eligible for use in the current vehicle. Eligibility is based not only on specifications and capabilities of the computational component but also vehicle manufacturer approval or disapproval of the computational component for vehicles having this particular make, model and year of manufacture.

When the computational component is eligible for use in the current vehicle, the installation supervisor **2044**, in step **1220**, creates data structures in the memories of the computational component and computational module binding the computational component to the vehicle. This can be done, for example, by creating data structures in the memory of the computational component containing a serial number or vehicle identification number of the vehicle and in the memory **220** of the processing module containing a serial number or other unique identifier for the computational component and a description of the type, make, model, year of manufacture, and date of installation of the computational component.

When any of the following is true, namely the computational component is already linked to another vehicle (decision diamond **1208**), the license does not permit the installation of the computational component (decision diamond **1212**), and/or the component is ineligible for use with the current vehicle (decision diamond **1216**), the installation supervisor **2044**, in step **1224**, ignores the computational component, and therefore refuses installation of same, logs the attempted installation (including a description of the computational component and time stamp associated with the attempted installation) and/or notifies a remote node **1500** (such as a manufacturer for purposes of warranty invalidation) and/or the operator of the invalid attempt.

Operation of Media Filter **2032**

An operation of the media filter **2032** will be discussed with reference to FIG. **13**.

In step **1300**, a processing module **124** receives a signal from a third party source, such as a web site or server (in

48

response to web browsing) or a communication from a third party, such as email, text, cellular call, and the like, for presentation to an occupant.

In step **1304**, the media filter **2032** determines preferences of the occupant and/or other restrictions. Preferences include, for example, a white or black list (of approved or disapproved message sources respectively), presence of the destination occupant as received from a presence server or service associated with the destination occupant, preferences of or rules relating to the destination occupant as determined by another occupant having privileges to control content presented to the destination occupant (e.g., parental control of content and/or communications presented to a child), context of the destination occupant (e.g., driving the vehicle, engaging in an unrelated higher priority activity on the input/output system associated therewith, etc.), and governing laws (or an applicable rule set **1612**).

In decision diamond **1308**, the media filter **2032** determines, based on the determined preferences and/or restrictions from step **1304**, whether or not to block the signal or alter the payload of the signal to conform with the preferences and/or restrictions.

When the signal is not to be blocked, the media filter **2032** proceeds to step **1312** and presents the signal or its payload to the destination occupant. The signal may be blocked, for example, when it is a call to an operator while the vehicle is in motion (to comply with a state or local law). Electronic SPAM may be blocked.

When the signal is to be blocked, the media filter **2032** proceeds to step **1316** and blocks the signal. The signal may be blocked, for example, when it is a call to an operator while the vehicle is in motion (to comply with a state or local law). Electronic SPAM may be blocked.

Operation of Diagnostic Module **2028**

The diagnostic module **2028** queries on board sensors **1516** and/or on board sensor monitor(s) **2020**, and/or critical and/or non-critical system controller(s) **2012** and **2016** to determine states of various parts, components, subsystems, tasks, functions, and/or operations of the vehicle. The diagnostic module **2028** can then perform diagnostics using locally stored or remotely stored (at remote node **1500**) pre-determined logic to identify faults, malfunctions, or other problems and, optionally, generate repair advice and/or warnings and/or instructions and/or recommendations to the vehicle operator. This diagnosis can also locate and/or determine and/or identify any parts or components required to repair the vehicle, the source and/or source(s) for replacement parts and/or components, identify a nearest and/or preferred service or repair facility or service, provide an estimate of the repair cost at a selected facility and/or comparative estimates at different facilities in proximity to the vehicle's current location, and/or obtain any manufacturer's and/or vendor's update information required to repair or resolve the identified fault, malfunction, or other problem. The diagnostic module **2028** can provide any repair instructions and/or recommendations to the operator, pre-order the replacement parts and/or components, contact the nearest and/or preferred service facility for a repair estimate, contact the nearest and/or preferred service facility to schedule an appointment for the repair or service, and/or forward, optionally at the owner's and/or operator's instructions, the collected information regarding the fault, malfunction, or other problem to a remote node **1500** (specified by the operator and/or owner) for monitoring and/or evaluation. The owner and/or operator can have a default location or select a location for fault, malfunction, or other problem analysis assistance.

**49**

FIG. **14** depicts an operation of the diagnostic module **2028**.

In step **1400**, the diagnostic module **2028** receives, from a local or remote source (such as the remote node **1500**), a signal warning of an actual or potential malfunction of an on board component, including any of the components discussed above.

In step **1404**, the diagnostic module **2028**, in step **1404**, determines user and/or default preferences regarding treatment of the signal. The various options include one or more of present the signal to a third party such as a manufacturer or servicing entity (option **1408**), presenting the signal to an occupant of the vehicle (option **1412**), contacting an emergency service provider or first responder (e.g., request tow truck or roadside service provider, contact police, and/or request dispatch of an ambulance), a service facility located in proximity to a current vehicle location, a manufacturer, a replacement part source, and a remotely located diagnostic service to diagnose a cause of the warning and/or error signal and performing on board diagnostics (option **1416**) to obtain more diagnostic information regarding the actual or potential malfunction followed by option **1408** or **1412**. In one application, the signal is forwarded to a manufacturer or repair service vendor that compares the reported fault and vehicle-specific parameters (e.g., mileage, date of last service, and/or environmental conditions) to the maintenance and/or fault history for the vehicle model and provides, to the vehicle operator, the result of the comparison along with a probability of the diagnosis being correct. The signal can include, for example, a current (SPS or map) location of the vehicle, an identity of the vehicle and/or vehicle owner or occupant, and diagnostic information and/or diagnosed cause of the warning signal. The manufacturer or service vendor also updates its database for the particular model of the vehicle to reflect the reported fault. The manufacturer or service vendor can dispatch an emergency service provider or first responder to the location reported by the vehicle SPS, and/or schedules the workload for the repair shop and pre-orders the required part(s) for the repair shop. The diagnostic module can recommend a source of conduct or action (including those discussed above) for the vehicle operator and, if accepted, execute or cause execution of same.

In step **1420**, the diagnostic module **2028** determines a further treatment of the warning or error signal. The determination may be based, for instance, on a command or request received from the third party or occupant or an applicable set of rules and/or policies.

FIG. **28** depicts another operation of the diagnostic module **2028**.

FIG. **28** depicts a vehicle ecosystem capable of providing accurate indications for purposes of service and maintenance in accordance with embodiments of the present disclosure. Currently, vehicles may offer a warning light and/or series of lights to provide information to a user regarding vehicle condition. These lights may have a multitude of meanings that may require further inspection by a mechanic or other qualified individual. In order to interpret and decode the meanings behind a light combination, the user is routinely required to consult the owner's manual, the Internet, or to call the dealer. In some cases, these lights are only maintenance reminders and need not be immediately addressed. However, in other cases, the lights are urgent and require immediate attention.

The present disclosure can provide an Internet enabled car that is capable of transmitting vehicle codes, error code readings, and to remotely diagnose and display these codes to a user and/or a mechanic. This diagnostic information may be performed on-board or remotely. It is anticipated that the

**50**

information may be accessed according to chosen preferences. Additionally, it is anticipated that based on the type of warning/error code, the system may suggest a recommended course of action. For example, if the error code indicates a severe or catastrophic failure the system may suggest to pull-over, stop the car, and proceed to a safe area away from the automobile.

In some embodiments, the system may provide "conversational" warnings to a user. These warnings and associated codes may also be simultaneously transmitted to a selected garage and/or postponed for approval to transmit to the nearest garage (either wired or wirelessly). In addition, the system may estimate an approximate time to fix (based on past garage fix times, garage inventory, severity of problem, combinations, etc.) and make appropriate suggestions. For example, the system may provide the conversational warning "Please do not be alarmed, your engine is running slightly low on oil; there are four garages in the general area. You have time to get a cup of coffee while you wait; here are three coffee shops in the immediate location" and/or "It appears that the rear left suspension is malfunctioning and the upper strut will need to be replaced. It is noticed that you are greater than 80 miles from home, would you like to book a reservation at a local hotel? There are five hotels in the area rated three stars or above."

Referring to FIG. **28**, the diagnostic module **2028**, in step **2800**, receives and interprets a maintenance and/or system error and/or warning code. Such codes are known in the art of automotive design and generally depend on the automotive and/or component manufacturer. Accordingly, the diagnostic module **2028** will, generally, have a lookup table or other set of data structures to map the code not only to a corresponding condition and/or conversation meaning but also behavioral rule in a rule set. In appropriate applications, the conversational meaning can be further determined based on the condition.

The diagnostic module **2028**, in step **2808**, provides the conversational meaning, such as audibly and/or visually, to the vehicle operator.

The diagnostic module **2028**, in step **2812**, determines other factors related to the received code(s). The pertinent rule in the rule set, for example, can cause the diagnostic to query other components potentially impacted by the condition and/or having other data points relevant to the condition. The diagnostic module **2028**, in accordance with the pertinent rule, may contact a remote node for additional information relevant to the code, including the conversational advice to be provided to the vehicle operator.

In step **2816**, the diagnostic module **2028** provides the conversational advice to the operator. The advice may be interactive in which event the operator would query the diagnostic module **2028** for information not clear from the initially provided conversation meaning and/or advice. A menu-type structure can be used by the diagnostic module to respond to the operator request for further information. Such further information may require the diagnostic module to initiate a contact, on behalf of the operator, with a remote node **1500**.

In step **2820**, the diagnostic module logs codes, internally and/or provides the codes to a remote node **1500** for logging, and provides for transfer of the operator to a selected entity or entities, such as one or more remote nodes **1500**.

In step **2824**, the diagnostic module **2028** optionally transfers the codes, on a predetermined stimulus, to a remote node **1500**.

US 9,116,786 B2

**51**

Operation of Displayed Object Movement Module **2024**

An operation of the displayed object movement module **2024** will now be discussed with reference to FIGS. **21** and **22**. The displayed object movement module **2024** enables a user to share displayed content or other image, in substantial real time and not via a message transmitted by a component located physically outside of the vehicle, with one or more other input/output systems. Typically, the displayed content is simply directed by the media controller to the target display (and/or a computational device associated with the target occupant as discussed in more detail below). The displayed object can be any displayed image, including streaming video, a web page, an icon, a window, an application, other content, and the like.

In step **2100**, the displayed object movement module **2024** detects a stimulus. The stimulus can be, for example, receipt of a gesture by a touchscreen display of an input/output system, user selection on a first input/output system of a different second input/output system to which the displayed object is to be moved, and the like.

In step **2104**, the displayed object movement module **2024** determines, based on the stimulus, to which input/output system display to move the displayed object.

FIG. **22**A depicts one technique to determine the destination input/output system(s). Each of the dashed lines **2208***a*— connecting to the displayed object **2204** in the display **2200** indicates a direction, or vector, along which the displayed object **2204** is to be moved. The displayed object movement module **2024** projects the direction to determine an input/output display intersected by or nearest the projection of the vector. By way of illustration, the first gesture **2208***a* (if received by an input/output system in a back seat) will cause the displayed object **2204** to move to the driver's input/output system (which corresponds to position "1"), the second gesture **2208***b* (if received by an input/output system in a back seat) will cause the displayed object **2204** to move to the input/output system positioned in the middle front seating position (which corresponds to position "2"), the third gesture **2208***c* (if received by an input/output system in a back seat) will cause the displayed object **2204** to move to the input/output system positioned in the right (facing the front of the vehicle) front seating position (which corresponds to position "3"), the fourth gesture **2208***d* (if received by an input/output system in either a front or back seat) will cause the displayed object **2204** to move to the left adjacent input/output system (relative to the gesture receiving input/output system) (which corresponds to position "4"), the fifth gesture **2208***e* (if received by an input/output system in either a front or back seat) will cause the displayed object **2204** to move to the right adjacent input/output system (relative to the gesture receiving input/output system) (which corresponds to position "5"), the sixth gesture **2208***f* (if received by an input/output system in a front seat) will cause the displayed object **2204** to move to the input/output system positioned in the left rear seating position (which corresponds to position "6"), the seventh gesture **2208***g* (if received by an input/output system in a front seat) will cause the displayed object **2204** to move to the input/output system positioned in the middle rear seating position (which corresponds to position "7"), and finally the eighth gesture **2208***h* (if received by an input/output system in a front seat) will cause the displayed object **2204** to move to the input/output system positioned in the right rear seating position (which corresponds to position "8").

FIG. **22**B depicts one technique to determine the destination input/output system(s). The display **2200** of the user's input/output system displays a seating diagram of the vehicle. The first seat icon **2212***a* corresponds to the driver's seating

**52**

position, the second seat icon **2212***b* to the middle front seating position (if present), the third seat icon **2212***c* to the right front seating position, the fourth seat icon **2212***d* to the left rear seating position, the fifth seat icon **2212***e* to the middle rear seating position (if present), and the sixth seat icon **2212***f* to the right rear seating position. This display would typically be selected from the display containing the displayed object to be moved and would be selected before or after selection of the displayed object for movement. Unlike the prior technique, which generally requires the displayed object to be moved to multiple input/output systems sequentially or entry of multiple gestures, which can be laborious, the seating diagram enables the displayed object to be moved substantially simultaneously to multiple input/output systems. Specifically, selection of a seating position selects the input/output system servicing the seating position. Multiple seating positions can be selected from the display **2200**, which, when a movement command is received, causes the displayed object to be moved to each of the input/output system(s) servicing the seating position(s) selected.

Other modalities for sharing the displayed object or content are possible. The displayed object movement module **2024** can provide the user seeking to share content with a list of the sensed identities of the various vehicle occupants. The user can simply select the occupants, by his or her corresponding unique identifier, to receive the shared content. When selected, the vehicle processing module would have a corresponding seating position and display for each named occupant. The content is, upon receipt of a "share" or "send" command then shared with each selected occupant's respective delay. The identity can be name, nickname, contact address (such as email address or instant message handle), and the like. The identity of each occupant can be sensed by any suitable technique, including parameters, such as weight, received by a seating sensor of the occupant's seat, seat or other settings selected by the occupant and received by a processing module, a computational device, such as a cell phone, laptop, tablet computer, e-reader, personal digital assistant, and the like carried by the occupant (such information would be exchanged, such as by a handshake, by the vehicle's processing module and the computational device), direct input from the occupant or user, sensed biometric information, and the like.

Returning to FIG. **21**, the displayed object movement module **2024** moves the displayed object selected for movement to the display of each of the selected input/output systems and alters the current display of each of the selected input/output systems to include the moved displayed object. Alteration of the display can depend on the content currently being viewed at each of the targeted displays. For example, if a target display is displaying streaming video, the moved displayed object could be minimized, giving the user the option of opening the displayed object and interrupting the video display. If a target display is inactive for a specified time period and therefore in "sleep" or "power down" mode, the moved displayed object could be maximized and the display awakened from a "sleep" or "power down" mode to display the maximized displayed object. The format and other display parameters of the shared content or displayed object can also be based on default or preferences of the sharing user or selected recipient (or target occupant) or a further command received from the sharing user or target occupant.

In decision diamond **2112**, the displayed object movement module **2024** determines whether to continue display of the displayed object on the source display which received the movement command for the displayed object. The determination can be based on default or preferences of the sharing

US 9,116,786 B2

53

user or target occupant or a further command received from the sharing user or target occupant. When the source display is to be altered, the displayed object movement module **2024**, in step **2116**, alters the source display to remove the displayed object. When the source display is not to be altered, the displayed object movement module **2024**, in step **2120**, continues to display the displayed object.

Problems can arise when the display of the target occupant is not activated. The vehicle processing module can determine which of the displays are activated and not activated. The vehicle processing module can cause each of the targeted displays to be activated if not already activated. Alternatively, the processing module can simply ignore any share command for those targeted displays that are not activated but perform the command for those targeted displays that are activated.

One optional operating mode of the displayed object movement module **2024** is to share the displayed object or other selected content with a computational device such as a cell phone, laptop, tablet computer, e-reader, personal digital assistant, and the like, carried and/or associated with one or more selected occupants and currently present in the vehicle. In that event, the content can be shared with the targeted display if activated and/or with the computational device if activated. The sharing user could specify which of the display and computational device is to be the recipient of the shared content. Alternatively, an order of priority could govern the selection. For example, the display is selected if activated and, if not activated, any activated computational device associated with the recipient and currently physically present in the vehicle would be selected as the recipient.

Operation of Presence Reporting Module **2056**

A presence reporting module considers local laws, individual (or contactee) context, and other factors in determining whether an individual is present (e.g., for unified communications) and, if so, by what communication modalities and/or channel(s) (e.g., Voice over IP, cellular call, email, texting, tweeting, instant messaging, short message service, audio and video enabled call, and the like. Local laws, for example, may prohibit cellular calls and/or texting and/or tweeting while the car is in motion. In that event, a permissible communication channel, such as email or paging, is reported to the presence service **1500**. The context could include, for example, the contactee is in the driver's seat (as determined by an on board sensor, such as a seating sensor, and the like), the vehicle is in motion, the vehicle is parked, the contactee is absent from vehicle (as determined by an on board sensor, such as a seating sensor, and the like), the contactee is currently using his or her corresponding input/output system and therefore is or is not available (depending on contactee preference), a current seating position of the contactee (e.g., whether the contactee is a driver or passenger), a current geographical and/or geopolitical location of the vehicle, and so on. Other factors include, for example, the on board communication system and/or external computational device(s) **1532** are currently out of cellular phone range, the on board communication system and/or external computational device(s) **1532** are currently roaming, the wireless connection, such as over a cellular network, with the on board communication system and/or external computational device(s) is currently unacceptable (e.g., unacceptably low signal-to-noise ratio or quality or grade of service), and the like.

In one exemplary application, the presence reporting module can determine, based on the vehicle occupant context, whether the vehicle occupant is present and available for receiving an inbound communication and/or by what communication channel and/or modality to contact the vehicle occupant. The vehicle occupant context can be one or more of

54

whether the vehicle occupant is in the driver's seat, whether the vehicle is in motion and/or in gear, whether the vehicle is parked, whether the vehicle occupant is absent from vehicle, whether the vehicle occupant is currently using his or her corresponding on board input/output system, whether an on board vehicle transceiver to receive in bound communications is contactable, whether the on board vehicle transceiver is currently roaming, and whether a quality and/or grade of service of a wireless connection with the vehicle transceiver is unacceptable.

With reference to FIG. **29**, the presence reporting module **2056**, in step **2900**, detects a stimulus, such as a passage of time, a query by the presence service **1500**, an incoming or inbound contact, a change in user context, a change in the applicable local law due to a change in location of the vehicle, a change in contactee context, or a change in another factor.

In step **2904**, the presence reporting module **2056** collects the context of the contactee, such as by querying on board sensors **1516**, a input/output system **1520** corresponding to a seating location of the contactee to determine a current state of the input/output system (operational or non-operational) and/or activity of the contactee (e.g., web surfing, playing media, engaged in a phone call, etc.), an external computational device **1532** associated with the contactee, and/or the transceiver **1508** and/or network controller **1528** for information regarding the available networks for a communication and/or the quality of a connection over each network.

In decision diamond **2908**, the presence reporting module **2056** determines whether the previously reported presence information requires updating (e.g., the previously reported presence information is no longer valid due a sensed change). When no update is required, the presence reporting module **2056** returns to step **2900**. When an update is required, the presence reporting module **2056** proceeds to step **2912**. In step **2912**, the presence reporting module **2056** reports the update(s) (or changes to the previously reported presence information) to the presence service **1500**.

In step **2916**, the presence service **1500** receives the update(s) and updates the current presence information for the associated contactee.

Operation of Networking Module **2070**

An operation of the networking module **2070** will now be discussed with reference to FIG. **30**.

Networking, particularly social networking, among vehicles can add a new dimension to driving. For example, an operator can socially network with a friend driving in the next lane. Although this can be done with cell phones, it can be difficult to retrieve the number while driving let alone to dial it without increasing accident risk. Rather than fuming silently, occupants of different vehicles can conduct a social round table as they sit in gridlock. If an operator wanted to communicate with another car, he or she could address it using the license plate number. When the networking session is a social networking session, the networking participants in each of the networked vehicles can be members of a preexisting online community, e-community, and/or virtual community.

There are a myriad of other examples of networked vehicles. Networked vehicles, for example, can enable multiple cars to connect while on car trips to share information about how much gas is left in the fuel tanks, competing fuel economy between the cars, shared routes, and land marks and gas stations on the route ahead. Networked vehicles can record the real-time fuel economy of a vehicle and then compare that fuel economy to peers, thereby enabling the driver to see other drivers that have driven the same, or similar routes, and receive suggestions from other drivers on the best route

US 9,116,786 B2

55

for the best fuel economy. A ride-sharing network can encourage ad hoc carpooling and provide a rating and recommendation system for its users. Networked vehicles can play games with one another. Since the game could have access to car metrics, games could incorporate actual car data, such as speed, fuel, etc. Games could simulate what would happen if an operator drove the way he or she wanted to. Kids in socially networked vehicles can play games against one another.

With reference to FIG. **30**, the processing module of a vehicle receives a stimulus in step **3000**. The stimulus can be a request by a user to initiate a network with a vehicle identified by the user providing the license plate number, receipt of a request for initiating a networking session from another vehicle, the determination that a vehicle of a socially networked contact is available to initiate a networking session, and the like.

In step **3004**, the social networking module **2070** identifies the vehicles in wireless communication with the selected vehicle and having one or more occupants in a networking relationship with a current vehicle occupant. The networked vehicles are typically in spatial proximity to one another, with the networking messages being exchanged over a short-range wireless technology forming a personal area network such that the information is not exchanged over the Internet. The networked vehicles can be in spatial proximity to one another, the networking messages can be exchanged using a short wavelength radio transmission having a limited range, and the radio transmission can use a frequency band ranging from about 2 to about 3 GHz.

In step **3008**, the networking module **2070** determines whether or not to initiate a networking session. This can be determined by receiving user input, predetermined rules provided by the user, legal restrictions on the ability of the current or other vehicle to engage in a networking session, and the like.

When a networking session is to be initiated, the networking module **2070**, in step **3012**, initiates the session.

In optional step **3016**, the networking module **2070** collects vehicle information and provides the information to the networked vehicle. The other vehicle, in return, can provide its collected vehicle information.

In step **3020**, the networking module terminates or suspends the session when a vehicle occupant leaves one of the networked vehicles and/or at the request of a vehicle occupant.

After step **3020** or when no networking session is to be initiated (decision diamond **3008**), the networking module **2070** returns to step **3000**.

The exemplary systems and methods of this disclosure have been described in relation to vehicle processing modules. However, to avoid unnecessarily obscuring the present disclosure, the preceding description omits a number of known structures and devices. This omission is not to be construed as a limitation of the scopes of the claims. Specific details are set forth to provide an understanding of the present disclosure. It should however be appreciated that the present disclosure may be practiced in a variety of ways beyond the specific detail set forth herein.

Furthermore, while the exemplary aspects, embodiments, and/or configurations illustrated herein show the various components of the system collocated, certain components of the system can be located remotely, at distant portions of a distributed network, such as a LAN and/or the Internet, or within a dedicated system. Thus, it should be appreciated, that the components of the system can be combined in to one or more devices, such as a vehicle computer system, a Personal Computer (PC), laptop, netbook, smart phone, Personal Digi-

56

tal Assistant (PDA), tablet, etc., or collocated on a particular node of a distributed network, such as an analog and/or digital communications network, a packet-switch network, or a circuit-switched network or collocated on a particular node of a distributed network, such as an analog and/or digital communications network, a packet-switch network, or a circuit-switched network. It will be appreciated from the preceding description, and for reasons of computational efficiency, that the components of the system can be arranged at any location within a distributed network of components without affecting the operation of the system. For example, the various components can be located in a server. Similarly, one or more functional portions of the system could be distributed between a communications device(s) and an associated computing device.

Furthermore, it should be appreciated that the various links connecting the elements can be wired or wireless links, or any combination thereof, or any other known or later developed element(s) that is capable of supplying and/or communicating data to and from the connected elements. These wired or wireless links can also be secure links and may be capable of communicating encrypted information. Transmission media used as links, for example, can be any suitable carrier for electrical signals, including coaxial cables, copper wire and fiber optics, and may take the form of acoustic or light waves, such as those generated during radio-wave and infra-red data communications.

Also, while the flowcharts have been discussed and illustrated in relation to a particular sequence of events, it should be appreciated that changes, additions, and omissions to this sequence can occur without materially affecting the operation of the disclosed embodiments, configuration, and aspects.

A number of variations and modifications of the disclosure can be used. It would be possible to provide for some features of the disclosure without providing others.

For example in one alternative embodiment, the application store is applied in a vehicle other than a wheeled or tracked vehicle. For example, the application store can be implemented in an aircraft, boat, ship, and the like.

In another alternative embodiment, the application store can include not only media player software but also media itself. Media, for example, can involve one or more media types (e.g., audio and/or video). Media can thus refer to music, movies, videos, audio books, pictures, screen savers, display wallpaper, and the like.

In yet another embodiment, the systems and methods of this disclosure can be implemented in conjunction with a special purpose computer, a programmed microprocessor or microcontroller and peripheral integrated circuit element(s), an ASIC or other integrated circuit, a digital signal processor, a hard-wired electronic or logic circuit such as discrete element circuit, a programmable logic device or gate array such as PLD, PLA, FPGA, PAL, special purpose computer, any comparable means, or the like. In general, any device(s) or means capable of implementing the methodology illustrated herein can be used to implement the various aspects of this disclosure. Exemplary hardware that can be used for the disclosed embodiments, configurations and aspects includes computers, handheld devices, telephones (e.g., cellular, Internet enabled, digital, analog, hybrids, and others), and other hardware known in the art. Some of these devices include processors (e.g., a single or multiple microprocessors), memory, nonvolatile storage, input devices, and output devices. Furthermore, alternative software implementations including, but not limited to, distributed processing or component/object distributed processing, parallel processing, or

US 9,116,786 B2

57

58

virtual machine processing can also be constructed to implement the methods described herein.

In yet another embodiment, the disclosed methods may be readily implemented in con junction with software using object or object-oriented software development environments that provide portable source code that can be used on a variety of computer or workstation platforms. Alternatively, the disclosed system may be implemented partially or fully in hardware using standard logic circuits or VLSI design. Whether software or hardware is used to implement the systems in accordance with this disclosure is dependent on the speed and/or efficiency requirements of the system, the particular function, and the particular software or hardware systems or microprocessor or microcomputer systems being utilized.

In yet another embodiment, the disclosed methods may be partially implemented in software that can be stored on a storage medium, executed on programmed general-purpose computer with the cooperation of a controller and memory, a special purpose computer, a microprocessor, or the like. In these instances, the systems and methods of this disclosure can be implemented as program embedded on personal computer such as an applet, JAVA® or CGI script, as a resource residing on a server or computer workstation, as a routine embedded in a dedicated measurement system, system component, or the like. The system can also be implemented by physically incorporating the system and/or method into a software and/or hardware system.

Although the present disclosure describes components and functions implemented in the aspects, embodiments, and/or configurations with reference to particular standards and protocols, the aspects, embodiments, and/or configurations are not limited to such standards and protocols. Other similar standards and protocols not mentioned herein are in existence and are considered to be included in the present disclosure. Moreover, the standards and protocols mentioned herein and other similar standards and protocols not mentioned herein are periodically superseded by faster or more effective equivalents having essentially the same functions. Such replacement standards and protocols having

The present disclosure, in various aspects, embodiments, and/or configurations, includes components, methods, processes, systems and/or apparatus substantially as depicted and described herein, including various aspects, embodiments, configurations embodiments, subcombinations, and/ or subsets thereof. Those of skill in the art will understand how to make and use the disclosed aspects, embodiments, and/or configurations after understanding the present disclosure. The present disclosure, in various aspects, embodiments, and/or configurations, includes providing devices and/or processes in the absence of items not depicted and/or described herein or in various aspects, embodiments, and/or configurations hereof, including in the absence of such items as may have been used in previous devices or processes, e.g., for improving performance, achieving ease and\or reducing cost of implementation.

The foregoing discussion has been presented for purposes of illustration and description. The foregoing is not intended to limit the disclosure to the form or forms disclosed herein. In the foregoing Detailed Description for example, various features of the disclosure are grouped together in one or more aspects, embodiments, and/or configurations for the purpose of streamlining the disclosure. The features of the aspects, embodiments, and/or configurations of the disclosure may be combined in alternate aspects, embodiments, and/or configurations other than those discussed above. This method of disclosure is not to be interpreted as reflecting an intention

that the claims require more features than are expressly recited in each claim. Rather, as the following claims reflect, inventive aspects lie in less than all features of a single foregoing disclosed aspect, embodiment, and/or configuration. Thus, the following claims are hereby incorporated into this Detailed Description, with each claim standing on its own as a separate preferred embodiment of the disclosure.

Moreover, though the description has included description of one or more aspects, embodiments, and/or configurations and certain variations and modifications, other variations, combinations, and modifications are within the scope of the disclosure, e.g., as may be within the skill and knowledge of those in the art, after understanding the present disclosure. It is intended to obtain rights which include alternative aspects, embodiments, and/or configurations to the extent permitted, including alternate, interchangeable and/or equivalent structures, functions, ranges or steps to those claimed, whether or not such alternate, interchangeable and/or equivalent structures, functions, ranges or steps are disclosed herein, and without intending to publicly dedicate any patentable subject matter.

What is claimed is:

1. A vehicle, comprising:
a plurality of vehicle components comprising a power source, wheels, a transmission, a transmission gear controller, a power controller, a braking system, a steering wheel, a display panel, an occupant seating system, and a satellite positioning system receiver; and
a microprocessor executable remote control module operable to (a) receive a command from a requestor to configure and/or alter and/or determine a state of a selected vehicle component, (b) when the requestor is authenticated successfully by the remote control module, determine whether the requestor is privileged to issue the command, and (c) when the successfully authenticated requestor is privileged to issue the command, configure and/or alter and/or determine a state of the selected vehicle component, wherein a first requestor, when authenticated successfully, is entitled to a first set of privileges to configure and/or alter and/or determine a state of the selected vehicle component and a second requestor, when authenticated successfully, is entitled to a different second set of privileges to configure and/or alter and/or determine a state of the selected vehicle component.

2. The vehicle of claim 1, wherein the selected vehicle component is the display panel and wherein the configuration and/or alteration is one or more of moving a graphical object to another location, removing a graphical object from the display panel, adding a graphical object to the display panel, adding wall paper to the display panel, and altering a setting of the display panel.

3. The vehicle of claim 1, wherein the requestor is one or more of an owner of the vehicle, an insurance company insuring the vehicle, a theft prevention service, and a law enforcement agency, wherein the selected vehicle component is a programmable hard button, and wherein the configuration and/or alteration is to assign, to the hard button, a different function.

4. The vehicle of claim 1, wherein the command is to download media content from the Internet and save the downloaded content in on board memory of the vehicle.

5. The vehicle of claim 1, wherein the command is to change a vehicle performance mode from a first performance configuration to a second performance configuration and/or alter a setting of a vehicle component associated with a power unit and/or drive train of the vehicle.

US 9,116,786 B2

59

**6**. The vehicle of claim **1**, wherein the command is to determine a state of the selected vehicle component.

**7**. The vehicle of claim **1**, wherein, when a vehicle occupant is identified, the remote control module automatically configures the selected vehicle component as desired by the identified occupant.

**8**. The vehicle of claim **1**, wherein the command is one or more of to accelerate, to decelerate, to activate, to deactivate, to provide current vehicle location, to broadcast audible and/or visual message to vehicle operator, to brake, to set a maximum vehicle velocity, to shut down vehicle, and to lock doors.

**9**. The vehicle of claim **1**, wherein the command comprises a function-specific code and wherein the remote control module maps the function-specific code in a look up table indexing function-specific codes with corresponding vehicle functions to determine a requested vehicle function to be performed.

**10**. The vehicle of claim **8**, wherein the requestor is a law enforcement agency.

**11**. The vehicle of claim **8**, wherein the requestor is the vehicle owner.

**12**. The vehicle of claim **1**, wherein the requestor is a leasing or rental car company, wherein the vehicle may be driven only within a limited geographical area, and wherein the vehicle is automatically disabled by the remote control module when the vehicle leaves the limited geographical area.

**13**. The vehicle of claim **1**, wherein the requestor is a law enforcement agency and wherein the command is to provide a current speed of the vehicle.

**14**. The vehicle of claim **1**, wherein the command is to provide one or more of historic vehicle operating information.

**15**. The vehicle of claim **1**, wherein the remote control module authenticates the requestor locally by one or more of a biometric feature of the requestor.

**16**. A method, comprising:
a microprocessor executable remote control module receiving, via a remote node, a command from a law enforcement agency to configure and/or alter and/or determine a state of a selected vehicle component of a vehicle, the selected vehicle component being one or more of a power source, wheels, a transmission, a transmission gear controller, a power controller, a braking system, a steering wheel, a display panel, an occupant seating system, and a satellite positioning system receiver; and
the remote control module, when the law enforcement agency is authenticated successfully, configuring and/or altering and/or determining a state of the selected vehicle component, wherein the command is one or more of accelerate, decelerate, activate, deactivate, provide current vehicle location, broadcast an audible and/or visual message to a vehicle operator, brake, set a maximum vehicle velocity, shut down the vehicle, provide a current speed of the vehicle, and lock doors.

**17**. The method of claim **16**, wherein the command comprises a function-specific code and wherein the remote control module maps the function-specific code in a look up table indexing function-specific codes with corresponding vehicle functions to determine a requested vehicle function to be performed.

60

**18**. The method of claim **16**, wherein the command is one or more of to accelerate, to decelerate, to activate, and to deactivate.

**19**. The method of claim **16**, wherein the command is to provide a current vehicle location.

**20**. The method of claim **16**, wherein the command is to change a vehicle performance mode from a first performance configuration to a second performance configuration and/or alter a setting of a vehicle component associated with a power unit and/or drive train of the vehicle.

**21**. The method of claim **16**, wherein the command is to broadcast an audible and/or visual message to vehicle operator.

**22**. The method of claim **16**, wherein the command is one or more of to brake, to set a maximum vehicle velocity, to provide a current speed of the vehicle, and to lock doors.

**23**. A vehicle, comprising:
a plurality of vehicle components comprising a power source, wheels, a transmission, a transmission gear controller, a power controller, a braking system, a steering wheel, a display panel, an occupant seating system, and a satellite positioning system receiver; and
a non-transient, tangible computer readable medium comprising a microprocessor executable remote control module on board the vehicle that (a), when executed, receives, via a remote node of a vehicle owner, the remote node comprising one or more of a home computer, tablet computer, laptop computer, and smart phone, a command from the vehicle owner to perform an operation of a selected vehicle component and (b), when the vehicle owner is authenticated successfully, performs the operation of the selected vehicle component, wherein the operation is one or more of alter one or more of a setting, appearance, sound, wall paper, and displayed icon selection and location of a vehicle display panel, configure a programmable hard button, download media, customize vehicle performance, determine whether a light is on or off, determine whether a window is up or down, determine whether an on board alarm is on or off, determine whether a sunroof is open or closed, and reset the selected vehicle component.

**24**. The vehicle of claim **23**, wherein the selected vehicle component is the display panel and wherein the command is one or more of moving a graphical object to another location, removing a graphical object from the display panel, adding a graphical object to the display panel, adding wall paper to the display panel, and altering a setting of the display panel.

**25**. The vehicle of claim **23**, wherein the selected vehicle component is a programmable hard button and wherein the configuration and/or alteration is to assign, to the hard button, a different function.

**26**. The vehicle of claim **23**, wherein the command is to download media content from the Internet and save the downloaded content in on board memory of the vehicle.

**27**. The vehicle of claim **23**, wherein the command is one or more of to determine whether a light is on or off, to determine whether a window is up or down, to determine whether an on board alarm is on or off, and to determine whether a sunroof is open or closed.

**28**. The vehicle of claim **23**, wherein the command is to reset the selected vehicle component.

* * * * *