**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| AUTOCONNECT HOLDINGS LLC,<br>*Plaintiff*,<br>v.<br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., *and* TOYOTA MOTOR SALES, U.S.A., INC.,<br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:24-CV-00802-JRG-RSP<br>(Lead Case) |

**<u>CLAIM CONSTRUCTION ORDER</u>**

On January 29, 2026, the Court held a hearing to determine the proper construction of disputed terms in United States Patents No. 8,793,034, 9,020,491, 9,020,697, 9,082,239, 9,098,367, 9,116,786, 9,123,186, 9,140,560, 9,147,296, 9,147,297, 9,173,100, 9,290,153, 10,862,764, 11,163,931, and 12,039,243.

Before the Court are the Opening Claim Construction Brief (Dkt. No. 127) filed by Plaintiff AutoConnect Holdings LLC, the Responsive Claim Construction Brief (Dkt. No. 134) filed by Defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Toyota Motor Sales, U.S.A, Inc. (collectively, "Toyota"), and General Motors LLC ("GM") (all, collectively, "Defendants"), and Plaintiff's reply (Dkt. No. 141). Also before the Court is the parties' October 28, 2025 P.R. 4-3 Joint Claim Construction Statement (Dkt. No. 83) and the parties' January 16, 2025 Joint Claim Construction Chart (Dkt. No. 146).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual

findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND** ........ **3**
**II. LEGAL PRINCIPLES** ........ **7**
**III. AGREED TERMS** ........ **10**
**IV. DISPUTED TERMS** ........ **10**
1. "selected" ........ 11
2. "authenticated" ........ 11
3. "privileges" ........ 15
4. "a microprocessor executable device discovery daemon" ........ 19
5. "permitting the computational device to . . . attempt to access" and "permitted to access or attempt to access" ........ 23
6. "two or more BLUETOOTH transceivers" ........ 26
7. "a signal processor" and "the signal processor" ........ 29
8. "determine one or more of available resources, available devices, and available sources" ........ 32
9. "determine load" and "determining the load" ........ 35
10. "can be installed currently in an electronic readable memory of the vehicle computer" .. 38
11. "infotainment system" ........ 41
12. "cloud" ........ 43
13. "refreshing, by the microprocessor executing a microprocessor executable desktop manager" ........ 47
14. "unified desktop" ........ 51
15. "and/or" ........ 54
16. "one or more" ........ 57
17. "not being based on or in response to a preceding request of the selected vehicle occupant" ........ 58
**V. CONCLUSION** ........ **63**
**APPENDIX A** ........ **64**

## I. BACKGROUND

Plaintiff alleges infringement of United States Patents No. 8,793,034 ("the '034 Patent"), 9,020,491 ("the '491 Patent"), 9,020,697 ("the '697 Patent"), 9,082,239 ("the '239 Patent"), 9,098,367 ("the '367 Patent"), 9,116,786 ("the '786 Patent"), 9,123,186 ("the '186 Patent"), 9,140,560 ("the '560 Patent"), 9,147,296 ("the '296 Patent"), 9,147,297 ("the '297 Patent"), 9,173,100 ("the '100 Patent") 9,290,153 ("the '153 Patent"), 10,862,764 ("the '764 Patent"), 11,163,931 ("the '931 Patent"), and 12,039,243 ("the '243 Patent") (collectively, "the patents-in-suit"). Plaintiff submits that the patents-in-suit "address different aspects of connected-vehicle functionality, including user identification and profiles, application execution, device connectivity, cloud-based services, vehicle control and configuration, system security, and related technologies." Dkt. No. 127 at 1.

The parties present disputes as to claims in 13 of the 15 asserted patents (the parties present no claim construction disputes as to the '296 Patent or the '931 Patent). Also, Defendants submit: "Toyota takes no position on terms relating to the '239, '367, '297, and '100 Patents. GM takes no position on terms relating to the '034, '697, and '186 Patents." Dkt. No. 134 at 1 n.1.

The '034 Patent, titled "Feature Recognition for Configuring Vehicle Console and Associated Devices," issued on July 29, 2014, and bears an earliest priority date of November 16, 2011. The Abstract of the '034 Patent states:

> Methods and systems for a complete vehicle ecosystem are provided. Specifically, systems that when taken alone, or together, provide an individual or group of individuals with an intuitive and comfortable vehicular environment. The present disclosure includes a system to recognize the drivers and/or passengers within the automobile. Based on the recognition, the vehicle may change a configuration of the automobile to match predetermined preferences for the driver and/or passenger.

The ’491 Patent, titled “Sharing Applications/Media Between Car and Phone (Hydroid),” issued on April 28, 2015, and bears an earliest priority date of November 16, 2011. The Abstract of the ’491 Patent states:

> Methods and systems for a complete vehicle ecosystem are provided. Specifically, systems that when taken alone, or together, provide an individual or group of individuals with an intuitive and comfortable vehicular environment. The present disclosure includes a system to generate a vehicle communication system. The vehicle communication system can determine which devices are within the vehicle. From this determination, the vehicle communication system may create a universal bus and hotspot where applications, data, multimedia information, and resources can be shared both with the vehicle and with the other devices in the vehicle.

The ’697 Patent, titled “Vehicle-Based Multimode Discovery,” issued on April 28, 2015, and bears an earliest priority date of April 15, 2013. The Abstract of the ’697 Patent states:

> Methods and systems for a device discovery daemon that bases access of a communication device to an on board vehicle network on device location are provided.

The ’239 Patent, titled “Intelligent Vehicle for Assisting Vehicle Occupants,” issued on July 14, 2015, and bears an earliest priority date of April 15, 2013. The Abstract of the ’239 Patent states:

> Methods, systems, and a computer readable medium are provided for maintaining a persona of a vehicle occupant and, based on the persona of the vehicle occupant and vehicle-related information, performing an action assisting the vehicle occupant.

The ’367 Patent, titled “Self-Configuring Vehicle Console Application Store,” issued on August 4, 2015, and bears an earliest priority date of October 15, 2012. The Abstract of the ’367 Patent states:

> The present disclosure is directed to an application store on board a vehicle. The application store contains, in one configuration, a plurality of applications for installation on an on board computer of the vehicle, with the applications provided to the vehicle operator being provided to the operator being based on predetermined types of information related to the vehicle, its state, operation, and/or configuration,

> vehicle location, vehicle type, make, model, and/or year of manufacture, and/or occupant(s) and/or occupant(s) of other vehicles.

The ’786 Patent, titled “On Board Vehicle Networking Module,” issued on August 25, 2015, and bears an earliest priority date of November 16, 2011. The Abstract of the ’786 Patent states:

> The present disclosure describes a microprocessor executable remote control module operable to receive, via a remote node, a command from a vehicle owner to configure and/or alter and/or determine a state of a selected vehicle component and, when the vehicle owner is authenticated successfully by the remote control module, to configure and/or alter and/or determine a state of the selected vehicle component.

The ’186 Patent, titled “Remote Control of Associated Vehicle Devices,” issued on September 1, 2015, and bears an earliest priority date of April 15, 2013. The Abstract of the ’186 Patent states:

> Methods and systems for a vehicle control system to control user access to vehicle tasks, functions and/or operations based on rights and privileges set forth in user accounts.

The ’560 Patent, titled “In-Cloud Connection for Car Multimedia,” issued on September 22, 2015, and bears an earliest priority date of November 16, 2011. The Abstract of the ’560 Patent states:

> Methods and systems for a complete vehicle ecosystem are provided. Specifically, systems that when taken alone, or together, provide an individual or group of individuals with an intuitive and comfortable vehicular environment. The present disclosure includes a system to generate a vehicle communication system. The vehicle communication system can determine which devices are within the vehicle. From this determination, the vehicle communication system may create a universal bus and hotspot where applications, data, multimedia information, and resources can be shared both with the vehicle and with the other devices in the vehicle.

The ’297 Patent, titled “Infotainment System Based on User Profile,” issued on September 29, 2015, and bears an earliest priority date of April 15, 2013. The Abstract of the ’297 Patent states:

> Methods and systems for a complete vehicle ecosystem are provided. Specifically, systems that when taken alone, or together, provide an individual or group of individuals with an intuitive and comfortable vehicular environment. The present disclosure includes a system that provides various outputs based on a user profile and determined context. An output provided by the present disclosure can change a configuration of a vehicle, device, building, and/or a system associated with the user profile. The configurations can include comfort and interface settings that can be adjusted based on the user profile information. Further, the user profiles can track health data related to the user and make adjustments to the configuration to assist the health of the user.

The ’100 Patent, titled “On Board Vehicle Network Security,” issued on October 27, 2015, and bears an earliest priority date of November 16, 2011. The Abstract of the ’100 Patent states:

> The present disclosure describes a microprocessor executable network controller operable to at least one of (a) isolate at least one other on board computational component in a vehicular wireless network not affected by a security breach event from a computational component affected by the security breach event and (b) isolate an on board computational component in the vehicular wireless network and affected by the security breach event from the at least one other on board computational component not affected by the security breach event.

The ’153 Patent, titled “Vehicle-Based Multimode Discovery,” issued on March 22, 2016, and bears an earliest priority date of April 15, 2013. The Abstract of the ’153 Patent states:

> Methods and systems for a device discovery daemon that bases access of a communication device to an on board vehicle network on device location are provided.

The ’764 Patent, titled “Universal Console Chassis for the Car,” issued on December 8, 2020, and bears an earliest priority date of November 16, 2011. The Abstract of the ’764 Patent states:

> Methods and systems for a complete vehicle ecosystem are provided. Specifically, systems that when taken alone, or together, provide an individual or group of individuals with an intuitive and comfortable vehicular environment. The present disclosure includes a universal chassis that may be mounted in the head unit of a vehicle. The chassis may accept one or more modules that each have common dimensions. With a common form factor, the universal chassis is configurable as different modules with different functionality may be inserted into the chassis with ease.

The ’243 Patent, titled “Access and Portability of User Profiles Stored as Templates,” issued on July 16, 2024, and bears an earliest priority date of April 15, 2013. The Abstract of the ’243 Patent states:

> A system to access one or more user profiles that govern one or more vehicle functions. The system cooperates with a processor and verification module which are adapted to verify, using one or more of biometric information, gesture recognition, facial recognition and device identification information, that a user has authority to access the one or more user profiles, where the one or more profiles are stored in one or more of a vehicle, a cloud and a communications device. An edit module is further provided and adapted to allow the user to make one or more edits to the one or more user profiles.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties’ arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

“It is a ‘bedrock principle’ of patent law that ‘the claims of a patent define the invention to which the patentee is entitled the right to exclude.’” *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff’d*, 517 U.S. 370 (1996). “In some cases, however, the district court will need to look beyond the patent’s intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period.” *Teva*, 135 S. Ct. at 841 (citation omitted). “In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the ‘evidentiary underpinnings’ of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.” *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The

specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported

assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

In the October 28, 2025 P.R. 4-3 Joint Claim Construction Statement, the parties submitted that "[t]here are no agreed constructions at this time." Dkt. No. 83, Ex. A. During the course of briefing the parties reached agreements as to certain terms, and those agreements are set forth in Appendix A to this Claim Construction Order.

## IV. DISPUTED TERMS

In their claim construction briefing, the parties have organized the disputed terms differently. Rather than attempt to divine an ideal ordering, the Court adopts the ordering set forth in Plaintiff's opening brief, and because the parties use differing lettering designations in their respective briefing, the Court uses numbering rather than lettering so as to minimize potential confusion.

Also, although not all patents are asserted against all Defendants (*see* Dkt. No. 127 at 2), the analysis herein refers to proposals and arguments as being of "Defendants" for all disputed terms.

**1. "selected"**

| **"selected"**<br>('697 Patent, Claims 4, 6, 11, 13, 18, 20;<br>'786 Patent, Claims 1, 2, 3, 6, 7, 16, 23, 24, 25, 28;<br>'153 Patent, Claims 7, 9, 18, 20) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | "selected" means "chosen" |

Dkt. No. 83, Ex. B at 1; *id.*, Ex. C at 7.

Plaintiff argued that this term "functions as an identifying descriptor—pointing to the component, device, profile, or access point that is relevant to the claimed operation—not as a verb imposing the separate act of choosing." Dkt. No. 127 at 3 (citation omitted).

Defendants responded that "Defendants can agree to the plain and ordinary meaning of 'selected' for the purposes of narrowing the disputes before the Court in this case." Dkt. No. 134 at 1.

This agreement between the parties is set forth in Appendix A to this Claim Construction Order.

**2. "authenticated"**

| **"authenticated"**<br>('786 Patent, Claims 1, 23) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | "authenticated" means "identified and verified as having rights" |

Dkt. No. 83, Ex. B at 2; *id.*, Ex. C at 4; Dkt. No. 146, Ex. A at 1.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "identified and verified."

(a) The Parties' Positions

Plaintiff argues "the claims use 'authenticated' in its ordinary sense, which is 'verified as genuine,'" and "the term addresses whether the requestor is a valid participant in the exchange, not whether the system has determined the requestor's specific identity." Dkt. No. 127 at 5. Plaintiff also argues, for example, that "confirming that the request is genuine is not the same as determining the requestor's rights." *Id.* at 6 (citation omitted).

Defendants respond that "authentication" "requires an identification such a[s] username, login or account identifier," and "only Defendants' construction accounts for all the words in the relevant claims." Dkt. No. 134 at 2. Defendants argue: "'authentication' requires *more* than simply determining whether a request is *genuine*. To be an *authentic* request, within the meaning of the claim, the request must be both *genuine* (i.e., verified) *and* from an *identified* source." *Id.* Defendants also argue that "AutoConnect's proposed construction is meaningless" because "to say something is 'verified as genuine' carries no weight without knowing what is being verified." *Id.* at 3.

Plaintiff replies that "the term 'requestor' is deliberately generic, and the claims impose no requirement that privileges (e.g., rights) be tied to identity rather than a credential, device, or role." Dkt. No. 141 at 1. Plaintiff also argues that "if authentication already required identification and rights verification—as Defendants contend—the privilege determination would be redundant, violating basic principles of claim construction." *Id.*

At the January 29, 2026 hearing, Plaintiff argued that this disputed term should encompass authenticating a device, arguing that the recited "requestor" can be a device rather than necessarily being a person or entity. Defendants argued that the "requestor" is a user, not a device, and Defendants agreed with the Court's preliminary construction (set forth above).

(b) Analysis

Claim 1 of the '786 Patent, for example, recites (emphasis added):

> 1. A vehicle, comprising:
>
> a plurality of vehicle components comprising a power source, wheels, a transmission, a transmission gear controller, a power controller, a braking system, a steering wheel, a display panel, an occupant seating system, and a satellite positioning system receiver; and
>
> a microprocessor executable remote control module operable to (a) receive a command from *a requestor* to configure and/or alter and/or determine a state of a selected vehicle component, (b) *when the requestor is authenticated successfully* by the remote control module, *determine whether the requestor is privileged to issue the command*, and (c) when the *successfully authenticated* requestor is *privileged* to issue the command, configure and/or alter and/or determine a state of the selected vehicle component, *wherein a first requestor, when authenticated successfully*, is entitled to a first set of *privileges* to configure and/or alter and/or determine a state of the selected vehicle component and *a second requestor, when authenticated successfully*, is entitled to a different second set of *privileges* to configure and/or alter and/or determine a state of the selected vehicle component.

Because the claim refers to authentication of "the requestor," and because different sets of privileges are associated with the requestor being "a first requestor" or "a second requestor," the context in which "authenticated" is used in the claim demonstrates that "authenticated" involves identification. Similarly, Claim 23 of the '786 Patent recites that "the vehicle owner is authenticated successfully," thus likewise using the word "authenticated" in a context that connotes identification.

This is consistent with dependent Claim 15 of the '732 Patent, which recites:

> 15. The vehicle of claim 1, wherein the remote control module authenticates the requestor locally by one or more of a biometric feature of the requestor.

Although Plaintiff argues that "a biometric check verifies that the presented trait (*e.g.*, fingerprint) is valid, but does not necessarily identify *who* the requestor is" (Dkt. No. 127 at 5), the recital of a "biometric feature of the requestor" in dependent Claim 15 is consistent with independent Claim 1 distinguishing between a "first requestor" and a "second requestor."

This is also consistent with the specification of the '786 Patent, which discloses:

> In step 904, the remote control module 2040 attempts to *authenticate the requestor. User authentication is a way of identifying a user* and verifying that the user is allowed to access some restricted service. Authentication can be performed by, for example, by encrypted symmetric or asymmetric key exchange, public and private key cryptography, a secure remote password, multi-factor authentication (e.g., three major factors include verification by something a user knows (such as a password or PIN), something the user has (such as a smart card, ATM card, or a security token), and something the user is (such as the use of biometrics, such as a fingerprint or retina scan)), time-based authentication, a unique digital identity, closed-loop authentication, access control service, and the like.

'786 Patent at 32:1–14 (emphasis added); *see id.* at 33:43–56 (similar).

Plaintiff argues that interpreting authentication as requiring identification would render the privilege determinations redundant (Dkt. 141 at 1), but Plaintiff does not persuasively show any such redundancy. Rather, once identity is established through authentication, determinations can be made regarding privileges.

To be clear, identification need not necessarily identify a particular human being. Rather, identification could be associated with a group of human beings or with some other type of entity. This comports with the understanding of both sides as demonstrated by deposition testimony, cited by Plaintiff, in which Defendants' expert acknowledged that an "access control service" ('786 Patent at 33:55–56) could involve determining whether to allow entry to a building without any "individual" identification (such as if the system presumes that anyone who has a key card for the building is a valid tenant of the building). *See* Dkt. No. 127, Ex. O, Nov. 20, 2025 D. Williams dep. at 52:17–56:16. This is also consistent with disclosure that "a law enforcement *entity* or

vehicle owner, for example, will generally have a highest level of privilege (enabling broad access to vehicle information and/or control of vehicle tasks, functions, and operations) while an insurance *company* or servicing *entity* will not have the highest level of privilege." '786 Patent at 32:25–30 (emphasis added). Nonetheless, this evidence demonstrates that merely identifying a *device* is insufficient. That is, the recited "requestor" is not a device. Rather, authentication in the present context refers to a person, group, or entity.

As to Defendants' proposal that "authenticated" means "identified and verified *as having rights*," the foregoing supports Defendants' proposal as to "identified and verified" but Defendants do not provide support for their proposal of "having rights" as being part of authentication. *See* Dkt. No. 134 at 1–4.

The Court therefore hereby construes "authenticated" to mean **"identified and verified."**

**3. "privileges"**

| **"privileges"**<br>('786 Patent, Claim 1;<br>'186 Patent, Claims 1, 6, 8, 13, 15, 20) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | "rights based on the identity of the individual or entity making the request" |

Dkt. No. 83, Ex. B at 3; *id.*, Ex. C at 5–6; Dkt. No. 146, Ex. A at 3.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "rights of the identified person, entity, or group that is making the request."

(a) The Parties' Positions

Plaintiff argues that "'privileges' refers to the permissions or access rights defined within the system, without dictating how those rights must be designed or assigned." Dkt. No. 127 at 6. Plaintiff urges that "Defendants' attempt to narrow 'privileges' to rights based on identity[] echoes the error in their construction of 'authenticated.'" *Id.*

Defendants respond that "'privileges' must be based on the identity of the requestor; otherwise, there would be no way to discern what rights to grant a requestor." Dkt. No. 134 at 4. "Defendants agree that privileges may be 'account-based, role-based, system-defined, or device-specific' as AutoConnect asserts," but Defendants maintain that "privilege" "cannot be unconstrained," and "a privilege that is available to everyone is not a privilege." *Id.* at 5 (citation omitted).

Plaintiff replies that "as with 'authenticated,' Defendants' proposal for 'privileges' wrongly imports an identity requirement that the claims do not impose," and "the term describes what a requestor may do—not who it is." Dkt. No. 141 at 2. Plaintiff argues: "Defendants are also wrong ([Dkt. No. 134] at 5) that a privilege 'available to everyone is not a privilege.' In computing systems, general privilege levels—such as 'guest,' 'default,' or 'public' access—are well-recognized and confer a defined set of permissions without identifying the user." *Id.*

At the January 29, 2026 hearing, the parties argued this disputed term together with "authenticated," which is a disputed term addressed separately above. Defendants agreed with the Court's preliminary construction (set forth above).

(b) Analysis

The '186 Patent discloses:

> The vehicle control system 204 can manage user accounts that stipulate, control, and define *rights and privileges* of each user of the vehicle and vehicle network.

> Different users and/or devices may include different accounts. In some cases these accounts may include user and/or device-specific *privileges*.

’186 Patent at 111:15–20 (emphasis added).

Although the disclosure of “rights and privileges” tends to suggest that “privileges” means something different than “rights” (*id.*), the parties agree that the term “privileges,” in the context of the patents here at issue, refers to rights. *See* Dkt. No. 127 at 6; *see also* Dkt. No. 134 at 5. The parties dispute whether those rights must be “based on the identity of the individual or entity making the request,” as Defendants have proposed.

Claim 1 of the ’786 Patent is reproduced in the discussion of “authenticated,” above, and recites that “a first requestor” is “entitled to a first set of privileges” and “a second requestor” is “entitled to a different second set of privileges.” The claim thus links the privileges to the identity of the requestor.

Claim 1 of the ’186 Patent, for example, likewise refers to “the account defining rights and privileges of the user” (emphasis added):

> 1. A method, comprising:
> (a) receiving, by a microprocessor executable vehicle control system, a request from a vehicle occupant to perform a vehicle task, function or operation;
> (b) determining, by the microprocessor executable vehicle control system, that the vehicle occupant has been authenticated successfully;
> (c) accessing, by the microprocessor executable vehicle control system, an account for the vehicle occupant, *the account defining rights and privileges of the user with respect to controlling a vehicle task, function or operation*, wherein the vehicle task, function or operation is one or more of the following: monitoring, controlling, and/or operating an engine control unit (“ECU”), transmission control unit (“TCU”), door setting, window setting, blind spot monitor, safety equipment, vehicle sensor, vehicle engine, head light control unit, power steering, display panel, switch state control unit, power control unit, brake control unit, alert to a user and/or remote monitoring entity of a potential problem with a vehicle operation, emission control, entertainment system, and media and/or multimedia content;
> (d) determining, by the microprocessor executable vehicle control system, at least one of an area and/or zone occupied by the vehicle occupant and an operating state of the vehicle; and

> (e) based upon the account corresponding to the vehicle occupant and the at least one of an area and/or zone occupied by the vehicle occupant and an operating state of the vehicle, applying, by the microprocessor executable vehicle control system, the following rules:
>
> (i) when the account permits the vehicle occupant to perform the requested vehicle task, function or operation, performing or causing to be performed the vehicle task, function or operation; and
>
> (ii) when the account does not permit the vehicle occupant to perform the requested vehicle task, function or operation, not performing or causing to be performed the vehicle task, function or operation.

Plaintiff argues that the claims distinguish between an account and a "vehicle occupant," noting that independent Claim 15 recites "accessing an account for the vehicle occupant, the account defining rights and privileges of the user with respect to controlling a vehicle task, function or operation . . . ."

Defendants respond that Plaintiff is reading Defendants' proposed construction too narrowly:

> "Identity," however includes an account, a username, a login, or similar identifiers. And the rights granted may not be specific to that identity. For example, a user's rights may be based on a group membership (e.g., law enforcement or passengers). Accordingly, Defendants agree that privileges may be "account-based, role-based, system-defined, or device-specific" as AutoConnect asserts.

Dkt. No. 134 at 5 (citation omitted).

Thus, considering as discussed above (regarding the term "authenticated) that the recited "requestor" is not a device, the parties otherwise essentially agree that "privileges" are rights of a person, entity, or group that is making a request. *See* Dkt. No. 127, Ex. N, Oct. 28, 2025 T. Williams Decl. ¶ 63 ("privileges may also be general, role-based, or functional permissions applicable across users or devices"); *see also id.* at ¶ 62; Dkt. No. 134, Ex. 1, Oct. 28, 2025 D. Williams Decl. ¶ 52 ("the rights of access (highest level vs. non-highest level) are based on identity (vehicle owner vs. insurance company)") (citing '786 Patent at 32:19–30).

Finally, as to Defendants' assertion that "a privilege that is available to everyone is not a privilege" (Dkt. No. 134 at 5), Plaintiff persuasively replies that there could be, for example, a "default" or "public" level of privilege. Dkt. No. 141 at 2. This does not, however, undercut the understanding that "privileges" are associated with an identified person, entity, or group that is making a request.

The Court therefore hereby construes "privileges" to mean **"rights of the identified person, entity, or group that is making the request."**

**4. "a microprocessor executable device discovery daemon"**

| **"a microprocessor executable device discovery daemon"**<br>('697 Patent, Claims 1, 3, 5, 8, 12, 15, 19;<br>'153 Patent, Claims 1–4, 8–10, 12, 14, 15, 19–21) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a computer program that runs as a background process that can discover *devices available for connection*" | "a computer program that runs as a background process that can discover *new devices*" |

Dkt. No. 83, Ex. B at 4; *id.*, Ex. C at 4; Dkt. No. 146, Ex. A at 9 (emphasis by the parties).

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "a computer program that runs as a background process that can discover devices."

(a) The Parties' Positions

Plaintiff argues that whereas "Defendants' attempt to narrow the term so that the daemon may discover only 'new' devices," "nothing in the claims supports that limitation." Dkt. No. 127 at 7. Plaintiff argues, for example, that "a daemon restricted to discovering only new devices could not repopulate system data for previously connected devices, manage temporary disconnections, or perform the recognition functions the specification describes." *Id.* at 8.

Defendants respond that "Defendants' construction is drawn from the specification's definition of this term . . . ." Dkt. No. 134 at 5. Defendants argue that "AutoConnect's construction injects ambiguity into the scope of the claim because it is unclear what it means for a device to be 'available for connection.'" *Id.* at 6.

Plaintiff replies that "the intrinsic record forecloses Defendants' lexicography argument" because "permissive, exemplary descriptions of functionality cannot redefine a claim term or narrow its scope." Dkt. No. 141 at 3. Plaintiff also argues: "Defendants' claim that AutoConnect's construction is ambiguous is unfounded. The phrase 'available for connection' is a functional, operational concept that a POSITA would readily understand. Devices may be available for connection at some times and not others, and the claims do not require more granularity than that." *Id.* at 3 (citation omitted).

At the January 29, 2026 hearing, the parties presented oral arguments as to this term.

<u>(b) Analysis</u>

This disputed term appears in claims of the '697 Patent and the '153 Patent. The '153 Patent resulted from a continuation of the '697 Patent.

Claim 1 of the '697 Patent, for example, recites (emphasis added):

> 1. A method, comprising:
> (a) determining, by *a microprocessor executable device discovery daemon*, that a computational device is connected to or attempting to connect to a network and/or communication subsystem of a vehicle;
> (b) in response, determining, by the device discovery daemon, whether the computational device is located within a predetermined area and/or zone of the vehicle; and
> (c) applying, by the device discovery daemon, at least the following rules:
> (C1) when the computational device is located within the predetermined area and/or zone of the vehicle, permitting the computational device to access or attempt to access the vehicle network and/or communication subsystem; and
> (C2) when the computational device is not located within the predetermined area and/or zone of the vehicle, not permitting

> the computational device to access or attempt to access the vehicle network and/or communication subsystem.

Claim 1 of the ’153 Patent, for example, recites (emphasis added):

> 1. A method, comprising:
> discovering, by a microprocessor executing *a microprocessor executable device discovery daemon*, one or more communication devices connected wirelessly to a network and/or communication subsystem of a vehicle;
> for each of the discovered one or more communication devices, populating, by the microprocessor executing the device discovery daemon, system data with device information and capabilities; and
> refreshing, by the microprocessor executing a microprocessor executable desktop manager, graphical elements of a graphical display of the vehicle to reflect the discovered one or more communication devices.

Defendants argue that the specification expressly defines “device discovery daemon” in the following portion of the specification:

> A device discovery daemon 1020 may be a computer program that runs as a background process that can discover *new devices* that connect with the network 356 or communication subsystem 1008 or devices that disconnect from the network 356 or communication subsystem 1008.

’697 Patent at 57:45–48 (emphasis added). The permissive phrase “may be,” however, undercuts any proposal of this passage as being a lexicography. *Id.* To whatever extent Defendants maintain that Plaintiff’s expert conceded that this is a lexicography, the cited deposition testimony does not include any apparent concession as to the above-reproduced portion of the specification. *See* Dkt. No. 134, Ex. 3, Nov. 25, 2025 T. Williams dep. at 55:1–15; *see also id.* at 55:16–60:1.

Moreover, this above-reproduced sentence cited by Defendants expressly contemplates “discover[ing]” not only “new devices that connect” but also “devices that *dis*connect,” which can be readily understood as referring to discovering devices that were previously connected. ’697 Patent at 57:45–48 (emphasis added).

In light of the absence of any lexicography, disclaimer, or compelling context that would warrant limiting a "device discovery daemon" to discovering only "new" devices, no such limitation is warranted. Defendants' proposal in this regard should be rejected.

As for Plaintiff's proposal of referring to discovering devices that are "available for connection," the specification discloses the "device discovery daemon 1020" detecting a "computational device" and determining whether the device is "recognized":

> Recognition can be based on any of the configuration and other information and is deemed to occur when selected fields of the information map to and are the same as similar fields previously encountered and/or recorded in system data 208 by the device discovery daemon 1020.

'153 Patent at 93:7–16; *see* '153 Patent at 92:29–93:16. Defendants nonetheless argue that Plaintiff's use of the word "available" is unclear. Dkt. No. 134 at 6 ("Does it mean available now? Available ever? Technically able to connect even if not presently connectable?").

Plaintiff's expert has testified that a previously connected device is "available for connection, not a new device." Dkt. No. 134, Ex. 3, Nov. 25, 2025 T. Williams dep. at 90:2–91:10. Plaintiff has not demonstrated, however, that the patents at issue impose a dichotomy between "available" and "new." Rather, Claim 1 of the '153 Patent, for example, recites "discovering . . . one or more communication devices connected wirelessly to a network and/or communication subsystem of a vehicle."

The Court therefore rejects Plaintiff's proposal as well as Defendants' proposal, and the Court adopts the remainder, which is agreed upon.

The Court accordingly hereby construes "a microprocessor executable device discovery daemon" to mean **"a computer program that runs as a background process that can discover devices."**

**5. "permitting the computational device to . . . attempt to access" and "permitted to access or attempt to access"**

| **"permitting the computational device to . . . attempt to access"**<br>**"permitted to access or attempt to access"**<br>('697 Patent, Claims 1, 5, 8, 12, 15, 19;<br>'153 Patent, Claims 4, 8, 15, 19) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | Indefinite. |

Dkt. No. 83, Ex. B at 5; *id.*, Ex. C at 2; Dkt. No. 146, Ex. A at 19.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [NOTE: not indefinite]."

(a) The Parties' Positions

Plaintiff argues that "a POSITA would readily understand that the patents describe a two-stage sequence: (1) detecting or recognizing a computational device and its location, and (2) based on that determination, authorizing the device to access (or attempt to access) a vehicle network or communication subsystem." Dkt. No. 127 at 8–9 (citation omitted).

Defendants respond that the claim language suffers from "indefinite circularity." Dkt. No. 134 at 7. Defendants urge that "access necessarily requires connection" and that "the patents fail to disclose how a device can attempt to access without first connecting." *Id.*

Plaintiff replies:

> Defendants' "circularity" theory disappears when the claim is read as written. Claim 1 first identifies a device that is connected or attempting to connect, then determines its location, and then applies rules that decide whether the device may access—or even attempt to access—the network. An attempt is not access, and systems routinely decide whether to allow an attempt before it occurs, such as granting or denying permission to prevent unauthorized attempts from ever reaching the network.

Dkt. No. 141 at 3–4.

At the January 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

Claim 1 of the ’697 Patent, for example, recites (emphasis added):

> 1. A method, comprising:
>
> (a) determining, by a microprocessor executable device discovery daemon, that a computational device is *connected to or attempting to connect to a network and/or communication subsystem of a vehicle*;
>
> (b) in response, determining, by the device discovery daemon, whether the computational device is located within a predetermined area and/or zone of the vehicle; and
>
> (c) applying, by the device discovery daemon, at least the following rules:
>
> (C1) when the computational device is located within the predetermined area and/or zone of the vehicle, *permitting the computational device to access or attempt to access* the vehicle network and/or communication subsystem; and
>
> (C2) when the computational device is not located within the predetermined area and/or zone of the vehicle, *not permitting the computational device to access or attempt to access* the vehicle network and/or communication subsystem.

Defendants argue that the claim is circular or internally inconsistent because whereas limitation (c) requires rules permitting access, or not permitting access, based on where the computational device is located, limitation (a) recites that the computational device “is connected to or attempting to connect to a network and/or communication subsystem of a vehicle.” Defendants urge that “access necessarily requires connection,” and “a user cannot attempt to access if the user is still attempting to connect.” Dkt. No. 134 at 7. Defendants conclude that Plaintiff “offers no explanation from the claim language, specification, or file history establishing how a POSITA is supposed to have reasonable certainty as to the scope of a claim that requires detecting an attempt to connect and then, in response, permitting an attempt to access.” *Id.* at 8.

On its face, the claim language that is being challenged by Defendants is readily understandable. In above-reproduced Claim 1 of the ’697 Patent, a device is determined to be

"connected to or attempting to connect," and access is permitted or not permitted depending on the location of the device.

Defendants do not persuasively support their assertion that "a user cannot attempt to access if the user is still attempting to connect." Dkt. No. 134 at 7. Also, the claim language on its face recites that access can be permitted while a device is still merely attempting to connect, and access could be permitted prior to an attempt to access. Defendants identify no persuasive intrinsic or extrinsic evidence demonstrating any impossibility or contradiction, and the opinions of Plaintiff's expert are further persuasive. *See* Dkt. No. 127, Ex. N, Oct. 28, 2025 T. Williams Decl. ¶¶ 69–72. Essentially the same analysis applies to the other claims here at issue. *See* '697 Patent, Cls. 5, 8, 12, 15, 19; *see also* '153 Patent, Claims 4, 8, 15, 19.

Disclosures in the specification are consistent with this understanding, such as:

> In step 2020, the device discovery daemon 1020 *permits or enables connection of the computational device* with the vehicle network 356 or communication subsystem 1008 and optionally stipulates or defines what set of tasks, functions, and/or operations the user of the computational device can perform using the computational device, such as based on the location of the computational device within the vehicle and/or based on the authentication credentials (e.g., the identity of the computational device user).
>
> When the computational device is determined to be outside of a defined area and/or zone of the vehicle (e.g., outside the passenger compartment or cabin) and the device discovery daemon 1020 does not recognize and/or authenticate the computational device successfully, the device discovery daemon 1020, in step 2024, *denies access of the computational device to connect to or access* the vehicle network 356 or communication subsystem 1008.

'153 Patent at 96:5–33 (emphasis added). The specification thus discloses that, for example, a denial of access can include denial of a connection. *Id.*

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "permitting the computational device to . . . attempt to access" and "permitted to access or attempt to access" to have their **plain meaning**.

**6. "two or more BLUETOOTH transceivers"**

| **"two or more BLUETOOTH transceivers"**<br>('491 Patent, Claim 11;<br>'560 Patent, Claim 11) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | "at least two BLUETOOTH transceiver chips" |

Dkt. No. 83, Ex. B at 6; *id.*, Ex. C at 7; Dkt. No. 146, Ex. A at 24.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [NOTE: expressly rejecting Defendants' proposal of 'chips' and Defendants' alternative proposal of 'each that can fully operate on its own']."

(a) The Parties' Positions

Plaintiff argues that "a transceiver is a common term in electronics and refers to a group of devices capable of transmitting and receiving wireless signals." Dkt. No. 127 at 10 (citation omitted). Plaintiff also argues that "by 'chips,' Defendants appear to mean a discrete integrated-circuit (IC) package that can be mounted on a circuit board," and "the patents nowhere state that a Bluetooth transceiver must be implemented as its own 'chip.'" *Id.* at 10 & 11.

Defendants respond that "'two or more' means at least two," and "two of something means that you have two distinct things that can be separated and still work." Dkt. No. 134 at 8. Defendants urge that Plaintiff's interpretation should be rejected because "having two of something does not mean that you have one thing that can be used in two different ways." *Id.* Defendants also argue that "the specification confirms that 'two or more transceivers' is intended

to cover two distinct transceivers." *Id.* at 9. Finally, Defendants propose that "if the Court rejects the word 'chip,' Defendants request that the Court at least clarify that this term requires two distinct transceivers, each that can fully operate on its own." *Id.* at 10.

Plaintiff replies that the claims "require two transceivers, not two removable or redundant hardware units." Dkt. No. 141 at 4.

At the January 29, 2026 hearing, the parties presented oral arguments as to this term.

<u>(b) Analysis</u>

Claim 11 of the '491 Patent, for example, recites (emphasis added):

> 11. A vehicle communication system, comprising:
> *two or more BLUETOOTH transceivers;*
> a communication system comprising:
> two or more communication modules;
> a signal processor;
> wherein the signal processor is operable to:
> receive a request for an application;
> determine one or more of available resources, available devices, and available sources;
> determine load;
> activate a function on a device or source to execute the application;
> receive, from the device, application user interface information or data at the vehicle to be displayed on a display associated with the vehicle; and
> display the application on the display.

The recited requirement of "two or more BLUETOOTH transceivers," rather than merely one such transceiver, should be given effect by requiring two or more distinct transceivers. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) ("Claims must be 'interpreted with an eye toward giving effect to all terms in the claim.'") (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).

Two distinct transceivers, however, could potentially be present within one physical structure, such as one physical "chip." The Court of Appeals for the Federal Circuit addressed an analogous situation in *Powell v. Home Depot*, in which the patentee identified a single structure as

satisfying both a "cutting box" requirement and a "dust collection structure" requirement. *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231 (Fed. Cir. 2011) ("the disclosure in the specification cuts against Home Depot's argument that the 'cutting box' and 'dust collection structure' must be separate components for purposes of the infringement analysis"; "even Home Depot's expert agreed that the rear portion of the cutting box on the accused product serves to collect sawdust and woodchips and has at least one port to allow for extraction of the sawdust and wood chips").

Defendants' proposal of requiring two "chips" is therefore disfavored. The illustration of "BlueTooth Transceiver 1" and "BlueTooth Transceiver 2" as separate blocks in Figure 10 of the '491 Patent does not compel otherwise. First, Defendants point to no evidence that the block diagram is intended to illustrate physical separation. Second, even assuming that this illustration indicates physical separation, "patent coverage is not necessarily limited to inventions that look like the ones in the figures." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 415 F.3d 1323, 1333 (Fed. Cir. 2007) (citation omitted). Likewise, the specification discloses:

> An embodiment of a communication system or network 1000 is shown in FIG. 10. The communication system 1000 can include two or more BLUETOOTH™ transceivers 1004. Each BLUETOOTH™ transceiver 1004 may be paired with a single-user device 1008.

'491 Patent at 23:44–48. This disclosure regarding the illustrated arrangement likewise does not warrant a narrow reading of the disputed term because it pertains to a particular embodiment rather than the meaning of "transceivers" more generally. *See Phillips*, 415 F.3d at 1323. The opinions of Defendants' expert do not compel otherwise. *See* Dkt. No. 134, Ex. 1, Oct. 28, 2025 D. Williams Decl. ¶¶ 75–78.

As for Defendants' alternative proposal that the Court should state that "this term requires two distinct transceivers, each that can fully operate on its own" (Dkt. No. 134 at 10), the term

already expressly recites distinct transceivers, and Defendants proposal that each can "fully operate on its own" would tend to confuse rather than clarify the scope of the claims.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court accordingly hereby construes "two or more BLUETOOTH transceivers" to have its **plain meaning**.

**7. "a signal processor" and "the signal processor"**

| **"a signal processor"**<br>**"the signal processor"**<br>('491 Patent, Claims 11–13;<br>'560 Patent, Claims 11–12) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a" means "one or more."<br><br>Plain and ordinary meaning as to the remainder of the term. | "a signal processor" must perform all of the steps/functions in the relevant claims. |

Dkt. No. 82, Ex. B at 7; *id.*, Ex. C at 7; Dkt. No. 146, Ex. A at 25.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary constructions: "'a signal processor': 'one or more signal processors'"; and "'wherein the signal processor is operable to': 'wherein each of the one or more signal processors is operable to.'"

(a) The Parties' Positions

Plaintiff argues that Defendants' proposal contradicts the well-established principle in patent claim drafting that "a" means one or more. Dkt. No. 127 at 11. Plaintiff also argues that "the claim language confirms that no singular limitation applies," and "AutoConnect's proposal also aligns with the patent specifications." *Id.* at 11 & 12.

Defendants respond that "because AutoConnect chose to draft the claim by introducing 'a signal processor' and then referring repeatedly to 'the signal processor,' the claim should be construed to require the same signal processor(s) satisfy all the limitations in the claim." Dkt. No. 134 at 20 (citation omitted). "In the face of this claim structure," Defendants argue, "AutoConnect cannot be permitted to pick and choose various processors for satisfying the claim limitations." *Id.*

Plaintiff replies by reiterating that "a" means "one or more" and that "the use of 'a signal processor' followed by references to 'the signal processor' satisfies antecedent basis but does not require a single, identical physical processor to perform every recited function." Dkt. No. 141 at 7.

At the January 29, 2026 hearing, the parties presented oral arguments as to this term (together with the "refreshing . . ." term addressed below). Plaintiff argued that, in the Court's preliminary construction, the phrase "each of" should be replaced with "at least one of."

(b) Analysis

Claim 11 of the '491 Patent, for example, recites (emphasis added):

11. A vehicle communication system, comprising:
two or more BLUETOOTH transceivers;
a communication system comprising:
two or more communication modules;
*a signal processor*;
wherein *the signal processor* is operable to:
receive a request for an application;
determine one or more of available resources, available devices, and available sources;
determine load;
activate a function on a device or source to execute the application;
receive, from the device, application user interface information or data at the vehicle to be displayed on a display associated with the vehicle; and
display the application on the display.

The recital of "wherein the signal processor is operable to" refers to what a particular signal processor is operable to do; this is true even though the indefinite article, "a," encompasses "one or more." *See In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016) ("For a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks."); *see also Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1317 (Fed. Cir. 2023) ("We agree with the district court that while the claim term 'a microprocessor' does not require there be only one microprocessor, the subsequent limitations referring back to 'said microprocessor' require that at least one microprocessor be capable of performing each of the claimed functions. This approach is entirely consistent with our precedent."); *id.* at 1315–18. The specification disclosures cited by Plaintiff do not demonstrate otherwise. *See* '491 Patent at 14:37–51 ("In accordance with at least some embodiments, the processor 504 may include multiple processor cores, and/or implement multiple virtual processors."; "In accordance with still other embodiments, the processor 504 may include multiple physical processors.").

The same analysis applies to the other claims here at issue. *See* '491 Patent, Cls. 12–13; *see also* '560 Patent, Cls. 11–12.

Thus, these claims require at least one signal processor that has all of the recited operability. The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| "a signal processor" | **"one or more signal processors"** |
| "wherein the signal processor is operable to" | **"wherein at least one of the one or more signal processors is operable to"** |

**8. "determine one or more of available resources, available devices, and available sources"**

| **"determine one or more of available resources, available devices, and available sources"** ('491 Patent, Claims 11, 16) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | Indefinite. |

Dkt. No. 83, Ex. B at 7; *id.*, Ex. C at 6; Dkt. No. 146, Ex. A at 27.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [NOTE: not indefinite]."

(a) The Parties' Positions

Plaintiff argues that "a POSITA would readily understand the distinction among 'available resources,' 'available devices,' and 'available sources' in the context of vehicle communication systems" and in the context of the specification. Dkt. No. 127 at 13 (citation omitted).

Defendants respond that "the claim language winnows a set of repeating limitations from three to two and finally to one, without any explanation of what to do about the missing limitations." Dkt. No. 134 at 11. "Further," Defendants argue, "the specification does not describe what it means for a resource, device, or source to be 'available.'" *Id.* at 12.

Plaintiff replies that "the word 'determining' indicates an evaluative step, and the phrase 'one or more of' indicates that the system may evaluate any subset of the listed categories, such that not every application implicates all three." Dkt. No. 141 at 4 (citation omitted).

At the January 29, 2026 hearing, Defendants reiterated their arguments and also urged that the antecedent basis for "the device" is ambiguous.

(b) Analysis

Claim 11 of the '491 Patent, for example, recites (emphasis added):

> 11. A vehicle communication system, comprising:
> two or more BLUETOOTH transceivers;
> a communication system comprising:
> two or more communication modules;
> a signal processor;
> wherein the signal processor is operable to:
> receive a request for an application;
> *determine one or more of available resources, available devices, and available sources;*
> determine load;
> activate a function on *a device or source* to execute the application;
> receive, from *the device*, application user interface information or data at the vehicle to be displayed on a display associated with the vehicle; and
> display the application on the display.

Defendants do not argue that the meaning of "resources," "devices," or "sources" is unclear. Rather, Defendants argue that this claim is not reasonably clear because the antecedent basis for "the device" is ambiguous and because the claim "winnows a set of repeating limitations from three to two and finally to one, without any explanation of what to do about the missing limitations." Dkt. No. 134 at 11. Defendants also argue that the claim does not specify any effect of "activat[ing] a function on" a "source." *Id.*

Because the phrase "determine one or more of" does not necessarily require all three of "available resources, available devices, and available sources," Defendants' argument regarding "winnow[ing]" and "missing limitations" is unpersuasive. Also, the recital of "activate a function

on *a* device or source" uses the indefinite article, "a," and therefore is not limited to the "available devices" or "available sources" recited in the "determine one or more of . . ." step. Further, the antecedent basis for "the device" is the recital of "a device," which is distinct from the separate operation of "determine one or more of . . . available devices." Essentially the same analysis applies to the other claim here at issue, Claim 16.

The opinions of Defendants' expert are likewise unpersuasive. *See* Dkt. No. 134, Ex. 1, Oct. 28, 2025 D. Williams Decl. ¶¶ 57–68. For example, as to the opinion that the "determine one or more of . . ." step is unclear because "nothing is ever done with the determination" (*id.* at ¶ 59), this argument might be inferred to pertain to some other potential doctrine, such as enablement, written description, or utility, but Defendants do not demonstrate any internal inconsistency or lack of reasonably clarity in this claim language.

Finally, Defendants argue that the word "available" is not reasonably clear:

> Does available mean that it is not performing other operations? That it is capable immediately? Capable at a later time? Something else? Neither the claim language nor the specification provide guidance to a POSITA.

Dkt. No. 134 at 12 (citing *id.*, Ex. 1, Oct. 28, 2025 D. Williams Decl. ¶ 65). Although Plaintiff identifies no intrinsic or extrinsic evidence that specifies the meaning of "available" in the context of the '491 Patent, this does not appear to be a term of art. The absence of any explanation of "available" in the '491 Patent is consistent with the patentee having used the word "available" in accordance with its general usage. Any remaining dispute regarding whether a resource, device, or source is "available" is a factual dispute regarding infringement rather than a legal question for claim construction. *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted

by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact").

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "determine one or more available resources, available devices, and available sources" to have its **plain meaning**.

**9. "determine load" and "determining the load"**

| **"determine load"**<br>**"determining the load"**<br>('491 Patent, Claims 11, 14, 16) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | Indefinite. |

Dkt. No. 83, Ex. B at 9; *id.*, Ex. C at 6; Dkt. No. 146, Ex. A at 28.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [NOTE: not indefinite]."

(a) The Parties' Positions

Plaintiff argues that "the plain meaning of 'determine load' means to assess or calculate the level of burden or capacity associated with one or more system components," and "the claims and specification confirm this understanding." Dkt. No. 127 at 14 (citation omitted). Plaintiff also argues that "the fact that different implementations may measure load in different ways does not create uncertainty." *Id.*

Defendants respond that these terms are indefinite because "the claims fail to specify what load should be determined." Dkt. No. 134 at 13. Defendants argue:

> The claim mentions several things that could be described as experiencing "load," including "the vehicle," "a vehicle communication system," "available resources, available devices, and available sources." But the claim has a different scope depending on which of these things (or some other thing) experiences load to be determined. The claim provides no guidance regarding the scope. To the contrary, the remainder of the claim only adds to the confusion because there is no recited purpose for determining load. The claim never recites another use for the load, which effectively renders the term meaningless. As a result, the claims do not inform a POSITA what load should be determined, and a POSITA is therefore left without guidance as to the scope of this term.

*Id.* (citing *id.*, Ex. 1, Oct. 28, 2025 D. Williams Decl. ¶ 72).

Plaintiff replies that a person of ordinary skill in the art would understand this term to "encompass evaluating metrics relevant to measure burden or capacity, such as communication traffic, computational demand, or memory usage, that informs the decision on which device or source to activate," and "the claim's context makes clear that the system is assessing feasibility under current conditions, and nothing about that usage creates uncertainty." Dkt. No. 141 at 4–5 (citation omitted).

At the January 29, 2026 hearing, the parties presented oral arguments as to this term.

<u>(b) Analysis</u>

Claims 11 and 14 of the '491 Patent, for example, recite (emphasis added):

> 11. A vehicle communication system, comprising:
> two or more BLUETOOTH transceivers;
> a communication system comprising:
> two or more communication modules;
> a signal processor;
> wherein the signal processor is operable to:
> receive a request for an application;
> determine one or more of available resources, available devices, and available sources;
> *determine load;*
> activate a function on a device or source to execute the application;
> receive, from the device, application user interface information or data at the vehicle to be displayed on a display associated with the vehicle; and
> display the application on the display.

> 14. The vehicle communication system of claim 11, wherein *determining the load* comprises one of:
>
> determining a number of input/output messages sent between the device and the vehicle communication system; or
>
> analyzing information sent to the vehicle communication system by the device.

The specification discloses:

> The signal processor 1108 may also determine the load on each of the devices, in step 1316. Thus, not only will the signal processor 1108 look for an available source, the signal processor 1168 can also look for a source that has the least amount of load. The load balancing may be determined by the number of input/output messages sent between a source or device 1008 and the signal processor 1108, may be determined by information sent to the signal processor 1108, or may be determined by some other means.
>
> * * *
>
> Determining the load may comprise one of: determining a number of input/output messages sent between a device and vehicle communication system; or analyzing information sent to the vehicle communication system by the device, wherein the selection of the device or source is based both on availability and load.

'491 Patent at 26:66–27:7 & 33:54–59.

This permissive, non-exhaustive listing of manners of determining "load" provides context. Also, the claims provide context for understanding that determining load is performed in the context of a "communications system" and is determined so as to facilitate the limitations that follow, as Plaintiff discussed at the January 29, 2026 hearing. The opinion of Plaintiff's expert is further persuasive that a person of ordinary skill in the art would understand "determine load." Dkt. No. 127, Ex. N, Oct. 28, 2025 T. Williams Decl. ¶¶ 84–89. Defendants do not persuasively demonstrate that an absence of "specify[ing] what load should be determined" gives rise to indefiniteness. The opinions of Defendants' expert in this regard are unpersuasive. Dkt. No. 134, Ex. 1, Oct. 28, 2025 D. Williams' Decl. ¶ 70 ("The claims do not inform a POSITA what load should be determined, and a POSITA is otherwise left without guidance as to what load is being

determined."); *see id.* at ¶¶ 69–74. Although "determine load" is a broad term, "breadth is not indefiniteness." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017).

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "determined load" and "determining the load" to have their **plain meaning**.

**10. "can be installed currently in an electronic readable memory of the vehicle computer"**

| **"can be installed currently in an electronic readable memory of"**<br>('367 Patent, Claims 1, 10, 17) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | "can be copied into an electronic readable memory of and is compatible with" |

Dkt. No. 82, Ex. B at 10; *id.*, Ex. C at 8; Dkt. No. 146, Ex. A at 30.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "can be copied into an electronic readable memory of the vehicle computer, is compatible therewith, and can be prepared for execution by the vehicle computer."

<u>(a) The Parties' Positions</u>

Plaintiff argues that "the claims . . . use 'can be installed' in its ordinary sense of a compatibility assessment, which is distinct from the act of installation." Dkt. No. 127 at 15 (citation omitted). Plaintiff urges that "copying software into memory and determining compatibility are not synonymous with installation." *Id.*

Defendants respond:

> Defendants' proposed construction of this term was intended to capture the minimum required for software installation. If AutoConnect asserts that the application must also be "registered, configured, or otherwise prepared for use by the system" (Br. 15) in order be installed, Defendants do not object. Including AutoConnect's addition to Defendants' proposed construction obviates all of AutoConnect's criticisms, as it does not dispute that installation requires copying into memory in a system where the application is compatible with that system.

Dkt. No. 134 at 14.

Plaintiff's reply brief does not address this term. *See* Dkt. No. 141.

At the January 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

Claim 1 of the '367 Patent, for example, recites (emphasis added):

> 1. A method, comprising:
>
> determining, by a microprocessor executable application manager, vehicle configuration data, wherein the vehicle configuration data is stored locally in a tangible and non-transitory computer readable memory of a vehicle and wherein the vehicle configuration data is updated dynamically to reflect a change in the vehicle configuration data, wherein the vehicle configuration data relates to one or more of an on board hardware and/or software resource, module, algorithm, and/or component and/or a setting and/or property thereof;
>
> determining, by the application manager, a requirement of a selected application in an application store, wherein the requirement relates to one or more of a microprocessor, central processing unit, a service quality measure of network performance, available, unused, unavailable, and/or in use memory capacity, and operating system, the application store comprising information relating to a plurality of applications available for installation on a vehicle computer, the plurality of applications comprising: a plurality of an application related to at least one of a handicap and accessibility graphical user interfaces, an email client, a web browser, a communications application, a game, an entertainment application, a satellite positioning system receiver application, an automotive navigation application or a device, a map application, a medical information application, an emergency service application, a noise suppression application, a news-related application, a vehicle manual related application, a weather information-related application, a biometric application, a travel application, a speech recognition application, an application to read to an operator of the vehicle Really Simple Syndication ("RSS") feeds, Twitter messages, email messages, and/or instant messages, a social networking application, a streaming media application, and a utility application; and

> comparing, by the application manager, the vehicle configuration data with the requirement of the selected application to determine at least one of whether the selected application *can be installed currently in an electronic readable memory of* the vehicle computer and/or whether the selected application can be executed currently by the vehicle computer.

Plaintiff submits that "an application can be copied into a memory device, and compatibility can be confirmed, without the application being installed—for example, if it is not registered, configured, or otherwise prepared for use by the system." Dkt. No. 127 at 15 (citing *id.*, Ex. N, Oct. 28, 2025 T. Williams Decl. ¶ 91). Plaintiff also states: "Execution refers to running an application that is already installed; installation is the preceding act that prepares the application for execution." *Id.* at 15; *see id.* at 16 (citing '367 Patent at 28:33–44); *see also id.*, Ex. N, Oct. 28, 2025 T. Williams Decl. ¶ 90 ("In my opinion, the claims use 'can be installed' consistent with its plain and ordinary meaning to refer to whether the application can be made operable on the system, not merely copied into and compatible with electronic readable memory of the system.").

Although Defendants' response brief reflects substantive agreement with Plaintiff's reading of this term (Dkt. No. 134 at 14), and although Plaintiff proposes that this term should be given its plain meaning (Dkt. No. 127 at 16), "some construction of the disputed claim language will assist the jury to understand the claims." *TQP Dev., LLC v. Merrill Lynch & Co.*, No. 2:08-CV-471-WCB, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J., sitting by designation).

The Court therefore hereby construes "can be installed currently in an electronic readable memory of the vehicle computer" to mean **"can be copied into an electronic readable memory of the vehicle computer, is compatible therewith, and can be prepared for execution by the vehicle computer."**

**11. "infotainment system"**

| **"infotainment system"**<br>('297 Patent, Claims 1, 4–6, 8–9, 12–15, 17, 19) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | "a system providing media and/or multimedia content" |

Dkt. No. 83, Ex. B at 11; *id.*, Ex. C at 9; Dkt. No. 146, Ex. A at 34.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "system that provides information and entertainment."

(a) The Parties' Positions

Plaintiff argues that "the word 'infotainment' is a combination of 'information' and 'entertainment,' and a POSITA would not limit the term to media playback or multimedia output alone as in Defendants' proposal." Dkt. No. 127 at 16. Plaintiff also argues that "a construction confined to media-only functionality would therefore exclude disclosed embodiments, contrary to basic claim construction principles." *Id.* at 17 (citation omitted).

Defendants respond that "AutoConnect's interpretation is at odds with the specification, which makes clear that 'infotainment' is not limited to the vehicle context, and includes infotainment systems for homes and buildings." Dkt. No. 134 at 14 (citations omitted).

Plaintiff replies that it "does not object to applying the plain and ordinary meaning of 'infotainment system' without imposing an in-vehicle limitation on the term itself." Dkt. No. 141 at 5.

At the January 29, 2026 hearing, the parties presented no oral arguments and instead rested on their briefing.

(b) Analysis

Claim 1 of the '297 Patent recites (emphasis added):

> 1. A method, comprising:
>
> detecting a user profile associated with a user, the user profile having infotainment information stored therein;
>
> detecting *at least one infotainment system* associated with the user; and
>
> determining to adjust a configuration of *the at least one infotainment system* based at least partially on the infotainment information in the user profile, wherein determining to adjust the configuration further comprises:
>
> determining an access priority of the user; and
>
> determining whether the access priority of the user allows for the adjustment to the configuration of *the at least one infotainment system*, wherein determining whether the access priority of the user allows for the adjustment further comprises:
>
> determining a second access priority of a second user associated with *the infotainment system*; and
>
> comparing the access priority of the user to the second access priority of the second user, wherein the adjustment is allowed when the access priority of the user is greater than the second access priority of the second user, and wherein the adjustment is prevented when the access priority of the user is less than the second access priority of the second user.

Plaintiff cites disclosure in the specification regarding "information-related" features (Dkt. No. 127 at 16):

> An embodiment of a vehicle control environment 300 including a vehicle control system 204 may be as shown in FIG. 3. Beyond the vehicle control system 204, the vehicle control environment 300 can include one or more of, but is not limited to, a power source and/or power control module 316, a data storage module 320, user interface(s)/input interface(s) 324, vehicle subsystems 328, user interaction subsystems 332, Global Positioning System (GPS)/Navigation subsystems 336, sensor(s) and/or sensor subsystems 340, communication subsystems 344, media subsystems 348, and/or device interaction subsystems 352. The subsystems, modules, components, etc. 316-352 may include hardware, software, firmware, computer readable media, displays, input devices, output devices, etc. or combinations thereof. The system, subsystems, modules, components, etc. 204, 316-352 may communicate over a network or bus 356. This communication bus 356 may be bidirectional and perform data communications using any known or

> future-developed standard or protocol. An example of the communication bus 356 may be as described in conjunction with FIG. 4.

’297 Patent at 20:22–41.

Because Plaintiff no longer proposes interpreting this term as being limited to vehicles (Dkt. No. 141 at 5), and because Defendants “do[] not oppose a construction that incorporates the ‘informational capabilities’ aspect of AutoConnect’s interpretation of the plain and ordinary meaning” (Dkt. No. 134 at 15 n.3), the Court hereby construes “infotainment system” to mean **“system that provides information and entertainment.”**

**12. “cloud”**

| **“cloud”**<br>(’034 Patent, Claims 7, 17;<br>’186 Patent, Claims 7, 14;<br>’560 Patent, Claims 11–13, 15–16;<br>’764 Patent, Claim 8;<br>’243 Patent, Claims 2, 12) | |
|---|---|
| **Plaintiff’s Proposed Construction** | **Defendants’ Proposed Construction** |
| “remote services, including storage and applications, that are delivered over a public wide-area network, such as the Internet” | “Cloud” should have its plain and ordinary meaning in the context of cloud computing. |

Dkt. No. 83, Ex. B at 12; *id.*, Ex. C at 2; Dkt. No. 146, Ex. A at 39–40.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: “remote services, including storage and applications, that are delivered over a public network or a private network.”

(a) The Parties’ Positions

Plaintiff argues:

> Although “cloud” may be a familiar term to laypersons, its technical meaning in the context of cloud computing likely differs from what a juror may intuitively understand. The term has a well-understood meaning to a POSITA in the context

> of the patents and refers specifically to cloud computing infrastructure—remote computing resources that provide storage, applications, and services over a public wide-area network such as the Internet. The difference between the technical and colloquial understandings makes construction appropriate to avoid juror confusion and to ensure the term is applied consistently with the intrinsic record.

Dkt. No. 127 at 17 (citation omitted). For example, Plaintiff submits that "Claims 2 and 12 of the '243 distinguish between a 'cloud server' and a 'remote server,' reinforcing that the cloud is a distributed computing environment, not merely any off-vehicle server." *Id.* at 18.

Defendants respond that "AutoConnect fails . . . to justify its position that a layperson's understanding would differ from the proper technical definition." Dkt. No. 134 at 16.

Plaintiff replies that "the intrinsic record confirms that 'cloud' is used in its technical sense, not as a synonym for any remote server," and "the specification repeatedly describes the cloud as providing access to further computing capabilities or storage outside the vehicle, as supporting data exchange across vehicles and locations, and as being associated with Internet or wide-area connectivity . . . ." Dkt. No. 141 at 5–6.

At the January 29, 2026 hearing, the parties presented oral arguments as to this term.

(b) Analysis

As a threshold matter, Defendants argue that Plaintiff inconsistently proposes a construction that refers to "remote services" while also characterizing its construction as referring to "cloud computing infrastructure." Dkt. No. 134 at 16. Plaintiff replies: "The references to 'remote services' and to 'cloud computing infrastructure' describe the same technical concept. Cloud computing involves remote computing resources that provide services—such as storage and applications—to users." Dkt. No. 141 at 5. Plaintiff's proposal of "remote services" thus reflects its position, and Plaintiff's reference to "cloud computing infrastructure" does not give rise to any internal inconsistency in Plaintiff's arguments.

The parties dispute whether a "cloud" must involve "a public wide-area network, such as the Internet," or could instead be implemented in a private network. The '186 Patent discloses:

> The vehicle control system 204 may communicate through the communication network 224 to a server 228 that may be located in a facility that is not within physical proximity to the vehicle 104. Thus, *the server 228 may represent a cloud computing system or cloud storage* that allows the vehicle control system 204 to either gain access to further computing capabilities or to storage at a location outside of the vehicle 104. The server 228 can include a computer processor and memory and be similar to any computing system as understood to one skilled in the art.
>
> * * * The stored data 232, being stored in a cloud or in a distant facility, may be exchanged among vehicles 104 or may be used by a user 216 in different locations or with different vehicles 104.

'186 Patent at 26:6–15 & 26:22–25 (emphasis added). This disclosure regarding "server 228" does not limit the server 228, or the term "cloud," to using a public network such as the Internet, and Plaintiff does not otherwise persuasively support its proposal in this regard with the claims, the specification, or any extrinsic technical definition of "cloud." References to "cloud/Internet" and "Internet resources (e.g., cloud storage, user accounts)" do not amount to any lexicography and do not warrant a narrow reading of "cloud." *See* '186 Patent at 32:5 ("cloud/Internet") & 47:58–62 ("Internet resources (e.g., cloud storage . . ."). The opinions of Plaintiff's expert in this regard are also unpersuasive. *See* Dkt. No. 127, Ex. N, Oct. 28, 2025 T. Williams Decl. ¶¶ 95–98. To the extent that the specification discloses embodiments in which a "cloud" is the Internet, this is a feature of particular disclosed embodiments that should not be imported into the claims. *See Phillips*, 415 F.3d at 1323.

Also, although terms of unrelated patents are construed separately, Defendants' position is reinforced by a decision of the Court of Appeals for the Federal Circuit finding that a "network service providers" term was not limited to "those providing access to general-purpose public

networks." *See Smartmetric Inc. v. Am. Express Co.*, Nos. 2011–1473, 2011–1497, 476 F. App'x 742, 745 (Fed. Cir. Apr. 11, 2012).

The Court therefore hereby expressly rejects Plaintiff's proposed construction. Nonetheless, "some construction of the disputed claim language will assist the jury to understand the claims." *TQP Dev.*, 2012 WL 1940849, at *2.

Finally, at the January 29, 2026 hearing, Plaintiff argued that its concern is not so much whether a "cloud" must be "public" but rather that a "cloud" must exist independent of a vehicle and must persist beyond a particular driving session. In particular, Plaintiff argued that a Bluetooth connection set up for a particular driving session is not a "cloud." In response, Defendants agreed that a connection between a user device and a vehicle is not a "cloud." Because the parties agree on this aspect of the term "cloud," the Court need not include any language to that effect in the Court's construction. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.")

The Court accordingly hereby construes "cloud" to mean **"remote services, including storage and applications, that are delivered over a public network or a private network."**

**13. "refreshing, by the microprocessor executing a microprocessor executable desktop manager"**

| **"refreshing, by the microprocessor executing a microprocessor executable desktop manager"**<br>('153 Patent, Claim 1)<br><br>**"a microprocessor executable desktop manager"**<br>('153 Patent, Claims 1, 12) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a" means "one or more."<br><br>"desktop manager" should be construed as "a program that manages a desktop-style graphical user interface, including graphical elements such as icons, windows, or panels"<br><br>Plain and ordinary meaning as to the remainder of the term. | "the microprocessor" that executes "a microprocessor executable device discovery daemon" must be the same microprocessor that executes "a microprocessor executable desktop manager" |

Dkt. No. 83, Ex. B at 14; *id.*, Ex. C at 3; Dkt. No. 146, Ex. A at 43.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary constructions: "Claim 1: the recital of 'refreshing, by the microprocessor executing a microprocessor executable desktop manager' refers to the same microprocessor that is recited as 'executing a microprocessor executable device daemon'"; and "Claim 12: Plain meaning."

(a) The Parties' Positions

Plaintiff argues: "Defendants' proposal incorrectly mandates that the same physical processor execute both the device discovery daemon and the desktop manager. All that the claims require is that the 'microprocessor' entity—whether implemented as one processor or as multiple processors operating together—performs the steps attributed to it." Dkt. No. 127 at 19.

Defendants respond that "it is well established that when a patentee drafts his claim to refer to the same component repeatedly in a claim, the claim requires the same component to perform the recited limitation." Dkt. No. 134 at 17 (citation omitted). Defendants also argue, for example, that "whether the specification discloses other embodiments, the claim is drafted to require a single processor executing functionality consistent with the embodiment in Fig. 10 where processor 304 runs both a software discovery daemon 1020 and desktop manager 1012, consistent with the scope of the claim." *Id.* at 19.

Plaintiff replies that the claim "nowhere requires that the recited microprocessor execute either program, much less both," and "the phrase 'microprocessor executable' describes software capability, not execution by a specific processor." Dkt. No. 141 at 6. Plaintiff urges that "nothing in claim 1 requires that the same physical processor execute all recited functions." *Id.* at 7.

At the January 29, 2026 hearing, the parties presented oral arguments as to this term (together with the "signal processor" terms addressed above). Plaintiff requested judicial correction to replace "the" with "a," arguing that Claim 1 on its face refers to two different microprocessors (a "microprocessor executing a microprocessor executable device discovery daemon" and a "microprocessor executing a microprocessor executable desktop manager"). Plaintiff also argued that the specification refers to "distributed processing." Defendants responded that Plaintiff did not brief any argument regarding judicial correction. Defendants argued that no error is apparent, and Defendants also argued that the specification contains no disclosure of using a different microprocessor.

<u>(b) Analysis</u>

Claim 1 of the '153 Patent recites (emphasis added):

1. A method, comprising:

> discovering, by *a microprocessor executing a microprocessor executable device discovery daemon*, one or more communication devices connected wirelessly to a network and/or communication subsystem of a vehicle;
>
> for each of the discovered one or more communication devices, populating, by *the microprocessor executing the device discovery daemon*, system data with device information and capabilities; and
>
> *refreshing, by the microprocessor executing a microprocessor executable desktop manager,* graphical elements of a graphical display of the vehicle to reflect the discovered one or more communication devices.

The recital of "refreshing, by *the microprocessor* executing a microprocessor executable desktop manager" refers to the same microprocessor that is recited in the claim as "a microprocessor executing a microprocessor executable device discovery daemon." This is true even though the indefinite article, "a," encompasses "one or more." *See In re Varma*, 816 F.3d at 1363 ("For a dog owner to have 'a dog that rolls over and fetches sticks,' it does not suffice that he have two dogs, each able to perform just one of the tasks."); *see also Salazar*, 64 F.4th at 1317 ("We agree with the district court that while the claim term 'a microprocessor' does not require there be only one microprocessor, the subsequent limitations referring back to 'said microprocessor' require that at least one microprocessor be capable of performing each of the claimed functions. This approach is entirely consistent with our precedent."); *id.* at 1315–18.

Plaintiff's reliance on disclosure of multi-processor embodiments (Dkt. No. 127 at 20 (citing '153 Patent at 30:67–31:3); Dkt. No. 141 at 7 (citing '153 Patent at 123:9–20)) does not override the explicit claim language. Plaintiff's late request for judicial correction (raised for the first time at the January 29, 2026 hearing), even if considered, is also unpersuasive. *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (judicial correction of an error in a patent may be available "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims").

Claim 12 of the '153 Patent, by contrast, recites (emphasis added):

> 12. A vehicle, comprising:
> a microprocessor;
> a network and/or communication subsystem of a vehicle;
> a microprocessor executable device discovery daemon stored in a computer readable medium and configured to discover one or more communication devices connected wirelessly to the network and/or communication subsystem of a vehicle and, for each of the discovered one or more communication device, populate system data with device information and capabilities; and
> *a microprocessor executable desktop manager* stored in the computer readable medium and configured to refresh graphical elements of a graphical display of the vehicle to reflect the discovered one or more communication devices.

Thus, unlike Claim 1, Claim 12 recites "a microprocessor" without reciting the microprocessor executing a device discovery daemon or executing a desktop manager.

As for "desktop manager," the parties have reached an agreed-upon construction, which is set forth in Appendix A to this Claim Construction Order.

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| <u>Term</u> | <u>Construction</u> |
|---|---|
| "refreshing, by the microprocessor executing a microprocessor executable desktop manager"<br><br>('153 Patent, Claim 1) | **The recital of "refreshing, by the microprocessor executing a microprocessor executable desktop manager" refers to the same microprocessor that is recited as "executing a microprocessor executable device discovery daemon."** |
| "a microprocessor executable desktop manager"<br><br>('153 Patent, Claims 1, 12) | **Plain meaning** |

**14. "unified desktop"**

| **"unified desktop"**<br>('034 Patent, Claim 14) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a graphical user environment in which multiple displays are coordinated to share and present common information in an integrated manner, such that the displays together form a unified interface rather than unrelated or merely duplicative displays" | Indefinite. |

Dkt. No. 83, Ex. B at 15; *id.*, Ex. C at 2; Dkt. No. 146, Ex. A at 44–45.

(a) The Parties' Positions

Plaintiff argues that "the phrase 'unified desktop' has an established meaning in the field of computer systems and graphical user interfaces—it is a graphical environment in which multiple displays operate together to present shared information as a single, integrated interface, rather than as isolated or duplicative screens." Dkt. No. 127 at 21 (citation omitted). Plaintiff also argues that "the term is not unclear because it does not specify which displays participate in the unified desktop." *Id.* at 22.

Defendants respond that "neither AutoConnect nor its expert found any evidence to support the proposition that the phrase 'unified desktop' has an established meaning in the art." Dkt. No. 134 at 21. Defendants argue: "A 'unified desktop' might refer to unifying desktops between a mobile device and PC, or between a mobile device and another mobile device, or between all mobile devices of a brand, or between any of those devices and a vehicle screen, or something else. Each of these yields a different claim scope to a POSITA, but neither the claim, the specification, nor the prosecution history offer guidance as to which is proper." *Id.* (citation omitted).

Plaintiff replies that "the specification squarely situates the 'unified desktop' in a vehicle ecosystem comprising multiple displays and associated devices," and "the '034 patent provides the relevant universe of displays." Dkt. No. 141 at 7. Plaintiff argues that "a POSITA would understand that 'unified desktop,' in the vehicle context, refers to a graphical user environment in which the vehicle's multiple displays—together with connected displays of associated devices—operate as one coordinated interface for presenting and sharing information, rather than unrelated or merely duplicative screens." *Id.* at 8 (citation omitted).

At the January 29, 2026 hearing, the parties presented oral arguments as to this term. Plaintiff submitted that, in its proposal of "a graphical user environment . . .," "environment" is broader than "interface" because "environment" encompasses using multiple devices. Plaintiff argued that a "unified desktop" unifies a vehicle's desktop with another desktop.

(b) Analysis

Claim 14 of the '034 Patent recites (emphasis added):

> 14. A non-transitory computer readable medium having stored thereon computer-executable instructions, the computer executable instructions causing a processor to execute a method for providing a *unified desktop*, the computer-executable instructions comprising:
>
> instructions to receive sensor data from one or more sensors;
>
> based on the received sensor data, instructions to automatically determine if a person is within a zone of a vehicle;
>
> based on the received sensor data, instructions to automatically identify the person;
>
> instructions to retrieve one or more settings associated with the identified person; and
>
> instructions to automatically configure the vehicle according to the retrieved settings.

The Summary section of the specification states:

> A series of devices associated with a vehicle along with other devices can form a complete and familiar user experience. In particular, the devices, applications, interfaces, hardware, and software may combine to form a user-friendly

> environment while traveling or otherwise moving from one location to another and/or when a vehicle is at rest.

'034 Patent at 3:21–26. Further, the specification describes the word "desktop" as follows:

> The term "desktop," as used herein, refers to a metaphor used to portray systems. A desktop is generally considered a "surface" that typically includes pictures, called icons, widgets, folders, etc. that can activate show [*sic*] applications, windows, cabinets, files, folders, documents, and other graphical items. The icons are generally selectable to initiate a task through user interface interaction to allow a user to execute applications or conduct other operations.

'034 Patent at 5:52–59. This description provided by the specification is consistent with the context in which "unified desktop" appears in the claim, particularly as to the recitals of "computer-executable instructions," "settings," and "configur[ing]" a "vehicle."

The only instance of "unified" in this patent, however, is in the preamble of above-reproduced Claim 1, and nothing in the body of the claim pertains to the nature of a desktop. This claim language is unclear because, as Defendants argue, the claim does not specify what desktops are being "unified" or what is meant by desktops being "unified." Dkt. No. 134 at 20–21. Although "breadth is not indefiniteness," *BASF*, 875 F.3d at 1367, here the meaning of "unified" is left to "depend[] on the unpredictable vagaries of any one person's opinion." *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). Indeed, Plaintiff's expert testified as to having "no opinion" as to whether the "desktop 666" disclosed in the specification is a "unified desktop." Dkt. No. 134, Ex. 3, Nov. 25, 2025 T. Williams dep. at 145:16–146:10; *see* '034 Patent at 16:21 & Fig. 6. Plaintiff's expert's reliance on a general-purpose dictionary definition of "unified" as meaning "brought together as one" is likewise unpersuasive. Dkt. No. 127, Ex. N, Oct. 28, 2025 T. Williams Decl. ¶ 104 (citing "https://www.merriam-webster.com/dictionary/unified"); *see id.* at ¶ 105.

The Court accordingly hereby finds that "unified desktop" is **indefinite**.

**15. "and/or"**

| **"and/or"**<br>('697 Patent, Claims 1, 3–5, 8, 11–12, 15, 18–19;<br>'186 Patent, Claims 1, 2, 6, 8–9, 12–13, 15, 20;<br>'153 Patent, Claims 1, 2, 4, 7–9, 10, 12, 15, 18–21;<br>'786 Patent, Claims 1, 2, 5, 8;<br>'239 Patent, Claims 1, 2, 5, 7–9, 12, 15–16, 19, 21–22, 30, 33, 35;<br>'367 Patent, Claims 1, 8–10, 15–17, 22–23, 27–29;<br>'100 Patent, Claims 1–3, 9–11, 17–19) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | Indefinite. |

Dkt. No. 83, Ex. B at 16; *id.*, Ex. C at 3; Dkt. No. 146, Ex. A at 45.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [NOTE: not indefinite]."

<u>(a) The Parties' Positions</u>

Plaintiff argues that "[t]he term has a well-established plain and ordinary meaning—denoting inclusive alternatives—that is readily understood by POSITAs and laypeople alike." Dkt. No. 127 at 22 (citation omitted).

Defendants respond that "what makes 'and/or' indefinite in the Asserted Patents is that, here, the patentee acted as his own lexicographer, specifically and explicitly defining 'and/or' in the specification to require 'both conjunctive and disjunctive' scope," and "this definition, which the patentee chose, results in a meaning that is inherently contradictory . . . ." Dkt. No. 134 at 22 (citing '697 Patent at 15:58–65).) Defendants argue that "because the claims' usage of 'and/or' injects a swirl of confusing multiplicity into the proper scope of the claims, they are indefinite." *Id.* at 24.

Plaintiff replies that "the full disclosure makes clear that this phrase does not describe the logical contradiction suggested by Defendants." Dkt. No. 141 at 8.

At the January 29, 2026 hearing, the parties presented oral arguments as to this term (together with arguments as to "one or more," which is a disputed term addressed below). The parties reiterated the arguments set forth in their briefing.

(b) Analysis

The portion of the specification cited by Defendants discloses:

> The phrases "at least one," "one or more," and "and/or" are open-ended expressions that are *both conjunctive and disjunctive* in operation. For example, each of the expressions "at least one of A, B and C," "at least one of A, B, or C," "one or more of A, B, and C," "one or more of A, B, or C" and "A, B, and/or C" means A alone, B alone, C alone, A and B together, A and C together, B and C together, or A, B and C together.

'697 Patent at 15:58–65 (emphasis added).

Defendants argue that defining "and/or" as being "both conjunctive and disjunctive" is "inherently contradictory." Dkt. No. 134 at 22.

A fair reading of this disclosure, however, is that defining the terms at issue as "open-ended expressions that are both conjunctive and disjunctive in operation" ('697 Patent at 15:58–65) means that both the conjunctive and the disjunctive are within the scope of the terms. This is consistent with the examples set forth by this disclosure that "'A, B, and/or C' means A alone, B alone, C alone, A and B together, A and C together, B and C together, *or* A, B and C together." '697 Patent at 15:58–65 (emphasis added).

Defendants cite a decision by the District of Delaware stating, as to the disclosure here at issue, that:

> Because AutoConnect identified "and/or" as both conjunctive and disjunctive in operation, AutoConnect has defined "and/or" to mean "x or y *and* x and y."

> * * * Plaintiff's use of "and/or" as both conjunctive and disjunctive is nonsensical because a limitation cannot have simultaneously A and B and C *and* A or B or C. The CAFC [(Court of Appeals for the Federal Circuit)] has held that "self-contradictory language of [a] limitation renders the claims indefinite." *WSOU Invs. LLC v. Google LLC*, Nos. 2022-1066; 2022-1067, 2023 WL 6210607, at *7 (Fed. Cir. Sept. 25, 2023) (holding that the phrase "second part in between the first part and the second part" was indefinite because it was nonsensical).

*AutoConnect Holdings LLC v. Ford Motor Co.*, No. 1:24-cv-01327, Dkt. No. 24, slip op. at 8 (D. Del. Sept. 24, 2025) (Choe-Groves, J., sitting by designation) ("Delaware Decision").

This portion of the Delaware Decision, however, addressed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and found that "the argument raised by Defendant is quintessentially one of claim construction." *Id.* at 10. The court denied the motion as to indefiniteness "because a determination on indefiniteness under 35 U.S.C. § 112 is not appropriate at the motion to dismiss stage . . . ." *Id.* Thus, the court did not make any finding on indefiniteness. The above-reproduced excerpt of the Delaware Decision therefore was not part of the Court's holding in denying the motion. The various related assertions of indefiniteness by Defendants, as to how "and/or" is recited in various claims, are likewise unpersuasive. *See* Dkt. No. 134 at 23–24.

The Court therefore hereby expressly rejects Defendants' indefiniteness arguments as to "and/or." Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "and/or" to have its **plain meaning**.

**16. "one or more"**

| **"one or more"**<br>('697 Patent, Claims 4, 11, 18;<br>'186 Patent, Claims 1, 4, 6, 8, 11–13, 15, 18, 20;<br>'153 Patent, Claims 1–3, 7, 9, 12, 14, 18, 20;<br>'786 Patent, Claims 2, 8, 23, 24, 27;<br>'239 Patent, Claims 1, 5, 7–8, 12, 15, 19, 21, 22, 33, 35;<br>'367 Patent, Claims 1, 8–10, 15–17, 22–23, 27–29;<br>'100 Patent, Claims 1–2, 7, 9–10, 15, 17–18, 23) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | Indefinite. |

Dkt. No. 83, Ex. B at 18; *id.*, Ex. C at 3; Dkt. No. 146, Ex. A at 46.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [NOTE: not indefinite]."

(a) The Parties' Positions

Plaintiff argues that "the phrase 'one or more' is a commonplace drafting convention with a plain and ordinary meaning that is readily understood by a POSITA, "and "it refers to at least one of the recited elements, while permitting more than one." Dkt. No. 127 at 24 (citation omitted).

Defendants respond that "the use of the term 'one or more' fails for all of the same reasons as 'and/or' described above," and "to further complicate the issue, many of the asserted claims include *both* 'and/or' and 'one or more,' further causing confusion as to their meaning." Dkt. No. 134 at 24–25.

Plaintiff replies: "Defendants' attack on the phrase 'one or more' repackages the same flawed premise underlying their 'and/or' argument and the isolated phrase 'both conjunctive and disjunctive in operation.' That reading again ignores the examples immediately thereafter that explain how the phrase should be applied." Dkt. No. 141 at 9 (citing '697 Patent at 15:58–65).

Plaintiff argues: "That some alternatives may not apply together in a given implementation does not create ambiguity or indefiniteness; it simply reflects the breadth of the claims." *Id.* at 9.

At the January 29, 2026 hearing, the parties presented oral arguments as to this term (together with arguments as to "and/or," which is a disputed term addressed above). The parties reiterated the arguments set forth in their briefing.

(b) Analysis

Defendants incorporate their arguments as to the term "and/or," and the Court rejects those arguments as discussed above. Defendants' assertions of indefiniteness as to "one or more" are therefore rejected for the same reasons. The various assertions of indefiniteness by Defendants, as to how "one or more" is recited in various claims, are likewise unpersuasive. *See* Dkt. No. 134 at 24–25. For example, Defendants argue that some of the features recited by Claim 4 of the '697 Patent are mutually exclusive, but "one or more" does not require all recited features to be mutually present.

The Court therefore hereby expressly rejects Defendants' indefiniteness arguments as to "one or more." Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "one or more" to have its **plain meaning**.

**17. "not being based on or in response to a preceding request of the selected vehicle occupant"**

| **"not being based on or in response to a preceding request of the selected vehicle occupant"** ('239 Patent, Claims 1, 8, 15) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning. | Indefinite. |

Dkt. No. 83, Ex. B at 19; *id.*, Ex. C at 7; Dkt. No. 146, Ex. A at 47.

Shortly before the start of the January 29, 2026 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [NOTE: not indefinite]."

(a) The Parties' Positions

Plaintiff argues that "a POSITA would understand 'preceding request' to mean a user command for the specific assistance at issue, not general setup or configuration interactions." Dkt. No. 127 at 26 (citation omitted). Plaintiff also argues that "a contrary reading—that any past user interaction contributing to the occupant's 'persona' qualifies as a 'preceding request'—would be inconsistent with the claim language and the intrinsic record." *Id.* at 26–27. Plaintiff submits that "the persona operates as a data repository, not as a directive instructing the system to perform a specific act." Dkt. No. 127 at 27 (citing '239 Patent at 12:2–35).

Defendants respond that this term is contradictory because "the claims require that the type of assistance provided is determined 'based on the persona of the selected vehicle occupant,'" which in turn is based on preceding user requests. Dkt. No. 134 at 26 (citing '239 Patent at 81:58–82:1 & 125:5–9). Moreover, Defendants argue that the disputed term lacks objective boundaries. Dkt. No. 134 at 26 (citations omitted).

Plaintiff replies that "the claim language and specification confirm that 'a preceding request' refers to the user command that would otherwise have triggered the specific assistance at issue, not any prior user interaction in the abstract." Dkt. No. 141 at 9. Plaintiff argues: "A POSITA would readily distinguish between background data used to build a persona and a user command that causally triggers a specific assistance action. The claims prohibit the latter, not the former." *Id.* at 10. Plaintiff also argues that "Defendants' 'objective boundary' argument likewise fails because it rests on a misframing of the limitation as a timing rule," and "the claim does not

ask *when* a request occurred; it asks whether the assistance is *caused by* or *responsive to* a request at all." *Id.*

At the January 29, 2026 hearing, the parties presented oral arguments as to this term. Plaintiff argued that this term is a carve-out that refers to any assistance that is presently being requested by the vehicle occupant. Defendants responded that "preceding" refers to anything that came before.

(b) Analysis

Claim 1 of the '239 Patent recites (emphasis added):

> 1. A method, comprising:
>
> maintaining, by a microprocessor executable profile identification module, a persona of a selected vehicle occupant, wherein the persona comprises one or more of bioinformatics, medical information, driving history, personal information, private information, travel information, and Internet browsing history and/or browsed content;
>
> determining, by a microprocessor executable vehicle control system, vehicle-related information, wherein vehicle related information comprises one or more of vehicle context, state, external surroundings, location, past, current, and/or intended path of travel, waypoint, and destination; and
>
> *based on the persona of the selected vehicle occupant and the vehicle-related information*, determining, by the microprocessor executable vehicle control system, a type of assistance to provide the selected vehicle occupant, the type of assistance *not being based on or in response to a preceding request of the selected vehicle occupant*;
>
> performing, by the microprocessor executable vehicle control system, an action assisting the selected vehicle occupant, the action being one or more of providing a suggestion or recommendation to the selected vehicle occupant, providing a reminder to the selected vehicle occupant, scheduling an activity involving the selected vehicle occupant, purchasing an item on line for the selected vehicle occupant, adding an entry into the selected vehicle occupant's electronic calendar, providing a notification to the selected vehicle occupant regarding an incoming message, call or action of a person, and/or sending a message to a person at a waypoint or destination of the vehicle regarding an arrival time of the vehicle.

The specification discloses, for example:

> The vehicle control system 204 can act as an artificially intelligent assistant that, based on an awareness of a selected vehicle occupant's persona (e.g., his or her physical, psychological, mental and other characteristics, needs, desires, behavior,

> personality, goals, habits, biometric information, likes or interests, dislikes, preferences, and the like) and/or the persona of family and friends of the selected vehicle occupant, proactively (without a preceding request of the selected vehicle occupant) provides feedback, suggestions, reminders, recommendations, and/or other types of assistance to the selected vehicle occupant. For example, the vehicle control system 204 can characterize, define, and/or analyze a person's persona based on profile data 252 of the person, device data 220 associated with the person, stored data 232, system data 208, and information related to the person as collected by vehicle interior and exterior sensors. In other words, a vehicle occupant's persona can include the information in one or more of the profile data 252 of the person, device data 220 associated with the person, stored data 232, system data 208, and information related to the person as collected by vehicle interior and exterior sensors. Based on the persona of selected persona and vehicle-related information (such as vehicle context, state, external surroundings, location, past, current, and/or intended path of travel, waypoints, and destination of the vehicle) can proactively provide suggestions, reminders, recommendations and/or other types of assistance to the selected vehicle occupant.

'239 Patent at 81:48–82:7; *see id.* at 12:32–35 ("The persona can include one or more of bioinformatics, medical information, driving history, personal information, private information, travel information, and Internet browsing history and/or browsed content.").

Defendants argue that Claim 1 is indefinite because the recited "persona," which the "determining . . . a type of assistance" is "based on," includes information derived from preceding requests. Dkt. No. 134 at 26. Defendants argue that this is inconsistent with the claim also reciting that "the type of assistance not being based on or in response to a preceding request of the selected vehicle occupant." *Id.* Claims 8 and 15 are similar in this regard.

Plaintiff persuasively argues, however, that "the persona operates as a data repository, not as a directive instructing the system to perform a specific act." Dkt. No. 127 at 27. Plaintiff also persuasively argues that "persona data may derive from past user behavior, but those historical interactions do not convert an autonomous system decision into one performed because of a user request." *Id.* The opinions of Defendants' expert to the contrary are unpersuasive. *See* Dkt. No.

134, Ex. 1, Oct. 28, 2025 D. Williams Decl. ¶¶ 86–88; *see also id.* at ¶¶ 79–85. Instead, the opinion of Plaintiff's expert is persuasive:

> 121. A POSITA would understand that prior setup steps, such as initially pairing a device, logging in, or enabling automatic assistance, merely establish system readiness or contextual parameters. Those are not "preceding requests" for the later act of assistance, even if they indirectly enable it. The claim therefore distinguishes between (1) assistance initiated automatically by the system using contextual information and (2) assistance provided in direct response to a specific, proximate user command for that action. This distinction, not the absolute passage of time, defines the scope of the limitation and would be readily understood by a POSITA.

*Id.*, Ex. N, T. Williams Decl. ¶ 121; *see id.* at ¶¶ 119–20.

Finally, Defendants argue that these claims are indefinite because there are no objective boundaries for "preceding," but this word is reasonably clear on its face and in the context of surrounding claim language. The opinion of Defendants' expert in this regard is unpersuasive. *See* Dkt. No. 134, Ex. 1, Oct. 28, 2025 D. Williams Decl. ¶¶ 81–85. The deposition testimony of Plaintiff's expert regarding lengths of time, cited by Defendants (Dkt. No. 134 at 26–27; *see id.*, Ex. 3, T. Williams dep. at 119:12–120:15 & 121:6–15), does not give rise to any indefiniteness because the claim language itself is reasonably clear. Further, the phrase "based on or *in response to*" underscores that the claims recite a *causal* requirement, which weighs further against interpreting "preceding" as referring to any particular *length* of time. Any remaining dispute pertains to factual questions regarding infringement. *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("the resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998)).

The Court therefore hereby expressly rejects Defendants' indefiniteness arguments as to "one or more." Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "not being based on or in response to a preceding request of the selected vehicle occupant" to have its **plain meaning**.

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 11th day of February, 2026.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| Term | Agreed Construction |
|---|---|
| “selected”<br><br>(’697 Patent, Claims 4, 6, 11, 13, 18, 20;<br>’786 Patent, Claims 1, 2, 3, 6, 7, 16, 23, 24, 25, 28;<br>’153 Patent, Claims 7, 9, 18, 20) | Plain and ordinary meaning |
| “desktop manager”<br><br>(’153 Patent, Claims 1, 12) | “a program that manages a desktop-style graphical user interface, including graphical elements such as icons, windows, or panels” |

Dkt. No. 134 at 1; Dkt. No. 146, Ex. A at 43.